**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| SUSAN SCHARPF and | No. _____ |
| ANTHONY D'ARMIENTO, | **CLASS ACTION COMPLAINT** |
| on behalf of themselves and all others similarly situated, | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| GENERAL DYNAMICS CORP., | |
| BATH IRON WORKS CORP., | |
| ELECTRIC BOAT CORP., | |
| GENERAL DYNAMICS INFORMATION TECHNOLOGY, INC., | |
| HUNTINGTON INGALLS INDUSTRIES, INC., | |
| NEWPORT NEWS SHIPBUILDING AND DRY DOCK CO., | |
| INGALLS SHIPBUILDING, INC., | |
| HII MISSION TECHNOLOGIES CORP., | |
| HII FLEET SUPPORT GROUP LLC, | |
| MARINETTE MARINE CORPORATION, | |
| BOLLINGER SHIPYARDS, LLC, | |
| GIBBS & COX, INC., | |
| SERCO, INC. | |

BMT INTERNATIONAL, INC.

TECHNOLOGY FINANCING, INC.

CACI INTERNATIONAL INC.,

THE COLUMBIA GROUP, INC.

THOR SOLUTIONS, LLC

TRIDENTIS, LLC, and

FASTSTREAM RECRUITMENT LTD.,

                                    Defendants.

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ...................................................................................1

II.  JURISDICTION AND VENUE.............................................................7

III. PARTIES ...............................................................................................8

    A.   Plaintiffs ......................................................................................8

    B.   Defendants ...................................................................................8

        1.   Shipbuilder Defendants ......................................................9

        2.   Engineering Consultancy Defendants ...............................17

        3.   Faststream Recruitment Ltd................................................24

IV.  AGENTS AND CO-CONSPIRATORS .................................................25

V.   INTERSTATE COMMERCE ................................................................26

VI.  FACTUAL ALLEGATIONS.................................................................26

    A.   Background....................................................................................26

        1.   The U.S. Naval Design and Shipbuilding Industries..............26

        2.   Naval Architects, Marine Engineers, and Associated
            Professionals ........................................................................28

        3.   Naval Engineering Employers ...............................................30

        4.   "Incestuous" Nature of the Naval Engineering Industry .........32

    B.   Defendants' No-Poach Conspiracy.................................................34

        1.   Participants in the No-Poach Conspiracy Directly Confirm
            Its Existence, Operation and Scope........................................35

        2.   Additional Evidence Affirms the No-Poach Conspiracy's
            Reach and Effects Throughout the Class Period......................40

    C.   Defendants Monitored and Enforced the No-Poach Agreement and
        its Goal of Compensation Suppression by Sharing Information
        Directly and through Third Parties .................................................47

    D.   Anticompetitive Effects and Injury Suffered by Class Members.........50

1.     Economic Theory Teaches That Defendants' No-Poach Conspiracy Had Anticompetitive Effects ................................................50

2.     Witnesses Confirm That the Conspiracy Had Anticompetitive Effects ................................................................51

VII.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS ................................................................................................55

     A.     Continuing Violation..........................................................55

     B.     Fraudulent Concealment ....................................................55

        1.     Defendants Concealed the Scope and Nature of Their Conspiracy .........................................................................56

        2.     Plaintiffs Failed to Discover the Conspiracy Despite Due Diligence .........................................................................62

VIII.    CLASS ACTION ALLEGATIONS...............................................63

IX.    CAUSE OF ACTION ................................................................66

X.    PRAYER FOR RELIEF ............................................................67

XI.    JURY TRIAL DEMAND ..........................................................68

Plaintiffs Susan Scharpf and Anthony D'Armiento bring this action on behalf of themselves individually and on behalf of a class (the "Class," or "Class Members") consisting of all persons employed as naval architects and/or marine engineers in the United States by Defendants (excluding Defendant Faststream Recruitment Ltd.), their subsidiaries, or related entities from January 1, 2000, to such date as Defendants' unlawful conduct ceases (the "Class Period").

## I.   INTRODUCTION

1.     Naval architects and marine engineers (collectively, "naval engineers") design and build the nation's warships and other "public fleet" vessels. While some naval engineers work directly for the federal government, most are employed by a group of private contractors and consulting firms who are hired by the Navy, the Coast Guard, and other federal and state entities. Confidential witnesses have confirmed that, for *decades*, these companies and a close-knit, "incestuous" community of their executives and managers have maintained an illegal agreement not to actively recruit, or "poach," each other's employees. This unwritten "gentlemen's agreement" suppressed wages for naval engineers below competitive levels, depriving Plaintiffs and the Class of hundreds of millions of dollars in compensation.

2.     Naked "no-poach" agreements such as the one alleged in this complaint are unlawful *per se* under the nation's antitrust laws. The purpose and effect of such agreements is to cheat the highly skilled workers who design the most powerful military fleet in the world out of the competitive wages they deserve.

3.     Defendants include shipbuilders that produce military vessels large and small, specialized consulting firms, and a recruiting firm that sometimes serves these companies. The large ship builders—General Dynamics and Huntington Ingalls Industries—operate the only five shipyards in the country used to build large military vessels. The mid-size ship builders—Bollinger

- 1 -

Shipyards and Marinette Marine—operate shipyards focused on smaller military ships. The specialized engineering "consultancies"—Gibbs & Cox, JJMA/Serco, BMT Group, CSC/CACI, The Columbia Group, Thor Solutions, Tridentis, and a subsidiary business unit of Huntington Ingalls—help design, refit, and maintain nearly every ship in the U.S. fleet.[1] Behind closed doors, these consultants refer to themselves as the "Beltway Bandits." Most have offices along a single one-mile stretch of M Street Southeast in Washington, DC, next to the Washington Navy Yard; all have headquarters in northern Virginia, convenient to each other and the Pentagon. The final Defendant is Faststream Recruitment—a recruitment agency that occasionally helped Defendants recruit naval engineers from outside the conspiracy. According to a former employee, Faststream abided by the no-poach rules agreed to by the Defendants and facilitated unlawful information exchanges among the Defendants that helped them enforce their no-poach conspiracy.

4.     Many of Defendants' former executives and managers provided direct evidence of the conspiracy. Several former managers directly confirmed that they had a standing "gentlemen's agreement" not to poach naval engineers from other conspirators (using exactly those words). One industry veteran bluntly admitted that his firm did not "go after people at other companies." And a former insider from Huntington Ingalls said that the company maintained a "do not hire list"—a

---

[1] Over the course of the Class Period, five consultancy firms who participated in the unlawful conspiracy were purchased by larger businesses. Gibbs & Cox is owned by parent company Leidos, a diversified science and engineering contractor. Formerly independent consultancy John J. McMullen Associates changed hands several times before being acquired by Defendant Serco, also a large science and engineering contractor. The naval engineering unit of CSC is now owned by Defendant CACI, a diversified defense technology contractor. AMSEC LLC, formerly an independent consultancy, is now owned by Defendant Huntington Ingalls Industries, one of the two large U.S. shipbuilding contractors. And formerly independent consultancy M. Rosenblatt & Son was purchased by AMSEC early in the class period and later spun off in substantial part to Defendant The Columbia Group.

list of companies from which Huntington Ingalls would not poach naval engineers. Every Defendant has been tied to the no-poach agreement by at least one confidential witness.

***

5.      Plaintiffs and the Class Members are highly skilled professionals who work or worked for the Defendants as naval architects and marine engineers. Naval architects are responsible for naval vessels' design, including the form, structure, and stability of hulls. These responsibilities require specialized knowledge of hydrostatics, hydrodynamics, vessel motion physics, mechanics, strength of materials, and design of structures. Marine engineers design onboard ship systems, including those related to propulsion, power generation, air conditioning, ventilation, water distillation, cargo handling, steering, and fuel. Marine engineers include workers with some variation of the job title "marine engineer" as well as specialized electrical, HVAC, structural, and other engineers whose work focuses on marine applications.

6.      In addition to developing the technical skills and experience necessary to perform this highly specialized work, naval engineers generally must also possess at least a bachelor's degree in engineering (for many positions, from one of a handful of schools with specialized naval engineering programs), a security clearance, and U.S. citizenship. These requirements dramatically limit the pool of eligible candidates and should have given naval engineers significant bargaining power with Defendants. In other industries, similarly specialized requirements generate cottage industries of recruiters whose full-time job is to convince skilled workers to leave their employers to accept substantially higher salaries with competitors.

7.      In this industry, however, no naval engineering consultancy or major defense shipbuilder routinely recruits naval engineers from other firms. Instead, each firm primarily recruits recent college graduates with no work experience and, to some extent, recently discharged

military personnel. One executive, who first entered the industry in 1969 and worked his way into management over the next five decades, put it bluntly: "You didn't recruit people from [other] firms." That same executive reported that, in the event someone floated the possibility of recruiting from a competitor, the answer was predictable: "He works for [a competitor]; we can't do that." As a result, naval engineers generally spend their entire careers without being solicited by a rival firm, earning modest annual raises and salaries well below those of engineers with similar degrees of training and expertise in other industries.

8.      In a competitive labor market, this state of affairs would make no economic sense. Experience is valuable in naval engineering. Inexperienced recruits must be trained and supervised closely, and they lack the skill needed to anticipate and prevent problems. Military contracts are enormous prizes and experienced teams with good track records can help win this business. Military contracts also come with specialized performance requirements and specialized oversight bureaucracy, and experience with these requirements and processes is invaluable. Mistakes can be extremely expensive, leading to massive remedial work with little additional compensation or even jeopardizing present and future contracts. In a competitive market, these facts would give Defendants powerful incentives actively recruit experienced naval engineers and lure them with high compensation. In reality, however, that does not happen.

9.      The reason experienced naval engineers are not constantly courted by their employers' competitors is that the market for these workers has been plagued by a decades-long conspiracy among Defendants that has successfully stifled competition for talented engineers and suppressed compensation. Starting in at least 2000, and likely dating back to the 1980s, Defendants have adhered to an informal "gentlemen's agreement" among themselves not to recruit each other's naval engineers. This no-poach conspiracy imposed clear rules on its participants:

Defendants were prohibited from affirmatively recruiting from one another—with some going so far as maintaining "do not hire" lists—but were permitted to hire naval engineers who initiated contact. Consistent with these rules, one executive explained that, if a competitor "offered my guy a position, they'd call me and say, 'We didn't poach him.'"

10.     Defendants' no-poach arrangement caused a persistent shortage of qualified naval engineers. As one industry insider put it: "[T]here was so much more demand [for employees] than there was talent." In a competitive labor market, strong demand for a small pool of qualified workers invariably drives up compensation. The persistent shortage of qualified naval engineers, and Defendants' failure to respond to that shortage with substantial increases in compensation, is strong economic evidence of a conspiracy.

11.     The close knit, interdependent nature of the naval engineering industry facilitated Defendants' conspiracy. Defendants collectively employ fewer than 10,000 naval engineers nationwide, frequently work together on the same projects, and are geographically concentrated—primarily in the Washington, D.C./Northern Virginia metro area and the Norfolk/Newport News area, with additional pockets of concentrated employment around other major shipyards. Many Defendants maintain offices for senior managers practically side-by-side on the same street abutting the Washington Navy Yard. The "incestuous" relationships among industry managers enabled Defendants to monitor each other's hiring practices, reinforce the agreement in direct communications, and punish firms who violated the agreement. As one former project manager admitted, firms who recruit another firm's employees "don't stay around that long because companies don't want to work with them."

12.     Defendants concealed their agreement throughout the conspiracy period by never committing it to writing and instead maintaining it as an unwritten "gentlemen's agreement"

among themselves and their executives. As one industry insider explained, "They don't put that in writing. You'd be hard pressed to find that in writing." A witness who worked as in-house recruiting staff for a Defendant confirmed the existence of a "non-ink-to-paper" agreement between Defendants that "we would not poach from each other." One of the few third-party recruiters who worked in the industry added that when Defendants' hiring managers reached out to solicit his help in recruiting new naval engineers, they would often use coded language to discuss the set of competitors whose employees the hiring manager did not want to recruit, referring to those companies as "friends" or explaining that the company "had a relationship" with these competitors.

13.    Defendants *did* enter explicit written agreements not to recruit from rivals when working on the same project—usually as a provision of "teaming agreements" delineating Defendants' work on a particular contract. The no-poach provisions in these teaming agreements were much more limited than the deliberately concealed "gentlemen's agreement" that forbade active recruitment among all Defendants. The language of these agreements typically prohibited recruitment of personnel *who worked on the project to which a teaming agreement pertained*, for the duration of the project. In fact, however, all active recruitment of *any* competitor Defendant's employees was off-limits. These written teaming agreements were used to cover up the Defendants' unlawful "gentlemen's agreement" with more credibly defensible project-based limitations. The teaming agreements created the false impression that workers could be solicited and recruited by rivals who were *not* working on their projects, even though Defendants' agreement not to recruit one another's naval engineers applied to *any* naval engineer working for *any* Defendant. These affirmative actions to fraudulently conceal the conspiracy enabled Defendants' unlawful behavior to go undetected by members of the Class.

- 6 -

14.     Defendants' no-poach agreement is a classic *per se* unlawful restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1. Together, Defendants' unlawful and anticompetitive conduct has cost thousands of highly skilled naval engineers hundreds of millions of dollars in compensation. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs bring this lawsuit to vindicate their rights to have their compensation determined by a competitive market.

## II.     JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of the forum state because each resides in or has its principal place of business in the Commonwealth of Virginia, employed individuals in this state during the Class Period, and/or has had substantial contacts within the Commonwealth of Virginia in furtherance of the conspiracy.

17.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.     Venue is proper in this Division under Local Rule 3(C) because one or more of the Defendants transacted business, was found, and/or resided in this Division; a substantial part of

the events giving rise to Plaintiffs' claims arose in this Division; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this Division.

### III.   PARTIES

**A.   Plaintiffs**

19.   Susan Scharpf was employed as a naval architect at Alion Science & Technology Corporation from 2007 to 2009, as a naval marine engineer with Computer Sciences Corporation from 2009 to 2011, and as a marine engineer with Gibbs & Cox, Inc., from 2011 to 2013.

20.   Anthony D'Armiento was employed as a naval architect by Northrop Grumman Ship Systems ("NGSS") at Ingalls Shipyard from 2002 to 2004. NGSS is a former division of Northrop Grumman Corporation. As discussed more fully in Section III.B.1.b(1) below, in 2011, Northrop Grumman spun off its shipbuilding operations, including NGSS, into a new entity, Huntington Ingalls Industries, Inc.

**B.   Defendants**

21.   The naval engineering industry has undergone many changes since the beginning of Defendants' conspiracy, including a number of major corporate transactions that merged or spun off various Defendants, their subsidiaries, and/or their naval engineering business units. Each of the naval engineering businesses that changed hands during the Class Period maintained a high degree of continuity in personnel, relevant policies and practices, customers, business culture, and standing within the industry. Indeed, naval engineers often continue to use the legacy name of a naval engineering business unit long after it has been officially renamed and merged into another corporate entity—sometimes two or three times.

22.   This Complaint uses the term "Engineering Defendants" to refer to the group of business units operated by Defendants other than Faststream Recruitment Ltd.—i.e., the units that employ or employed naval engineers during the Class Period. Where the Complaint refers to "each

Engineering Defendant," it means each such functional business unit that exists or existed with an independent identity at the relevant time(s). "All Engineering Defendants" similarly refers to all such business units that exist or existed with an independent identity at the relevant time(s).

1.  **Shipbuilder Defendants**

    a.  **General Dynamics Defendants**

        (1)  <u>General Dynamics Corporation</u>

23.     Defendant General Dynamics Corporation ("General Dynamics" or "GDC") is a global aerospace and defense company and was the fourth-largest U.S. defense contractor by dollar value of awards in 2022. It is incorporated in Delaware with its principal place of business in Reston, Virginia.

24.     During the Class Period, General Dynamics Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

25.     On information and belief, General Dynamics Corporation operates centralized human resources and recruiting functions that assist GDC subsidiaries, including Bath Iron Works, Electric Boat, and NASSCO in filling positions for naval engineers. On information and belief, GDC employees helped GDC subsidiaries participate in the alleged conspiracy, including by refraining from actively recruiting competitors' naval engineers.

        (2)  <u>Bath Iron Works Corporation</u>

26.     Defendant Bath Iron Works Corporation ("Bath Iron Works") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Maine with its principal place of business in Bath, Maine. Bath Iron Works is a full-service shipyard that specializes in the design, building, and support of complex surface combatants for the U.S. Navy. General Dynamics Corp. acquired Bath Iron Works Corporation in August 1995.

27.     During the Class Period, Bath Iron Works, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(3)     Electric Boat Corporation

28.     Defendant Electric Boat Corporation ("Electric Boat") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Delaware with its principal place of business in Groton, Connecticut. Electric Boat operates a major shipyard in Groton, Connecticut, that focuses on the U.S. submarine fleet.

29.     During the Class Period, Electric Boat, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(4)     General Dynamics Information Technology, Inc.

30.     General Dynamics Information Technology, Inc. ("GDIT") is a wholly owned subsidiary of General Dynamics Corp., incorporated in Delaware with its principal place of business in Falls Church, VA.

31.     As discussed more fully below, on information and belief, GDIT is the successor to the liabilities for the Sherman Act violations alleged here committed by a naval engineering consultancy business unit that did business during the Class Period at various times as Computer Sciences Corporation ("CSC"), CSRA, Inc., and CSC Advanced Marine Center, from the start of the Class Period to approximately August 2018. In approximately August 2018, this business unit was sold to CACI International, Inc., which assumed liability for the unit's antitrust violations from that point forward. Details of the transactions resulting in this arrangement of liability are described in Section III.B.2.d below. On information and belief, the sale did not transfer liabilities prior to August 2018, which remained with GDIT.

### b.    Huntington Ingalls Defendants

#### (1)    Huntington Ingalls Industries, Inc.

32.    Defendant Huntington Ingalls Industries, Inc. ("Huntington Ingalls" or "HII") is incorporated in Delaware with its principal place of business in Newport News, Virginia. Huntington Ingalls Industries is the largest military shipbuilding company in the United States.

33.    During the Class Period, Huntington Ingalls Industries, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

34.    Huntington Ingalls Industries, Inc. operates two divisions, Newport News Shipbuilding and Ingalls Shipbuilding, which operate major shipyards in Newport News, VA, and Pascagoula, MS, respectively.

35.    Huntington Ingalls Industries, Inc. was incorporated in 2010 as a subsidiary of Northrup Grumman Corp. and spun off by Northrup Grumman into its own public company in 2011. As part of the spinoff, Northrup Grumman Corp. transferred its wholly owned subsidiary Northrup Grumman Shipbuilding, Inc., then the operating subsidiary of Northrup Grumman that held Northrup's shipbuilding business, including Northrup Grumman Ship Systems, Inc., which employed Plaintiff Anthony D'Armiento. Northrup Grumman Ship Systems, Inc. and Northrup Grumman Shipbuilding, Inc. were renamed and dissolved after the spinoff of Huntington Ingalls (as no subsidiary of either name is listed by Huntington Ingalls Industries, Inc. on its most recent SEC filings).

36.    The shipbuilding businesses spun off by Northrup Grumman included the two major shipyards it had acquired, which are today the main divisions of Huntington Ingalls. Northrup acquired Litton Industries Inc., the ultimate owner of Ingalls Shipbuilding, in 2000, and acquired Newport News Shipbuilding Inc. in 2001.

37.     Ingalls and Newport News shipyards were acquired in whole-company transactions by Northrup Grumman, and the operating subsidiaries containing Northrup Grumman's shipbuilding business were transferred *in toto* to Huntington Ingalls Industries, Inc. Through these transactions Huntington Ingalls, Inc. assumed liability for the violations of the Sherman Act alleged here attributable to the former Northrup Grumman shipbuilding division during the Class Period.

(2)     Newport News Shipbuilding and Dry Dock Company

38.     Defendant Newport News Shipbuilding and Dry Dock Company ("Newport News Shipbuilding") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc., incorporated in Delaware, with its principal place of business in Newport News, Virginia. On information and belief, it operates the Newport News Shipbuilding division of Huntington Ingalls.

39.     On information and belief, during the Class Period, Newport News Shipbuilding and Dry Dock Company, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(3)     Ingalls Shipbuilding, Inc.

40.     Defendant Ingalls Shipbuilding, Inc. ("Ingalls Shipbuilding" or "Ingalls") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc., incorporated in Delaware, with its principal place of business in Pascagoula, Mississippi. On information and belief, it operates the Ingalls Shipbuilding division of Huntington Ingalls.

41.     On information and belief, during the Class Period, Ingalls Shipbuilding, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

(4)    Huntington Ingalls Consultancies

42.    Over the course of the Class Period, three former engineering consultancies were purchased by Huntington Ingalls Industries, Inc. or absorbed into the Huntington Ingalls corporate family as part of another transaction. Two of these consultancies remain part of the Huntington Ingalls corporate family and the third was sold, but on information and belief a portion of its liabilities remain with a Huntington Ingalls subsidiary.

(a)    *HII Fleet Support Group LLC*

43.    Defendant HII Fleet Support Group LLC ("HII Fleet Support"), formerly known as AMSEC LLC, is a naval engineering consultancy. HII Fleet Support is a Delaware limited liability company with its principal place of business in Virginia Beach, Virginia. It is a wholly owned subsidiary of Huntington Ingalls Industries, Inc.

44.    During the Class Period, HII Fleet Support, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

45.    HII Fleet Support is the successor to former Huntington Ingalls Industries, Inc. subsidiary AMSEC LLC, a legacy engineering consultancy. Huntington Ingalls changed the name of the company from AMSEC LLC to its current name in approximately September 2018. Though it has been gradually phasing out its use of the AMSEC LLC name, Huntington Ingalls continues to use it to market its naval engineering services, including on job-focused social media platform LinkedIn.

46.    AMSEC LLC was acquired by Huntington Ingalls Industries, Inc. in March 2011. During the Class Period, AMSEC LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

47.     M. Rosenblatt & Son, Inc.,[2] a legacy naval engineering consultancy, was acquired by AMSEC LLC in April 2000. During the Class Period, M. Rosenblatt & Son, Inc. and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States. In 2008, AMSEC sold the M. Rosenblatt & Son business unit to Defendant The Columbia Group.

48.     As used in this complaint, "AMSEC" refers to legacy consultancy AMSEC LLC and to its successor HII Fleet Support Group LLC, which operates in continuity with AMSEC LLC and continues to use that name. Where the complaint refers to "M. Rosenblatt," it means M. Rosenblatt & Son Inc. and/or the business unit of AMSEC and later The Columbia Group that traces its lineage back to M. Rosenblatt & Son, Inc., as these business units operated with a high degree of continuity even as its corporate ownership changed hands. Many industry participants continued to identify the unit with the M. Rosenblatt name long after its acquisition by AMSEC and later The Columbia Group.

(b)     *HII Mission Technologies Corp.*

49.     Defendant HII Mission Technologies Corp. ("HII Mission Technologies") is a wholly owned subsidiary of Huntington Ingalls Industries, Inc. Through approximately August 2019 HII Mission Technologies operated, *inter alia*, a naval engineering consultancy business unit. HII Mission Technologies is a Delaware corporation with its principal place of business in McLean, Virginia.

---

[2] Not to be confused with Bruce S. Rosenblatt & Associates, another naval engineering consultancy that Plaintiffs do not name as a defendant or co-conspirator.

50.     During the Class Period, HII Mission Technologies Corp., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

51.     On information and belief, as part of the corporate structuring associated with Huntington Ingalls' purchase of Alion Science and Technology Corporation ("Alion") in approximately August 2021, HII Mission Technologies assumed liabilities stemming from this action through approximately August 2019 of both John J. McMullen & Associates ("JJMA") and Alion.

52.     JJMA provided naval architecture and marine engineering services from 1957 until its acquisition in 2005 by Alion, which marketed the former JJMA business unit as "JJMA Maritime Sector" or "JMS." However, the JJMA business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture through its purchase by Alion, and remains to this day broadly referred to in the industry as "JJMA."

53.     During the Class Period, JJMA, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

54.     During the Class Period, Alion Science & Technology Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

55.     Alion sold the legacy JJMA business unit as part of its Naval Systems Business Unit to Defendant Serco Inc. in approximately August 2019. On information and belief, under the terms of this asset sale liabilities for antitrust violations predating the sale remained with Alion.

56.    From approximately August 2019 forward, the business unit tracing its lineage back to JJMA was absorbed into Defendant Serco, Inc., which rebranded it as Serco's Maritime, Engineering, Technology and Sustainment division. Nonetheless, the business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture, and continues to be widely referred to with the name "JJMA."

57.    The remainder of Alion, including its liabilities, was purchased by Huntington Ingalls Industries, Inc. in approximately August 2021. On information and belief, HII caused Alion to be merged into its wholly-owned subsidiary Huntington Ingalls Mission Technologies Corp. soon after this sale, including Alion's assets and liabilities.

58.    In this complaint, "John J. McMullen & Associates" and "JJMA" refer to that engineering consultancy business prior to its sale to Alion. "Alion" refers to Alion Science and Technology Corporation prior to its sale of the legacy JJMA unit to Serco.

c.    **Marinette Marine Corporation**

59.    Defendant Marinette Marine Corporation ("Marinette Marine" or "MMC") is a ship manufacturer that produces ships for the U.S. Navy and Coast Guard. It is incorporated in Wisconsin with a principal place of business in Marinette, Wisconsin. Since 2009, Marinette Marine has been majority-owned by Italian shipbuilder Fincantieri Marine Group (FMG), when the latter acquired the company from The Manitowoc Group. As of 2022, FMG owned an 87% share of the company.

60.    During the Class Period, Marinette Marine Corporation, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### d.      Bollinger Shipyards, LLC

61.     Defendant Bollinger Shipyards, LLC ("Bollinger" or "Bollinger Shipyards") is a privately owned shipyard that produces ships, workboats, and patrol vessels. It is a Louisiana limited liability company with its principal place of business in Lockport, Louisiana.

62.      During the Class Period, Bollinger Shipyards, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### 2.      Engineering Consultancy Defendants

### a.      Gibbs & Cox, Inc.

63.     Gibbs & Cox, Inc. ("Gibbs" or "Gibbs & Cox")  is an engineering consultancy that primarily provides naval architecture and marine engineering services. As of approximately May 2021, it is a wholly owned subsidiary of Leidos Holdings, Inc. (formerly Science Applications International Corporation, SAIC). It is a New York corporation with its principal place of business in Arlington, Virginia.

64.     During the Class Period, Gibbs & Cox, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

### b.      Serco, Inc.

65.     Defendant Serco, Inc. ("Serco") is a New Jersey corporation with its principal place of business in Herndon, Virginia. It provides a diversified range of government contracting services, including naval architecture and marine engineering. It is a wholly owned subsidiary of British multinational Serco Group plc., which provides similar services worldwide.

66.     During the Class Period, Serco, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

67.     Serco, Inc.'s naval architecture and marine engineering business unit traces its lineage through a series of transactions to legacy engineering consultancy JJMA.

68.     As discussed in Section III.B.1.b(4), Alion acquired JJMA in 2005 and sold the business to Serco in approximately August 2019 as part of its Naval Systems Business Unit. On information and belief, the terms of this asset sale left liabilities attributable to the unit prior to the sale with Alion.

69.     From approximately August 2019 forward, the business unit tracing its lineage back to JJMA was absorbed into Serco, Inc., which rebranded it as Serco's Maritime, Engineering, Technology and Sustainment division. Despite this rebranding, the business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture with its predecessors.

c.     **BMT Defendants**

70.     Defendant Technology Financing Inc. is a Delaware corporation with its principal place of business in Houston, Texas. It directly owns 100% of named co-conspirator BMT Designers & Planners Inc., a New York corporation currently in Chapter 7 bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York.[3] BMT Designers & Planners, Inc. was an engineering consultancy that provided naval architecture and marine engineering services to the federal government. It abruptly folded in early 2022 after a contract dispute with the United States Navy and subsequently entered liquidation.

---

[3] *In re BMT Designers & Planners, Inc.*, No. 1:22-bk-10123 (Bankr. S.D.N.Y.).

71.     During the Class Period, BMT Designers & Planners Inc. employed and paid wages, salaries, and/or benefits to Class Members in the United States.

72.     Defendant BMT International, Inc. is a Maryland corporation with its principal place of business in Houston, Texas. It directly owns 100% of Defendant Technology Financing, Inc.

73.     Named co-conspirator BMT Group Ltd. is a British limited company with its principal place of business in London, United Kingdom. BMT Group is an international design, engineering, science, program, and risk-management consultancy.

74.     Defendants Technology Financing, Inc. and BMT International, Inc. are intermediate holding companies interposed between BMT Designers & Planners, Inc. and ultimate parent BMT Group Ltd. On information and belief, neither has any employees, operations, or business it transacts under its own name.

75.     On information and belief, Defendants Technology Financing, Inc. and BMT International, Inc. are alter egos of each other and of BMT Designers & Planners, Inc. They exist solely to structure the potential liabilities of BMT Group Ltd. for its American subsidiary operations while enabling the parent company to extract millions of dollars in revenue from those same subsidiaries.

76.     Complex corporate forms might be lawful and socially beneficial for structuring corporate debt liability—in which context lenders and debtors carefully allocate risks and depend on reliable application of corporate law. In quasi-tort cases like this one, however, honoring the corporate form of BMT Designers & Planners, Inc. would unjustly impair Plaintiffs and Class Members, who received low, noncompetitive wages throughout the Class Period but could not

have been expected to know of the conspiracy alleged here in time to file suit before BMT Designers & Planners, Inc.'s bankruptcy.

77. Technology Financing, Inc. and BMT International, Inc., meanwhile, received millions of dollars in profits during the Class Period flowing from, at least in part, the savings BMT Designers & Planners Inc. obtained from paying noncompetitive wages.

78. This complaint uses the terms "BMT" and "BMT Designers & Planners" to refer to BMT Designers & Planners, Inc.

### d. CACI International Inc.

79. Defendant CACI International Inc. is a Delaware corporation with its principal place of business in Reston, Virginia. CACI International Inc. is primarily in the business of providing technology-related services to the United States Government, among them naval architecture and marine engineering services.

80. During the Class Period, CACI International Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

81. CACI International Inc.'s naval architecture and marine engineering business unit traces its lineage back through a series of transactions to Computer Sciences Corporation ("CSC"), a company primarily in the business of providing technology-related services to the United States Government. During the Class Period, among the services CSC provided were naval architecture and engineering services.

82. During the Class Period, CSC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

83.     Some or all of the naval architecture and marine engineering services provided by CSC and its subsidiaries during the Class Period were provided through a business unit or subsidiary of CSC under the name "CSC Advanced Marine Center."

84.     During the Class Period, CSC Advanced Marine Center, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

85.     From late 2015 to approximately April 2018, CSRA, Inc. was a Nevada corporation with its principal place of business in Falls Church, Virginia. CSRA was formed in late 2015 in a transaction that merged the North American public sector business line of CSC with SRA International, another government technology services contractor. After the transaction, the business unit(s) of the CSC corporate family that provided naval architecture and engineering services were absorbed into CSRA, Inc., including, on information and belief, the pre-transaction liabilities of CSC and CSC Advanced Marine for the conspiracy alleged in this action.

86.     During the Class Period, CSRA, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

87.     General Dynamics Corporation acquired CSRA, Inc. in April 2018. On information and belief, General Dynamics Corporation later caused CSRA, Inc. to be merged into its wholly owned subsidiary Defendant General Dynamics Information Technology, Inc., discussed above.

88.     In approximately August 2018, General Dynamics Corporation, GDIT, or another GDC subsidiary sold CSRA, Inc.'s former systems engineering and acquisition services business unit to CACI International Inc. This sale included business lines that provided naval architecture and marine engineering services to the United States Government.

- 21 -

89.     On information and belief, the sale of CSRA's former systems engineering and acquisition services business unit to CACI International transferred assets, but not existing liabilities, to CACI International. Accordingly, Defendant General Dynamics Information Technology, Inc. is the successor to liabilities related to this action incurred before the sale of CSRA's former systems engineering and acquisition services business unit to CACI International Inc.

90.     Throughout these transactions, the legacy CSC/CSC Advanced Marine business unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture.

91.     In this complaint, "CSC" refers to the CSC/CSC Advanced Marine business prior to the spinoff of its naval engineering business to CSRA. "CSRA" refers to CSRA, Inc. from the time of its formation to the time when General Dynamics sold CSRA's naval engineering business unit to CACI International Inc. "CACI" and "CACI International" refer to CACI International Inc.

### e.     The Columbia Group, Inc.

92.     Defendant The Columbia Group, Inc. is a District of Columbia corporation with its principal place of business in Fairfax, Virginia. It provides technology and engineering services to the federal government, including naval architecture and marine engineering services.

93.     During the Class Period, The Columbia Group, Inc., its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

94.     The Columbia Group, Inc. acquired Columbia Research Corporation in 2005. Columbia Research Corporation provided engineering, logistics and acquisition services. During the Class Period, Columbia Research Corporation, its predecessors, and/or its wholly owned or

controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

95.     In June 2008, The Columbia Group, Inc. assumed the operations of the Washington, DC office of AMSEC LLC, which itself had acquired M. Rosenblatt & Son, Inc. in April 2000. The operations that The Columbia Group, Inc. assumed traced their lineage to the legacy M. Rosenblatt engineering consultancy. After the acquisition, The Columbia Group began referring to this business unit as the Rosenblatt Ship Design Division. This unit maintained a high degree of continuity in personnel, policies and practices, customers, and business culture with the legacy M. Rosenblatt business unit.

96.     As used in this complaint, "Columbia Group" refers to The Columbia Group, Inc. or its predecessor Columbia Research Corporation. As noted above, "M. Rosenblatt" refers to M. Rosenblatt & Son, Inc. prior to its 2000 acquisition by AMSEC LLC and to the legacy M. Rosenblatt business unit as part of AMSEC LLC from its 2000 acquisition to 2008 and as a division of The Columbia Group from 2008 onward.

**f.     Thor Solutions LLC**

97.     Defendant Thor Solutions LLC is a Virginia limited liability company with its principal place of business in Arlington, Virginia. It is an engineering consultancy firm that provides technical and engineering services to the federal government, including naval architecture and marine engineering services. It was founded in 2009.

98.     During the Class Period, Thor Solutions, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

99.     In this complaint, "Thor Solutions" refers to Thor Solutions LLC.

g.    **Tridentis, LLC**

100.    Defendant Tridentis, LLC is a Virginia limited liability company with its principal place of business in Alexandria, Virginia. Tridentis, LLC is an engineering consultancy that provides naval architecture and marine engineering services to the federal government. It was founded in 2006.

101.    During the Class Period, Tridentis, LLC, its predecessors, and/or its wholly owned or controlled subsidiaries employed and paid wages, salaries, and/or benefits to Class Members in the United States.

102.    In this complaint, "Tridentis" refers to Tridentis, LLC.

**3.    Faststream Recruitment Ltd.**

103.    Defendant Faststream Recruitment Ltd is a British limited company with its principal place of business in Southampton, United Kingdom. Faststream Recruitment Ltd. is an international recruitment agency that specializes in the maritime, shipping, and energy sectors. Until approximately 2020, Faststream Recruitment Ltd. was the sole owner and corporate parent of Faststream Recruitment Inc., a now-dissolved Delaware company with its principal place of business in Houston, Texas.

104.    During the Class Period, Faststream Recruitment Inc., its predecessors, and/or its wholly owned or controlled subsidiaries knowingly joined and acted in furtherance of the conspiracy alleged herein by, *inter alia*, refraining from recruiting candidates for naval architecture and engineering positions on the basis of an illicit agreement between competitors; divulging up-to-date and confidential salary information about competitors' wage levels for naval architects and marine engineers to Engineering Defendants; and preparing "salary surveys" for Engineering Defendants with current, firm-identifiable salary information for naval architects and marine engineers.

105.     Faststream Recruitment Inc. no longer has any corporate presence in the United States. As corporate parent of Faststream Recruitment, Inc., Defendant Faststream Recruitment Ltd. is the successor to its liabilities for the Sherman Act violations alleged in this complaint.

106.     In this complaint, Faststream Recruitment Ltd. and its predecessor Faststream Recruitment Inc. are referred to as "Faststream."

## IV.     AGENTS AND CO-CONSPIRATORS

107.     The Defendants were joined in their anticompetitive conspiracy by co-conspirators both known and unknown who joined the conspiracy and acted in furtherance of it.

108.     BMT Designers & Planners, Inc. is a New York corporation with, on information and belief, no current business operations. It is presently being liquidated in Chapter 7 bankruptcy in the United States Bankruptcy Court for the Southern District of New York. As detailed in Section VII.B.1 below, witness statements confirm that BMT Designers & Planners was a member of the alleged conspiracy.

109.     NASSCO Holdings Incorporated ("NASSCO") is a Delaware corporation with its principal place of business in San Diego, California. It is a wholly owned subsidiary of Defendant General Dynamics Corp. It operates the NASSCO shipyard in San Diego, California, which builds many of the largest ships in the U.S. fleet. On information and belief, NASSCO is a party to the conspiracy alleged herein.

110.     Austal USA LLC ("Austal") is an Alabama limited liability company with its principal place of business in Mobile, Alabama. It is a wholly owned subsidiary of Australian limited company Austal Limited. It specializes in ship manufacturing for the U.S. Navy and the Coast Guard. On information and belief, Austal is a party to the conspiracy alleged herein.

111.     BAE Systems Ship Repair Inc. ("BAE") is a Delaware corporation with its principal place of business believed to be in Norfolk, VA. It is a wholly owned indirect subsidiary of global

- 25 -

defense contractor BAE Systems plc. Through subsidiaries including BAE Systems Norfolk Ship Repair Inc., BAE Systems Jacksonville Ship Repair LLC, BAE Systems San Diego Ship Repair Inc., and BAE Systems Hawaii Shipyards Inc., BAE provides marine engineering services in U.S. Navy shipyards, where BAE is responsible for a variety of maintenance, repair, and modernization work on U.S. vessels. It is a major employer of marine engineers in the United States. On information and belief, BAE and its ship repair subsidiaries are parties to the conspiracy alleged herein.

112.   Various other persons and entities not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.

113.   Throughout the Class Period, Defendants acted by and through agents to plan and execute their anticompetitive conspiracy.

## V.   INTERSTATE COMMERCE

114.   During the Class Period, Defendants employed Plaintiffs and other Class Members in various states across the United States, including Virginia, the District of Columbia, Maine, Mississippi, and Connecticut.

115.   Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

## VI.   FACTUAL ALLEGATIONS

### A.   Background

#### 1.   The U.S. Naval Design and Shipbuilding Industries

116.   The shipbuilding industry in the United States is heavily concentrated on the design and manufacture of the U.S. "public fleet"—vessels owned or operated by federal and state governments or government agencies, particularly the U.S. Navy and Coast Guard. Commercial

shipping vessels, in contrast, are generally built overseas. The country's five major shipbuilding yards—Bath Iron Works in Bath, Maine; Electric Boat in Groton, Connecticut; Newport News Shipbuilding in Newport News, Virginia; Ingalls Shipbuilding in Pascagoula, Mississippi; and NASSCO in San Diego, California—all rely predominantly, if not exclusively, on contracts with the U.S. military. Several midsize shipyards, including those owned by Defendant Marinette Marine in Marinette, Wisconsin, and Defendant Bollinger Shipyards in the Gulf Coast region, are also reliant on military contracts, with the relatively small remainder of the U.S. industry devoted to civilian vessels. A handful of public shipyards owned by the U.S. Navy and Coast Guard are devoted to maintenance and repair of public vessels rather than new construction.

117.    The U.S. shipbuilding industry generates just shy of $30 billion in annual revenue. Nearly 80% is derived from military shipbuilding, maintenance, and repairs. The U.S. Navy alone spent roughly $23 billion per year on shipbuilding between 2017 and 2021. The industry employs approximately 108,000 workers—64% of whom are concentrated in just five coastal states, with Virginia accounting for 28%.

118.    The "Big 5" shipyards are owned by only two companies—General Dynamics Corp. and Huntington Ingalls Industries, Inc. General Dynamics owns Bath Iron Works, Electric Boat, and NASSCO, while Huntington Ingalls owns Newport News Shipbuilding and Ingalls Shipbuilding. These yards build all of the largest vessels in the U.S. Navy and Coast Guard fleets, along with vessels operated by the U.S. Army's Transportation Corps and the National Oceanic and Atmospheric Administration. The U.S. Navy primarily awards shipbuilding contracts to just three other shipbuilding companies—Marinette Marine in Wisconsin, Bollinger Shipyards in Louisiana, and Austal USA in Alabama. These shipbuilders generally build smaller ships including patrol boats, littoral combat ships, naval tugboats, and naval transports.

119.    For large ships, years of engineering and design work go into a vessel before a single piece of steel is fabricated. This is due in part to the fact that shipbuilders do not work from prototypes. As the president of Huntington Ingalls put it when testifying before Congress, "[t]he first ship in a class *is* the prototype." The U.S. Navy's latest frigate—the *Constellation*-class—illustrates this heavy investment and long lead time, with the Navy anticipating two years of design and four years of construction before the first ship is delivered.

120.    The working lives of U.S. military ships span decades. The typical ship serves 30 to 50 years depending on the class. Over the course of a vessel's life, it may go through several nearly complete refittings with the latest advancements in communications, propulsion, and weapons systems. These refittings require major engineering and design support.

### 2.    Naval Architects, Marine Engineers, and Associated Professionals

121.    As of 2020, nearly 10,000 individuals work in the United States as naval architects or marine engineers. Other professionals including designers, project managers, and associated staff work closely with naval architects and marine engineers to serve the design and engineering needs of the U.S. public fleet.

122.    Naval architects design vessel hulls and are responsible for a vessel's overall stability and performance. Marine engineers design a wide array of onboard systems, from propulsion mechanics to electrical systems to water purification, heating, and air conditioning. Marine engineers are employed under a variety of titles, including "marine engineer" as well as other specialty titles like structural or electrical engineer. This Complaint refers to all these workers collectively as "naval engineers."

123.    Naval engineering is a highly skilled profession with degree, citizenship, and security clearance requirements that serve as barriers to entry. The median salary for naval engineers is nearly $100,000. Naval engineers generally must have earned at least a bachelor's

degree in engineering, with certain roles requiring a master's degree or PhD. Certain positions are also restricted to candidates with degrees from schools with specialized naval engineering programs such as the Merchant Marine College. Once on the job, naval engineers receive additional specialized training.

124.    In addition to having significant education and specialized training, naval engineers generally must hold a security clearance because of the sensitive nature of their work. Depending on the clearance level, obtaining such a clearance can take over a year. Workers who have previously obtained a security clearance can often be cleared faster and present less risk to employers of being denied clearance.

125.    Given the security clearance requirement, naval engineers must also generally be U.S. citizens, which further restricts the pool of available talent. In industries that do not have citizenship requirements, companies can fill engineering talent needs by recruiting globally. For example, a 2019 study found that nearly 40% of U.S. computer hardware engineers are immigrants to the United States. Naval engineering firms, however, *cannot* fill their talent needs in a worldwide marketplace.

126.    Finally, naval engineering jobs have characteristics that ordinarily promote job mobility. Despite being highly skilled and subject to security clearance and citizenship requirements, naval engineers are generally employed on an at-will basis without contracts, meaning they can quit at any time to accept work with a new employer. Jobs in the industry are geographically concentrated in the Washington, DC, metropolitan area and around major shipyards in Virginia, Connecticut, and other coastal states, making it possible for naval engineers to switch jobs without moving households and to interview with potential employers without extensive travel. These characteristics should have made it easy for naval engineers to readily switch between

competing firms, and for Defendants to profitably "headhunt" for experienced candidates, had Defendants' conspiracy not forbidden active recruitment.

### 3. Naval Engineering Employers

127. Almost all naval engineers working on the U.S. public fleet work for one of three types of employers: (1) shipbuilders, including major general defense contractors like General Dynamics and Huntington Ingalls; (2) dedicated engineering consultancies, such as Gibbs & Cox and The Columbia Group; and (3) the federal government. Data collected by the Bureau of Labor Statistics suggests that roughly 40% of naval engineers work for shipbuilders; 40% work for engineering consultancies; and the remaining 20% work directly for the federal government.[4]

128. Shipbuilders design and build the U.S. public fleet. The largest shipbuilders are the two general defense contractors—General Dynamics and Huntington Ingalls—who own the five major private U.S. shipyards that build and service major warships. These companies are generally the lead contractors on major shipbuilding programs such as *Virginia*-class submarines or *Arleigh Burke*-class destroyers. These companies employ naval engineers to help design, build, support, and refit U.S. public vessels.

129. Major shipbuilders do not design and build each piece of a ship in-house. Instead, shipbuilding projects typically involve a host of subcontractors covering nearly every aspect of a project. Subcontractors may be other major general defense contractors, like Raytheon or Lockheed Martin; diversified manufacturing powerhouses, like General Electric; or specialized firms, including the engineering consultancy Defendants.

---

[4] These estimates also exclude from the total pool naval engineers counted by BLS as working in other industries and self-employed engineers.

130.    Engineering consultancies are specialized firms (or specialized units of larger firms) focused on naval design and engineering. They usually employ naval architects and marine engineers of all stripes, as well as associated professionals. Consultancies may contract directly with the federal government, either to design projects in the first instance or to help evaluate and liaise with shipbuilders on the government's behalf; consultancies are also frequently hired as subcontractors by major shipbuilders. Consultancies may also subcontract between themselves, and competing consultancies frequently work together on major projects.

131.    The federal government employs naval engineers to help oversee the design, construction, and maintenance of the public fleet and to perform some in-house engineering work at the nation's five public shipyards: Navy facilities at Norfolk, Virginia; Portsmouth, Maine; Puget Sound, Washington; and Pearl Harbor, Hawaii; and the Coast Guard Yard at Baltimore, Maryland. These public naval yards are dedicated exclusively to maintenance of the Navy's and Coast Guard's existing fleets. Naval engineers employed directly by the federal government mostly work in the Navy and Coast Guard, and the special circumstances of military employment limit the flow of naval engineers between the public and private sectors.

132.    Shipbuilders and engineering consultancies are horizontal competitors for the same pool of naval engineering talent. Naval architecture and marine engineering skills are highly transferable and applicable across a variety of contexts. This is especially true of engineers with experience managing projects, personnel, and government relationships.

133.    Therefore, while shipbuilders may hire engineering consultancies as subcontractors (or consultancies may subcontract among themselves), all of the Defendants are horizontal competitors to each other in the labor market for naval engineers regardless of the structure of inter-Defendant relationships (which themselves change from project to project).

134.    In practice, however, as described below, there is almost no competition to hire experienced naval engineers.

### 4.    "Incestuous" Nature of the Naval Engineering Industry

135.    Public fleet naval engineers are an extremely close-knit community; indeed, multiple witnesses described the industry as "incestuous." Fewer than 10,000 naval engineers work in the United States today. For comparison, there are 804,000 private-sector attorneys in the United States; there are 15,500 administrative law judges, adjudicators, and hearing officers. Other occupations with higher total employment than naval engineers include cartographers and photogrammetrists; gambling cage workers; and postsecondary physics professors.

136.    Only a small handful of colleges and universities in the United States—fewer than twenty—offer accredited training in naval engineering. In fact, the pool of newly trained naval engineers is so concentrated that *40%* have some tie with the University of Michigan. Of the remaining schools, four are either military service academies or operated by the U.S. Navy.[5] Naval engineers are bound together across firms by alumni networks and relationships forged at these colleges and universities.

137.    Naval engineers routinely work together across firms. As described above, naval engineering consultancies work together with each other and with shipbuilders in relationships ranging from co-equals to supervisors to subcontractors. Two firms in a contractor/subcontractor relationship on one contract may find their roles reversed on the next contract. This repeat-player dynamic encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as "allied places." It also

---

[5] They are: the Naval Postgraduate School, United States Coast Guard Academy, United States Merchant Marine Academy, and the United States Naval Academy.

ensures that competing firms' fates are bound to each other by networks of obligation and favoritism that provide each firm with many opportunities to help friends and punish rivals who are perceived as competing "out of bounds."

138.    Industry groups and conferences provide many opportunities to reinforce close relationships, especially among industry leaders. The Society of Naval Architects and Marine Engineers (SNAME) serves a variety of industry functions including publishing research, coordinating educational opportunities, and organizing conferences and events. SNAME organizes some 32 standing committees affording naval engineering managers and executives from competing firms the opportunity to interact. It organizes regular events at which competitors have the opportunity to interact socially, including lunches, happy hours, and conventions. These events offer competitors the freedom to interact privately without any digital record—a combination that has facilitated anticompetitive activity and communications in numerous industries. The American Society of Naval Engineers puts on similar events.

139.    Industry executives are heavily concentrated in the Washington, DC, area. Engineering consultancies including Serco, CACI, Gibbs & Cox, AMSEC, and The Columbia Group all have offices along M Street SE between First Street and Twelfth Street in Washington, just a stone's throw from the Washington Navy Yard, as does shipbuilder Huntington Ingalls. Competitors bump into each other on the street frequently. All Defendant corporate families, except recruiting agency Faststream and BMT Designers and Planners, which has closed its U.S. offices, have U.S. headquarters in the Eastern District of Virginia; all but Huntington Ingalls are headquartered in close-in D.C. suburbs of Northern Virginia, convenient to each other and the Pentagon.

140.    The close-knit nature of the naval engineering industry and the specialized nature of naval engineers facilitated Defendants' no-poach conspiracy.

**B.    Defendants' No-Poach Conspiracy**

141.    Executives in charge of hiring in the naval engineering industry have long adhered to a "gentlemen's agreement" that prohibits any Defendant from actively recruiting naval engineers from other Defendants, in spite of the obvious incentives for companies in need of scarce naval engineering talent to do so. This long-standing agreement reduces Class Members' mobility and depresses salaries industry-wide.

142.    Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide "gentlemen's agreement," using that term, not to actively poach from competitors. Another senior employee conveyed that a company that had broken the rules was "not supposed to do that." Each Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime.

143.    Other witnesses, though unaware of no-poach agreements, confirmed close relationships with supposed competitors, that they had never been actively recruited by competitors, and that salaries in the industry are inexplicably low relative to salaries in comparable fields. Indeed, several witnesses—including naval engineers who were not themselves aware of the no-poach—described the industry as "incestuous," referring to the industry's small, close-knit, geographically concentrated nature.

144.    The conspiracy, which began at least by the early 1980s, expanded to industry-wide proportions by at least 2000. The conspiracy alleged herein has persisted among the major industry participants, and coordination among participants has only become easier as smaller players have

consolidated into larger ones. Each firm's commitment to the unlawful conspiracy is reaffirmed every time a hiring manager decides not to call a competitor's employee they know to be qualified.

145.     Former managers of the Defendants confirmed broad agreements among all industry participants. Moreover, the circumstances that prevail in the industry—in which there is *almost no recruitment among competitors*, despite a very limited and specialized pool of potential employees and low salaries—reinforces the conclusion that all Defendants engaged in a single no-poach conspiracy. The conspiracy is facilitated by the close business ties among competitors, which provide a range of levers for punishing defection from the conspiracy. It is also facilitated by close personal relationships among the small community of naval engineers, and a wealth of opportunities to conspire at conferences, social events, and private in-person meetings.

146.     The conspiracy is still in effect to this day. One naval engineer—who was last employed in 2020—was unaware of the no-poach agreement, but did report that when he attempted to interview with other naval engineering firms, he was required to specify that he had independently pursued the opportunity and not been solicited. And a recruiter from Huntington Ingalls indicated that the company's applicant tracking system contained a "do not hire list" of companies whose employees Huntington Ingalls' recruiters were not permitted to affirmatively recruit.

### 1.     Participants in the No-Poach Conspiracy Directly Confirm Its Existence, Operation and Scope

147.     Plaintiffs' investigation has uncovered direct evidence of the conspiracy, gathered from eyewitness industry participants.

148.     At least as far back as the early 1980s, a no-poach conspiracy existed among Gibbs & Cox, JJMA (now Serco), and other engineering consultancies. A management-level employee with hiring authority who was subject to the conspiracy's rules confirmed the existence of a

"gentlemen's agreement" among these firms that "you didn't recruit people" from competitors. Firms could hire a competitor's employee if and only if the employee affirmatively reached out—a rule that continues in substantially the same form to this day. By the late 1980s, the conspiracy extended at least to include Bath Iron Works—a major shipyard acquired by General Dynamics in 1995.

149.    The conspiracy continued throughout the late 1990s and all defendant corporate families that existed in 2000 had joined it by that time. Gibbs & Cox, JJMA (now Serco, with pre-sale liabilities owned by HII Mission Technologies), M. Rosenblatt & Co. (now the Columbia Group, with pre-sale liabilities owned by HII Fleet Support), Advanced Marine Enterprises[6] (now CACI, with pre-sale liabilities owned by General Dynamics Information Technology), and Designers and Planners (now BMT) participated in a no-poach agreement with each other. It was still limited to active recruitment of competitors' employees and enforced when necessary by phone calls among high-level employees. The agreement was never reduced to writing and passed on only as verbal instructions from executives to managers.

150.    Senior managers who worked at Gibbs & Cox, Alion Science & Technology (successor to JJMA, now Serco), and BMT Designers and Planners confirmed that they would not actively recruit from competitor firms. One witness, asked about the scope of no-poach agreements in the industry, stated: "I never recruited anyone actively from a competitor."

151.    Defendants' former employees mad statements that the following Defendants or business units participated in the gentlemen's agreement not to recruit naval engineers from competitors: Gibbs & Cox, Alion (now Serco), CSC Advanced Marine Enterprises (now General

---

[6] Advanced Marine Enterprises was acquired in or around 2001 by CSC.

Dynamics and/or CACI), BMT Designers & Planners, The Columbia Group, AMSEC (now HII Fleet Support), Bath Iron Works, and Marinette Marine.

152.    Several of the engineering consultancy Defendants, including at least Gibbs & Cox, JJMA/Alion (now Serco), CSRA (now CACI), AMSEC, Tridentis, and the Columbia Group, referred to each other collectively as the "Beltway Bandits." According to an executive employed by one of these Defendants who was involved in recruiting naval engineers, these companies shared an agreement among themselves not to actively recruit each other's employees. Indeed, one executive for Gibbs & Cox reported that he overheard a colleague say to another colleague in regard to recruiting a potential candidate, "He works for JJMA, we can't do that." Another executive explained that, "If Gibbs & Cox offered my guy a position, they'd call me and say, 'We didn't poach him.'"

153.    Exceptions to the no-poach rule were tightly controlled. The primary exception was that Defendants could hire employees who applied for a position on their own. In some circumstances, a Defendant who lost a major contract would allow its employees to be recruited by the winner of the contract. One witness, who attempted to recruit an engineer to one of the engineering consultancy Defendants during this period from a competitor, noted that some Defendants disapproved of the recruitment. That recruitment nevertheless fell within the narrow exception to Defendants' no-poach agreement because the contract on which the recruit was working for the competitor was being transferred to the Defendant. Other witnesses described the exception in virtually identical terms.

154.    The conspiracy is still going strong today.

155.    At least as recently as 2018, Huntington Ingalls maintained a "do not hire list" of companies from whom HII's recruiters could not actively recruit, including at least General Dynamics.

156.    A manager involved in recruitment for Thor Solutions in the mid-to-late 2010s confirmed the existence of a "non-ink-to-paper" agreement among Thor Solutions and companies with which it worked, including Alion, that "we would not poach from each other."

157.    One of the handful of independent recruiters who placed naval engineers in the industry in the late 2010s noted that they were instructed to avoid recruiting from other companies in the industry. Hiring managers sometimes explained these restrictions by describing competitors as "friends," or by saying "we have a relationship," which the recruiter understood to mean that the relationship in question was non-contractual. The recruiter recalled in particular that in one instance, Bollinger Shipyards indicated that it could not hire a candidate from Alion, despite the candidate's being an otherwise perfect fit. The recruiter recalled another attempt to place a Gibbs & Cox employee that was stymied by an apparent agreement not to recruit from Gibbs.

158.    A manager who left a Defendant for the government in 2019 confirmed the existence of a widespread no-poach "gentlemen's agreement" in the industry. Another manager who worked in the industry during the last five years confirmed the existence of a no-poach agreement among naval engineering competitors, including at least Gibbs & Cox and Alion (now Serco).  Other witnesses employed in managerial positions as recently as 2022 described ongoing agreements among competitors in the industry not to actively recruit employees from each other.

***

159.    For each of the following Defendant entities or business units, at least one industry witness either named it as part of the industry-wide no-poach conspiracy, discussed an application

involving that entity of the no-poach agreement to a particular individual seeking to change employment in the industry, or acknowledged that it had a policy or practice of not recruiting competitors' employees: Bath Iron Works, Electric Boat, Huntington Ingalls Industries, Inc., Newport News Shipbuilding, Ingalls Shipbuilding, Marinette Marine, Bollinger Shipyards, Gibbs & Cox, John J. McMullen & Associates, Alion, Serco, BMT Designers & Planners, AMSEC (both during the period of independence as AMSEC LLC and as a subsidiary of Huntington Ingalls Industries, Inc.), Computer Sciences Corporation, CSRA, CACI International, the Columbia Group, M. Rosenblatt, Thor Solutions, and Tridentis.

160.    The conspiracy was continuous and industry-wide throughout the Class Period. Though its origins are obscure, by at least 2000 all major players in the industry had reached a mutual understanding that they would not poach each other's employees. While naval engineering business units and their parent companies went through an astonishing number of sales, spin-offs, reorganizations, and other corporate events during the Class Period, the business units themselves maintained continuity from place to place. Indeed, veteran naval engineers often refer to certain consultancies, like the ones tracing their lineage back to John J McMullen & Associates and M. Rosenblatt & Son, by their legacy names three or more transactions old. Through these transactions, key personnel and corporate cultures remained the same, and as a result these business units continued to adhere to the unlawful no-poach agreement. Newcomers to the conspiracy like Thor Solutions and Tridentis, who started their firms in the middle of the Class Period, quickly joined the fold. The conspiracy continues to this day.

2. **Additional Evidence Affirms the No-Poach Conspiracy's Reach and Effects Throughout the Class Period**

a. **Uniform, Anticompetitive Hiring Practices**

161. During the Class Period, each Engineering Defendant followed two distinctive hiring practices that, taken together, make no economic sense except in the context of a conspiracy to reduce competition and depress wages in the naval engineering labor market. Each Engineering Defendant (1) maintained a practice or policy of *not* actively recruiting competing Defendants' naval engineers; and (2) maintained a practice or policy that the Defendant *could* (and often *did*) *hire* competing Defendants' naval engineers, provided the engineer made the initial approach to the Defendant.

162. No Engineering Defendant, much less *all Engineering Defendants*, would arrive at such a combination of practices independently without a mutual understanding that the other Engineering Defendants would restrict themselves to the same policies. In the absence of an unlawful agreement among the Engineering Defendants, each would have every incentive to recruit each other's employees, competing in the labor market on salaries, benefits, working conditions, and other dimensions of normal labor markets. Economic theory suggests that naval engineers should have been able to exert significant bargaining power over Defendants during the conspiracy period because the education, specialized training, security clearance, and citizenship requirements described above made the pool of naval engineers small and the cost of replacement significant. As a long-time industry insider put it, naval engineers are "so rare" and "very special." Moreover, during the Class Period, there was a shortage of naval engineers. As this witness explained: "[T]here was so much more demand [for employees] than there was talent."

163. These market characteristics should have resulted in a war for talent in which Defendants offered regular promotions and pay increases, attempted to lure talent away from

rivals, and matched offers from competitors trying to do the same. Indeed, in other industries with small labor pools and high-stakes competition, whole specialized mini-industries exist solely to recruit talent. For example, in data science, software engineering, and other engineering segments of the defense industry (not to mention law), dedicated, highly paid professionals have full-time jobs working industry contacts and connections in order to tempt engineers from one competitor to another. By contrast, in the naval engineering industry, Plaintiffs could only identify one recruiting firm (Faststream) that, as a small fragment of its business, helped Engineering Defendants recruit naval engineers. When asked if the Engineering Defendants placed limitations on his ability to recruit naval engineers from other companies, a former Fastream employee replied: "100 percent," adding "that happened with everyone."

164.    In a labor market with these characteristics (especially with a shortage of supply), the only explanation for firms' parallel failure to actively recruit from competitors is an unlawful agreement.

165.    Lest there be any doubt, however, the second prong of Defendants' policies—that competitors' employees who *themselves apply* for jobs may be hired—belies any innocent or procompetitive explanation for Defendants' policies. If market-wide factors like an oversupply of workers or overspecialization of experienced engineers were driving independent decisions not to recruit by all Defendants, *they would also lead these companies not to hire employees who applied.*[7] It is not that experienced naval engineers are not *valuable* to competitor Defendants; it is that the Defendants mutually recognize that they benefit *more* from a regime of mutual non-recruitment than they would from any individual hire.

---

[7] A market-wide labor oversupply, of course, is the opposite of what is alleged here, and in any case would be very unlikely to last from the 1980s to the present day.

b.      **The Industry Is Susceptible to Collusion**

166.    Several features of the naval engineering industry render the industry particularly susceptible to collusion and illustrate that Defendants had the motive, means, and opportunity to execute their conspiracy, and that innocent explanations for Defendants' behavior are unlikely. These "plus factors" include: (1) high barriers to entry; (2) shared financial incentives to maintain low salaries industry-wide; (3) shared pressure from government customers to keep costs low; (4) extensive repeat-player working relationships among competitors, with opportunities for a range of informal punishments that can be used to enforce the unlawful no-poach agreement; (5) social ties between key personnel, encouraging trust and cooperation among competitors; (6) opportunities to collude at industry events, social events, and frequent informal meetings among key personnel; and (7) a culture of secrecy that insulates the industry from rigorous oversight and enables collusion.

167.    *High Barriers to Entry*. The naval engineering employment market is susceptible to collusion given the high barriers to creating a naval engineering firm. Naval engineering firms face high barriers to entry given the contract-based, relationship-driven, and specialized nature of the work. Naval engineering firms work on extremely sensitive projects and spend years developing trust and reputation among government customers and peer firms. Both naval engineering and government contracting are highly specialized fields requiring considerable skill and experience from a substantial number of personnel. These barriers enabled Defendants to sustain their conspiracy because new entrants could not easily enter the market, draw naval engineers away with promises of higher compensation, and expect their investment to be quickly rewarded with lucrative government contracts. Indeed, because all Engineering Defendants paid Class Members artificially low wages, they were able to bid for government contracts at lower

prices than potential new entrants could bid, further entrenching the Engineering Defendants against potential threats from non-conspirators.

168.    *Shared Financial Incentives to Maintain Low Salaries and Ban Recruitment.* The Engineering Defendants have and had throughout the Class Period obvious financial incentives to keep salaries for naval engineers low. As noted above, the demand for naval engineering talent far outstrips the pool of available personnel. Under ordinary circumstances, this imbalance between supply and demand would put tremendous upward pressure on salaries, eating into Defendants' profits. Collectively, however, the Engineering Defendants can maintain stable, low wages in the industry by limiting the avenues through which they compete with each other for talent.

169.    Perhaps less obviously, each Engineering Defendant has financial and other incentives to restrain active recruitment in particular (relative to other forms of competition). First, the naval engineering industry's orientation around large, unique government contracts makes it difficult to coordinate some forms of anticompetitive agreement, like price fixing, output reduction, or division of territory; Defendants' no-poach agreement was by contrast a relatively easy way to realize benefits from Defendants' unlawful conspiracy. Second, competitive recruitment is particularly costly for firms whose employees are "poached" because not only do they lose an employee but they must suffer a disruption to the work the employee was doing. Moreover, and perhaps as importantly, it takes a personal toll on managers at that firm, who must not only find a replacement for the poached employee but also handle the administrative consequences of the departure and manage the employees who remain, whose workload has likely increased. This kind of disruption gives managers a personal incentive to form, maintain, and enforce unlawful agreements restraining competition.

170.    *Shared Pressure from Government Customers.* Government specialists exercise substantial oversight over contractors, including expenditures on personnel. Several witnesses remarked that the government put unrealistic pressure on firms that employed naval engineers to keep salaries low. This external pressure from customers incentivized each Engineering Defendant to find ways to keep wages low for naval engineers—including securing understandings from competitor firms to maintain low wages by not recruiting each other's employees.

171.    *Repeat-Player Working Relationships.* Defendants were able to form, monitor, and enforce their conspiracy given the close-knit nature of the industry. Naval engineering consultancy Defendants frequently worked on "gigantic" contracts where rival firms were very likely to be involved. They could be contracted by the U.S. government for the same project or subcontracted by the same general defense contractor. Given these close and repeated working relationships, one naval engineer with experience working at three different Defendants noted that "[c]ompanies that [recruit rivals' employees] don't stay around that long because companies don't want to work with them."

172.    *Forums for Collusion.* Defendants' executives also met annually at various industry-wide conferences, including at events put on by WorkBoat and Shipbuilders Council of America. These events offered opportunities for the industry's most senior executives to confer regarding naval engineers and their compensation. In addition to the salary discussions found in both informal and formal settings at WorkBoat conferences, the Shipbuilders Council of America features a board of directors that includes senior executives—such as the president or CEO—from nearly every industry player. General Dynamics, Bath Iron Works, Huntington Ingalls, Newport News Shipbuilding, Ingalls Shipbuilding, and Marinette Marine (among others) all occupy positions on that board. As a result, board meetings and the more informal, private social events

that followed offered executives from each of these companies the opportunity to discuss, implement, and reinforce their unlawful gentlemen's agreement.

173. Trade associations like the Society of Naval Architects and Marine Engineers (SNAME) and the American Society of Naval Engineers (ASNE) offered Defendants a further opportunity to conspire. As alleged above, both SNAME and ASNE regularly put on events, ranging from large annual conferences to more regular regional meetings, at which competitors have the opportunity to confer privately and off the record, including during lunches, happy hours, and other social functions.

174. *Teaming Agreements.* In addition to the extensive gentlemen's agreement described above, Defendants entered written agreements to not recruit each other's naval engineers when working on the same project. These agreements were generally part of broader "teaming agreements"—contracts consummated between naval engineering firms working alongside each other on projects. Defendants entered these agreements when subcontracting with one another or when submitting joint bids to the U.S. government (or another contractor) after which the firms would complete the work together if awarded the contract.

175. These agreements had the effect of facilitating the unlawful no-poach conspiracy at issue in this action[8] because: (1) no-poach practices were normalized and discussed on a regular basis between competing firms; (2) the incentive to cheat on the broader conspiracy was reduced because teaming agreements reduced the potential upside of cheating; and (3) Defendants' employees were led to mistakenly believe that the teaming agreements were the *only* recruiting

---

[8] The no-poach restrictions in individual teaming agreements may by their own terms violate the Sherman Act, but Plaintiffs do not seek to resolve those questions in this action.

restrictions in place. This last effect enabled Defendants to fraudulently conceal their conspiracy, as discussed in Section VIII.B below.

### c.     Defendants Took Actions Against Their Unilateral Self-Interest

176.    Defendants acted against their unilateral self-interest by not competing for talent. Naval engineering is a highly specialized industry in which human capital constitutes Defendants' greatest asset. Moreover, industry insiders acknowledged that there was an industry-wide shortage of naval engineers. Given the inadequate supply of naval engineers, a Defendant pursuing its own unilateral interests would have offered promotions and raises to retain top talent. Defendants also would have competed aggressively to lure away each other's employees by offering better salaries and benefits. This competition would have resulted in a high degree of labor mobility and the ratcheting up of pay as high performers switched between firms. Instead, Defendants maintained relatively uniform compensation structures, rarely gave bonuses or promotions, and did not actively recruit each other's employees.

177.    As explained further below, Defendants also acted against their self-interest by exchanging competitively sensitive compensation information. In a competitive market—particularly one with a shortage of qualified workers—a firm acting in its unilateral self-interest would not share its compensation information with rivals because it would tell rivals how much they needed to offer to poach employees. For example, if a firm told rivals that it was paying its naval engineers $90,000, the rivals would know that they could lure those naval engineers away by offering them only slightly more compensation. Yet Defendants routinely shared their compensation information with one another, showing a level of trust among Defendants that only makes sense if they had an agreement not to poach one another's employees.

**C.** **Defendants Monitored and Enforced the No-Poach Agreement and its Goal of Compensation Suppression by Sharing Information Directly and through Third Parties**

178.   The goal of Defendants' conspiracy not to recruit one another's naval engineers was to suppress their compensation. To ensure that the no-poach conspiracy's goal of compensation suppression was achieved, Defendants monitored Class Members' compensation by sharing sensitive compensation and wage information. This unlawful and anticompetitive conduct helped ensure that naval engineers were unable to leverage the otherwise-favorable market dynamics—including a scarce supply of specialized employees and an outsized demand for that talent—to seek better wages and higher compensation.

179.   Defendants' sharing and monitoring of the compensation of naval engineers took numerous forms. They included in-person and direct communications between competitors. Defendants' executives met annually at various industry-wide conferences, including events hosted by WorkBoat and the Shipbuilders Council of America, and engaged in direct communications about Class Members' compensation with their competitors. These events offered executives the opportunity to compare sensitive hiring information like wages paid to naval engineers during cocktail hours or other informal gatherings—something a third-party recruiter who attended such events confirmed was a regular occurrence. These informal settings often featured a kind of "scuttlebutt," according to that recruiter, with hiring managers saying things like "I'm paying $90,000 for my naval architects. What are you doing?"

180.   At cocktail hours hosted by Defendant Faststream in the mid-2010s, Defendants' personnel frequently asked Faststream employees to divulge sensitive wage information for naval engineers from Faststream's other clients. Faststream is a marine recruiting agency and was at the time one of only a few firms that Defendants would occasionally engage to find naval engineers

from non-conspirators.[9] A typical question that Faststream employees heard from attendees at such events was, "What is so-and-so [competitor firm] paying?"

181.   Defendants' sharing and monitoring of Class Members' compensation also included formal presentations concerning that compensation. They included presentations by Faststream that offered detailed insights into salaries offered to naval engineers throughout the industry. Following these presentations, industry executives had the opportunity to question Faststream's team about salary information. These sessions offered Defendants detailed insights into the compensation offered to naval engineers throughout the industry and did so with their competitors for labor in the same room. For example, a Faststream employee gave a presentation entitled "Human Capital Management: Recruitment, Hiring and Retention in Today's Marine and Offshore Environment" at the WorkBoat Maintenance & Repair Conference and Expo in New Orleans on April 14, 2015. Attendees at that conference included at least Alion, Bollinger Shipyards, and Gibbs & Cox.

182.   In yet another mechanism of the conspiracy, Defendants requested and received formal surveys of Class Members' compensation from third parties. Separate from their presentations at trade conferences, Faststream allowed Defendants to confirm the success of their no-poach conspiracy by conducting by-request salary surveys. When a Defendant asked Faststream for a salary survey—typically when recruiting or hiring for a naval engineer opening—Faststream would create a spreadsheet identifying the different salaries offered to employees it had placed with other companies. A recruiter for Faststream confirmed that to produce such a spreadsheet, he would be asked for detailed, firm-specific information, such as the following: "I placed two people at Gibbs & Cox at $X in X position. I placed two people at Austal at $X in X

---

[9] Faststream has since closed its U.S. offices.

position." The survey Faststream sent to the client would involve both current salary averages for industry positions and specific examples of current salaries at specific companies. For example, the survey received by the client might have identified Gibbs & Cox as paying $90,000 for a specific level of naval architect, and generally included several such examples, showing multiple specific salaries for specific openings, down to the position level. Salary information within these surveys was transparent to the Defendant recipients. Crucially, this information was provided to Defendants but *not* to their employees.

183. All of these mechanisms of sharing and monitoring Class Members' compensation—informal, in-person, direct communications with competitors, presentations by third parties hired by Defendants (and delivered to Defendants while they were in in the same room), and formal compensation surveys requested and paid for by Defendants—all enabled Defendants to confirm that their no-poach agreement was continuing to have its desired effect of suppressing compensation and that their competitors' compensation was not indicative of true competition for labor. Those mechanisms allowed Defendants to know their own suppressed compensation was sufficient to continue to retain their own employees and that candidates for their open positions would not be offered better compensation by their competitors. The no-poach agreement in conjunction with these mechanisms of monitoring and enforcement meant that not only was the compensation of "passive talent"—those naval engineers who did not actively seek employment at a competitor—suppressed, but the compensation of those who did seek employment at competitors was as well. In other words, even if a naval engineer employed by a Defendant took the initiative to apply for an opening with another Defendant—thereby evading the "gentlemen's agreement" not to poach one another's employees—that naval engineer would be unlikely to secure better compensation.

**D.      Anticompetitive Effects and Injury Suffered by Class Members**

184.    Defendants' conspiracy significantly suppressed the earnings of thousands of naval engineers for decades.

**1.      Economic Theory Teaches That Defendants' No-Poach Conspiracy Had Anticompetitive Effects**

185.    Economic theory teaches that the multitude of barriers to becoming a naval engineer, the excess demand for naval engineers relative to supply, the dependence of Defendants on naval engineers who built up project-specific expertise, the at-will nature of employment contracts, and the geographic concentration of the work should have combined to form a competitive and high-paying labor market. Instead, Plaintiffs and Class Members were compensated significantly below the level they would have received absent a conspiracy.

186.    As explained above, Defendants conspired to suppress Plaintiffs' and Class Members' earnings by agreeing not to recruit each other's naval engineers. By putting the onus on Class Members to seek new employment opportunities, Defendants reduced the likelihood that Class Members would leave for rivals and avoided paying the higher compensation that would have been necessary to mitigate this risk.

187.    The no-poach made Class Members less likely to leave their current jobs for several mutually reinforcing reasons. First, Class Members simply were not contacted by rival firms. Absent conspiracy, Defendants would have contacted one another's naval engineers who were not actively looking for new jobs (a pool of workers that economists call "passive talent") and tried to lure them away with higher compensation; their current employers would then face pressure to match their rivals' salary offers to keep their workers. Second, the lack of proactive recruiting meant there was less information available regarding opportunities at rival firms. Class Members who took it upon themselves to seek better opportunities therefore found it more difficult than they

would have absent a conspiracy. Third, the lack of labor market dynamism enabled Defendants to maintain relatively similar—and stagnant—compensation scales such that the opportunity for a motivated class member to find a better opportunity elsewhere was diminished. This is because the conspiracy avoided what otherwise would have been the ratchet effect present in competitive labor markets, where competing firms continually raise the bar to attract talent. The conspiracy therefore suppressed the compensation of those Class Members who were actively recruited, but did not seek out work at other companies, as well as those Class Members who did seek other opportunities.

188.    Recent economic literature confirms that no-poach agreements such as the one alleged here suppress compensation through the mechanisms described above.[10]

### 2.    Witnesses Confirm That the Conspiracy Had Anticompetitive Effects

189.    Consistent with the economic theory described above, salaries for naval engineers at Defendant firms are low and stagnant. Engineers in peer fields can expect to make substantially more than their counterparts in naval engineering and to see their salaries rise faster.

190.    Several witnesses remarked on the industry's reputation for underpaying for talent. Not only are starting salaries low, but wages do not grow substantially with experience and sometimes fail to keep pace with inflation. One naval engineer observed that promotions were hard to come by and that no raises were available beyond a 2% annual cost-of-living adjustment.

---

[10] *See, e.g.*, Brian Callaci et al., *The Effect of Franchise No-Poaching Restrictions on Worker Earnings* (July 20, 2023), http://dx.doi.org/10.2139/ssrn.4155577; Francine Lafontaine et al., *No-Poaching Clauses in Franchise Contracts, Anticompetitive or Efficiency Enhancing?* (March 24, 2023), http://dx.doi.org/10.2139/ssrn.4404155; Matthew Gibson, *Employer Market Power in Silicon Valley*, IZA DP No. 14843 (Nov. 2021), https://www.iza.org/publications/dp/14843/employer-market-power-in-silicon-valley; Alan B. Krueger & Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, 57 J. HUM. RES. S324 (2022), https://doi.org/10.3368/jhr.monopsony.1019-10483.

Another witness remarked that competing naval engineering firms all seemed to offer similar compensation, making it difficult to find higher salaries by switching jobs. Yet another echoed that sentiment, noting that "nobody really jumped ahead" in compensation by moving from one Defendant to another.

191.    The anecdotal experience of witnesses confirms that Defendants offer salaries far below what would be available in a competitive market. For example, in most industries, government salaries are substantially lower than private-sector salaries, because government jobs make up for lower pay with a combination of benefits, improved work-life balance, job security, and the satisfactions of public service. One naval engineer, however, noted that they had been offered a job with a government agency that paid $40,000 per year *more* than their job with a Defendant doing equivalent work.

### a.    Defendants' Market Power Bolsters an Inference of Anticompetitive Effects

192.    As explained further below, the market for naval engineers in the United States is a distinct labor market, and Defendants collectively wielded power within that market. This market power provides further evidence that Defendants' conspiracy could—and did—harm Class Members.

### (1)    Relevant Labor Market

193.    The relevant labor market is the market for naval engineers.

194.    From the perspective of naval engineers, there are no close economic and/or functional substitutes for employment in other industries. As explained above, naval engineers have industry-specific credentials, skills, and experiences—including specialized bachelors' degrees and a specialized understanding of military ships—that are not transferable to other

industries. Employers of naval architects are willing to pay a premium (i.e., a higher salary) for workers with these credentials, skills, and experiences.

195.    If naval engineers were to take a job in another industry that required *fewer* skills or credentials, they would likely have to take a pay cut because their industry-specific skills would not provide a benefit for which the new employer is willing to pay. And if naval engineers sought employment in a field with more or different job requirements, they would likely have to either (a) pay to receive training in that field or (b) accept a pay cut to work at a lower level in a different field while they built new expertise.

196.    Naval engineers, like most laborers, cannot withhold their services until a later date as a means of negotiating for higher compensation. They depend on a regular income. This weakens their negotiating position with potential employers and enhances the Defendants' market power.

(2)    Relevant Geographic Market

197.    The relevant geographic market is the United States. If all employers collectively imposed a slight decrease in compensation for naval engineers from the competitive level, the vast majority of naval engineers would remain in the United States and within the industry, making the slight decrease in compensation profitable. This is in part because naval engineers have United States citizenship, a United States security clearance that is not transferable to other countries, and specialized knowledge that serves the United States military.

(3)    Market Power

198.    Defendants controlled the relevant market during the conspiracy period. Defendants collectively employ approximately three out of four of the naval engineers in the United States. This market power, combined with the barriers to entry discussed previously, limited the opportunity for Class Members to obtain higher earnings by working for an entity other

than Defendants. Thus, Defendants' no-poach agreement had the effect predicted by economic theory: depressed compensation for Class Members.

### b.      Scope of the Harm to Class Members

199.   Defendants' conspiracy harmed tens of thousands of Class Members. In 2020, there were just under 10,000 marine engineers and naval architects employed in the United States. This figure may undercount the true number of naval engineers affected by Defendants' conspiracy because Defendants employed naval engineers under other titles as well, such as structural engineers. After accounting for the fact that a portion of naval engineers are employed by the government, along with the growth rate of the industry since Defendants' conspiracy began, Class Members easily number in the tens of thousands.

200.   Defendants' conspiracy deprived Class Members of hundreds of millions of dollars in earnings. As of May 2022, the median compensation of naval engineers in the United States was $96,910 per year. The overall compensation for all Class Members across the Class Period is measured in the billions of dollars. But for Defendants' conspiracy, that compensation would have been materially higher for Class Members throughout the Class Period.

### c.      Lack of Procompetitive Justification

201.   Defendants' conspiracy constituted a "naked" no-poach agreement with no procompetitive justification. The purpose and effect were to avoid paying Class Members higher salaries in what otherwise would have been a very dynamic labor market. The decades-long duration and large number of firms involved in Defendants' conspiracy underscores the fact that it lacked a legitimate rationale and was not ancillary to any project-specific agreements (or any other agreements).

## VII.   THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS

### A.   Continuing Violation

202.   Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein. Defendants' unlawful and anticompetitive scheme is continuing.

203.   Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts: (1) repeated refusal to actively recruit naval engineers from one another's ranks, in spite of the obvious incentives to do so, including each time the Defendant seeks to hire for a naval engineering position for which competitors' employees would be appropriate but restricts recruitment to candidates applying of their own accord; (2) enforcing the anticompetitive agreement with communications involving implicit or explicit threats of retaliation for breaching the agreement; (3) sharing of sensitive salary and wage information during annual trade conferences; and (4) requesting targeted salary benchmarking services from third-party recruiters.

### B.   Fraudulent Concealment

204.   Plaintiffs' claims are not time-barred because Defendants affirmatively concealed the existence, true nature, and scope of their industry-wide "gentlemen's agreement." Defendants' efforts prevented Plaintiffs from discovering the facts necessary to pursue their claims despite the exercise of due diligence—including that Defendants had established an "unwritten rule" that no one Defendant would affirmatively recruit the other's naval engineers, and that Defendants' executives and hiring managers were engaged in information exchanges and salary benchmarking that further suppressed their wages.

1.      **Defendants Concealed the Scope and Nature of Their Conspiracy**

205.    Defendants actively concealed their unlawful conduct in several ways. First and foremost, Defendants concealed their conspiracy by carefully avoiding putting anything in writing. Instead, each Defendant abided by a "gentlemen's agreement" which was an industry-wide "unwritten rule."

206.    Maintaining an unwritten, broad secret agreement was crucial not only to evade detection or accountability but because Defendants also entered into less-restrictive, unconcealed hiring covenants with each other that misled Plaintiffs and Class Members and kept them from uncovering the conspiracy. As discussed previously, Defendants entered into written agreements not to recruit each other's naval engineers when working on the same project. Multiple industry participants have reported that these agreements were explicit contractual provisions. These explicit, unconcealed agreements misled Plaintiffs and Class Members into thinking they could be recruited whenever they were not working on the same project as a rival. But the written, unconcealed agreements hid the true nature of Defendants' conspiracy: that each had entered into a secret and much more expansive "gentlemen's agreement" not to affirmatively recruit others' naval engineers, regardless of whether the two companies were engaged on the same project and regardless of whether the engineers in question were working on that project. Defendants' inclusion of these narrower no-poach provisions in written agreements were affirmative acts to fraudulently conceal their unlawful conspiracy.

207.    Defendants also concealed their conspiracy by falsely representing that they offer "competitive" compensation and benefits packages. For example, the respective recruitment and career web pages for Defendants state the following:

- Bath Iron Works Corporation states that it is "proud to offer competitive compensation."

- Bollinger Shipyards LLC offers "competitive wages."

- General Dynamics Corporation states that it provides both "fair compensation" and "competitive benefits."

- General Dynamics Information Technology, Inc. offers "market-competitive salaries" and "competitive health and wellness packages."

- Huntington Ingalls Industries, Inc. provides "competitive pay" and "competitive benefits." These representations also apply to the HII divisions Newport News Shipbuilding, Ingalls Shipbuilding, and Mission Technologies.

- Fincantieri Marine Group offers "competitive wages" and "competitive compensation packages," including for its jobs at the Fincantieri Marinette Marine shipyard.

- Serco, Inc. indicates its employees can expect a "competitive salary."

- BMT also states that it offers a "competitive salary" and "tailor[s] benefits to ensure they remain competitive with the local geographies in which [BMT] operate[s]."

- Gibbs & Cox, Inc. offers "competitive salaries" and a "competitive benefits package."

- The Columbia Group also offers "competitive salaries" and a "very competitive benefits package."

- Tridentis LLC states that it provides "higher salaries" and "better benefits."

- CACI International, Inc. offers a "competitive mix of benefit options."

208.    In reality, due to their mutual no-poach agreements, Defendants have offered neither "competitive" pay nor "competitive" benefits throughout the Class period. Defendants' representations otherwise are affirmative acts taken to mask this reality from Plaintiffs and Class Members.

209.    Defendants also used false or misleading representations, euphemisms and code words to direct attention away from their conspiratorial agreement. For example, Huntington Ingalls's 2021 annual report describes offering "base wages and salaries that are competitive and consistent with employee positions, skill levels, experience, knowledge, and geographic location," though in fact those wages for naval engineers were not competitive. It notes that HII uses "nationally recognized surveys and outside compensation and benefits consulting firms to

independently evaluate the effectiveness of our employee and executive compensation and benefit programs and to provide benchmarking against our peers within the industry," when in fact such surveys are used (at least in part) to ensure that Defendants' no-poach conspiracy is achieving its intended objective of reducing wages for naval engineers. Finally, it states that "[o]ne of the key components of our approach to workforce development is to 'grow our own'"—explaining away its lack of competitive recruitment as a unilateral strategic choice rather than a bargained-for conspiratorial agreement. Other Defendants made similar public and private representations that they operated as competitors in the talent market rather than allied conspirators.

210.    Moreover, Defendants affirmatively represented that they adhere to values and ethics standards incompatible with the wage suppression conspiracy in which they were engaged. Multiple Defendants have articulated these values on their websites or in their published Codes of Conduct. For example:

- General Dynamics Corporation ("GDC") represents that its "defining moral character" is a dedication to "transparency, trust, . . . and honesty" including towards its "employees."

- General Dynamics Information Technology, Inc. also includes "honesty, transparency, . . . and trust" as a core value in how it interacts with "fellow employees."

- In its 2022 Code of Ethics booklet, HII states "[i]ntegrity is at the heart of who we are and what we do," that it will be "truthful, trustworthy and honorable in all aspects of [the] work," and it is "committed to being honest and fair with . . . employees."

- Bollinger Shipyards, LLC likewise lists "honesty and integrity" as part of its core values.

- Serco, Inc.'s code of conduct states that it conducts business "honestly" and "transparently" and that it "compete[s] fairly."

- Alion Science & Technology Corporation's "2013 Code of Ethics, Conduct, and Responsibility" indicates that its "core values" include "integrity," "honesty," and "fairness to [its] employees."

- CACI International, Inc. states that one of the two pillars to CACI's culture is "Character – our commitment to ethics and integrity in all we do."

- The Columbia Group indicates that it will "always conduct business with integrity, applying the highest ethical standards."

211.   These representations obscured Defendants' secretive, no-poach agreement as Plaintiffs and Class Members would expect Defendants to adhere to their self-proclaimed ethical standards and act with transparency, honesty, and integrity when setting their employees' compensation and benefits offerings.

212.   Defendants have also acted to conceal their conspiracy by representing in formal, published reports that they abide by federal laws. For example, the 2023 Employee Code of Conduct for Bollinger Shipyards, LLC establishes that "[a]ll Bollinger employees must completely abide by the laws and regulations of local, national and international governing bodies." Likewise, Alion Science & Technology Corporation's 2013 Code of Ethics, Conduct, and Responsibility represents that "Alion is committed to complying with the letter and spirit of all laws, [and] regulations . . . to which the Company is subject."

213.   Several Defendants have represented that they comply with the antitrust laws, specifically. For example, in its 2022 Standards of Business Ethics and Conduct, General Dynamics Corporation asserted, "We comply fully with the antitrust and competition laws of every jurisdiction where we do business." The report further indicates that GDC is "committed to fair and competitive sales practices" and "will not communicate formally or informally with competitors to fix or control prices, allocate markets, boycott customers or suppliers, or limit the sale of products." Finally, the report states that GDC will not "conspire to gain or use [its competitors'] proprietary information improperly."

214.   Similarly, in its 2022 Code of Ethics Booklet, HII indicates that it abides by the set of laws under which the U.S. government requires its contractors to operate, including the U.S. antitrust laws.

215.    Given Defendants' explicit representations that they comply with the antitrust laws, it was reasonable for Plaintiffs and Class Members to believe these representations to be true.

216.    Furthermore, Defendants represented that they preserve confidential business and employee information. By way of example, in its 2022 Standards of Business Ethics and Conduct, General Dynamics Corporation stated that employees "should only gather information about . . . competitors from public sources that are freely available to others" and further represented that employee "information and data are confidential and are used only for valid business purposes." Similarly, in its 2022 Code of Ethics Booklet, HII emphasized that employees' financial information should be protected and "should not be disclosed to persons inside or outside of the company except for legitimate business purposes and in accordance with the laws." These representations were intended to mislead Plaintiffs and Class Members into believing that Defendants, abiding by their own ethical codes, would not illegally share with one another their employees' compensation information.

217.    Defendants also misled employees by representing that they actively recruit potential employees while failing to disclose that throughout the Class Period, recruitment of competitors' employees was off-limits. For example, in its 2022 Corporate Sustainability Report, General Dynamics Corporation states that its "ongoing efforts include developing ways to attract and retain diverse talent" including by gathering data about overall promotions, recruitment and other processes across the employee lifecycle as a basis for continued improvement. On its recruitment website, Bath Iron Works indicates that its HR professionals engage in worker recruitment. Electric Boat states on its career website that it is "always seeking outstanding people" to join its engineering team. Fincantieri Marine Group's career web page indicates that the company is "actively seeking" skilled tradespeople and engineers at its Marinette facility. Gibbs

& Cox, Inc. likewise represents on its careers page that it is "always seeking and recruiting" talented, motivated and top-quality engineering and naval architecture experts. Thor Solutions LLC's open application recruitment web pages state that it is "actively seeking" naval architects and engineers. Finally, Tridentis LLC's career page indicates that the company is "currently looking" for highly skilled and motivated employees. On its recruitment website, BMT Group states that it recruits the best naval architects and engineers, and each year "also take[s] on many graduates." The website does not state that BMT Group will not recruit from its competitors, and by using the phrase "also" it suggests that it recruits from a population beyond recent graduates. None of those companies' websites discloses that those companies have agreed *not* to actively recruit naval engineers from their competitors.

218.    Defendants' representations obfuscate the truth that because of the no-poach agreements, Defendants have severely limited the pool of potential employees from which they will recruit, excluding their competitors' employees from this pool entirely. Many of these representations imply that Defendants actively recruit experienced candidates. They do not.

219.    Defendants discussed, monitored and enforced their conspiracy at trade conferences attended by industry executives and through salary surveys conducted by Faststream for specific companies by request. The informal cocktail hour conversations and client-specific salary surveys that facilitated this unlawful information exchange occurred well outside the public eye, permitting Defendants to suppress Plaintiffs' wages without raising suspicion.

220.    In addition, Defendants enforced the conspiracy through private phone calls between high-level executives and unofficial retribution through the companies' many working relationships.

221.    Each of these mechanisms involved affirmative actions taken by Defendants to conceal the existence, nature, and scope of their unlawful conspiracy from Plaintiffs and the Class.

### 2.    Plaintiffs Failed to Discover the Conspiracy Despite Due Diligence

222.    Plaintiffs at all times exercised due diligence with respect to the facts alleged here. Prior to April 2023, Plaintiffs did not and could not have uncovered Defendants' conspiracy with the exercise of reasonable diligence. The Plaintiffs at all times believed that they were being compensated at competitive levels and were unaware of the agreement to pay sub-competitive wages.

223.    While Defendants' conspiracy meant that many naval engineers were never solicited by rival firms during their careers, this would not have been enough for a reasonable plaintiff to suspect and uncover a multi-firm, decades-long conspiracy in an industry as heavily regulated with as much government involvement as naval engineering. To the contrary, a reasonable plaintiff would have assumed that a naval engineering firm employing cadres of employees with high level security clearances thoroughly vetted to work on sensitive projects on behalf of the U.S. government was complying with all relevant laws.

224.    For similar reasons, Plaintiffs could not have inferred the likelihood of Defendants' conspiracy from their sub-competitive wages. Estimation of competitive wage levels requires specialized expertise not available to ordinary naval engineers. Moreover, it is difficult for naval engineers to draw any conclusions about the sufficiency of their salaries because of a lack of transparency in the industry concerning salaries. This lack of transparency is not unique to naval engineering and makes it difficult to uncover no-poach conspiracies wherever they occur. For example, nearly 90% of job postings lack salary information. The majority of Americans have also never shared salary information with a coworker.

225.    Plaintiffs had no reason to suspect that Defendants were unlawfully exchanging wage information at trade conferences or engaging in salary benchmarking.

226.    Even had Plaintiffs had suspected Defendants' conspiracy, Defendants' comprehensive efforts to conceal the conspiracy would have prevented them from discovering it. Because Plaintiffs and Class Members did not and could not have known about Defendants' efforts to conceal their conduct, they had no occasion to investigate further.

## VIII.    CLASS ACTION ALLEGATIONS

227.    Plaintiffs bring this action on behalf of themselves and on behalf of the members of the following class ("Class Members") under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3):

> All naval architects and marine engineers employed by Defendants (except Defendant Faststream Recruitment Ltd.), their predecessors, subsidiaries, and/or related entities in the United States at any time from January 1, 2000, until Defendants' unlawful conduct ceases.

228.    The following persons and entities are excluded from the proposed Class: Defendants' executives, human resources managers, and human resources staff; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities.

229.    The Class definition provides clear, objective criteria that Class Members and Defendants alike can understand, and it allows the parties to identify the members of the Class.

230.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

231.    The Class is so numerous that joinder of all members in this action is impracticable. The proposed Class contains thousands of similarly situated workers.

232.    The Class is readily identifiable and is one for which records should exist.

233. Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

234. Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in naval architecture and marine engineering than they would have in a competitive market.

235. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic, to the Class.

236. Questions of law and fact common to the Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the Class Members.

237. Questions of law and fact common to the Class include:

    a. Whether Defendants engaged in an agreement, combination, or conspiracy to restrict hiring and recruiting of naval engineers in the naval engineering industry;

    b. Whether such agreements constituted violations of the Sherman Act;

    c. Whether Defendants exchanged sensitive and confidential wage information at trade conferences and other industry-wide events;

    d. Whether Defendants unlawfully engaged in salary benchmarking using sensitive and confidential wage information provided by third-party recruiting services;

    e. The identity of the participants of the alleged conspiracy;

f. The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

g. Whether Defendants fraudulently concealed their misconduct;

h. Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

i. The nature and scope of injunctive relief necessary to restore competition; and

j. The measure of damages suffered by Plaintiffs and the Class.

238. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

239. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The individual joinder of all damaged members of the Class is impracticable, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

240. Defendants have acted on grounds generally applicable to the Class, making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSE OF ACTION

### FIRST CLAIM FOR RELIEF:
### CONSPIRACY TO DEPRESS COMPENSATION IN VIOLATION OF
### SECTION 1 OF THE SHERMAN ANTITRUST ACT
### (Against All Defendants)

241.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242.    Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class Members' services through restrictions on hiring and recruiting naval engineers from, between, and among each other, in the form of a long-standing and unwritten "gentlemen's agreement" not to affirmatively recruit one another's naval engineers. This agreement was a *per se* violation of 15 U.S.C. § 1. However, even if Defendants' agreement were viewed through the quick-look or rule-of-reason lens, the manifest anticompetitive effects of the agreement render it unlawful.

243.    The relevant product or service market is the labor market for employment as naval engineers in the United States, and the relevant geographic market is the United States.

244.    Defendants collectively possess market power in the relevant market. Defendants and co-conspirators together control approximately 75 percent of the relevant market. Defendants' and co-conspirators' collective market power includes the power to jointly set compensation for naval engineers in the United States below competitive levels. This joint power clearly exists because it has been used by Defendants and co-conspirators to pay Class Members and sub-competitive compensation.

245.    Defendants could and did profitably suppress compensation paid to naval engineers in the United States below competitive levels. In such circumstances, naval engineers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring employers, as Defendants and co-conspirators control approximately 75 percent of the market.

246.    A slight decrease in compensation to naval engineers in the United States from a competitive level could be imposed collectively by the Defendants without causing too many such workers to switch employment to occupations in other industries or other countries. Such a slight decrease in compensation would therefore be profitable for Defendants.

247.    Plaintiffs and the other Class Members have been injured and will continue to be injured in their businesses and property by receiving less compensation from Defendants, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy and by depriving them of free and fair competition in the market for their services.

248.    Defendants' conspiracy violated Section 1 of the Sherman Act, whether analyzed under the *per se*, quick-look, or rule-of-reason standard.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

D.      Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.      Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

F.      Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

G.      Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper by this Court.

## XI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

DATED: October 6, 2023

Respectfully Submitted,

By      /s/ *Steven J. Toll*
       STEVEN J. TOLL
       (Va. Bar No. 15300)

Brent W. Johnson (*pro hac vice* forthcoming)
Robert W. Cobbs (*pro hac vice* forthcoming)
Alison S. Deich (Va. Bar No. 87452)
Zachary R. Glubiak (Va. Bar No. 93984)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

By      /s/ *Shana E. Scarlett*
       SHANA E. SCARLETT
       (*pro hac vice* forthcoming)

Rio S. Pierce (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Tel: (206) 623-7292
steve@hbsslaw.com

Elaine T. Byszewski (*pro hac vice* forthcoming)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Tel: (213) 330-7150
elaine@hbsslaw.com

By    /s/ *George F. Farah*
         GEORGE F. FARAH
         (*pro hac vice* forthcoming)

Rebecca P. Chang (*pro hac vice* forthcoming)
Nicholas Jackson (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
njackson@hfajustice.com

William H. Anderson (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
5353 Manhattan Circle, Suite 204
Boulder, CO 80303
Tel: (202) 559-2433
wanderson@hfajustice.com

Simon Wiener (*pro hac vice* forthcoming)
**HANDLEY FARAH & ANDERSON PLLC**
68 Harrison Avenue, Suite 604
Boston, MA 02111
Tel: (202) 921-4567
swiener@hfajustice.com

***Counsel for Plaintiffs and the Proposed Class***

Candice J. Enders (*pro hac vice* forthcoming)
Julia R. McGrath (*pro hac vice* forthcoming)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark (*pro hac vice* forthcoming)
Stephen J. Teti (*pro hac vice* forthcoming)
Arielle S. Wagner (*pro hac vice* forthcoming)
Eura Chang (*pro hac vice* forthcoming)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Facsimile: (612) 339-0981
bdclark@locklaw.com
sjteti@locklaw.com
aswagner@locklaw.com
echang@lawlaw.com

***Additional Counsel for Plaintiffs and the Proposed Class***