IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| SUSAN SCHARPF, *on behalf of herself and all others similarly situated, et al.*, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Civil Action No. 1:23-cv-01372 (AJT/WEF) |
| GENERAL DYNAMICS CORP., *et al.*, | ) ) ) | |
| *Defendants.* | ) ) ) | |

## **MEMORANDUM OPINION AND ORDER**

In this antitrust putative class action, Defendants[1] have filed a Joint Motion to Dismiss for Failure to State a Claim, [Doc. No. 178] (the "Joint Motion"), and, separately, various individual Motions to Dismiss for Failure to State a Claim, [Doc. Nos. 180, 181, 184, 187, 189, 191, 193] (the "Individual Motions"). For the reasons stated below, the Joint Motion is GRANTED on the grounds that the claims by the named plaintiffs are barred by the applicable statute of limitations.[2]

## **I. BACKGROUND**

In this antitrust action, Plaintiffs Susan Scharpf and Anthony D'Armiento (together, "Plaintiffs") brought suit on October 6, 2023 on behalf of themselves individually and, under

---

[1] The Defendants are General Dynamics Corp., Bath Iron Works Corp., Electric Boat Corp., General Dynamics Information Technology, Inc., Huntington Ingalls Industries, Inc., Newport News Shipbuilding and Dry Dock Co., Ingalls Shipbuilding, Inc., HII Mission Technologies Corp., HII Fleet Support Group LLC, Marinette Marine Corporation, Bollinger Shipyards, LLC, Gibbs & Cox, Inc., Serco, Inc., CACI International Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC, BMT International, Inc., Technology Financing, Inc., and Faststream Recruitment Ltd. BMT and Technology Financing have been dismissed from this action, [Doc. No. 200], and Plaintiffs have filed a notice of settlement with Faststream and a motion for the Court to preliminarily approve of that settlement, certify a settlement class, and appoint settlement class counsel. [Doc. Nos. 201, 219].

[2] Because the Court will grant the Joint Motion, it does not need to reach the Individual Motions, which will be denied as moot.

Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of a class "consisting of all persons employed as naval architects and/or marine engineers in the United States by Defendants" (the "Class"). [Doc. No. 1] at 1 (the "Complaint").[3] Scharpf worked in the alleged relevant market from 2007 to 2013, first, as a naval architect at Alion Science & Technology Corporation from 2007 to 2009, then, as a naval marine engineer with Computer Sciences Corporation from 2009 to 2011, and finally, as a marine engineer with Gibbs & Cox, Inc. from 2011 to 2013. *Id.* ¶ 19. D'Armiento worked in the alleged relevant market from 2002 to 2004 when he was employed as a naval architect with Northrop Grumman Ship Systems[4] from 2002 to 2004. *Id.* ¶ 20.

The Complaint alleges as its sole cause of action a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, which provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

*Id.*

Briefly summarized, the Complaint alleges in support of that Section 1 claim that Defendants—who comprise approximately "75 percent of the relevant market"—entered into a conspiracy in restraint of trade that consists of an "'unwritten gentlemen's agreement' not to affirmatively recruit one another's naval engineers" or naval architects, *id.* ¶¶ 244, 242, and that

---

[3] More specifically, the Complaint purports to include in the proposed Class "[a]ll naval architects and marine engineers employed by Defendants (except Defendant Faststream Recruitment Ltd.), their predecessors, subsidiaries, and/or related entities in the United States at any time from January 1, 2000, until Defendants' unlawful conduct ceases." *Id.* ¶ 227. The proposed Class excludes "Defendants' executives, human resources managers, and human resources staff; Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; and federal, state, or local governmental entities." *Id.* ¶ 228.

[4] Northrop Grumman Ship Systems was a former division of Northrop Grumman Corporation that has since been spun off into a new entity named "Huntington Ingalls Industries, Inc." *Id.* ¶ 20.

this agreement "suppressed wages for naval engineers below competitive levels, depriving Plaintiffs and the Class of hundreds of millions of dollars in compensation," *id.* ¶ 1.

### A. The Naval Industry

Plaintiffs' Section 1 conspiracy claim pertains only to that part of the naval industry involved with the design and manufacture of the United States "public fleet," that is, vessels owned or operated by federal and state governments or agencies, which are built domestically, while most commercial vessels are built overseas. *Id.* ¶ 116. The domestic shipbuilding industry generates approximately $30 billion a year, nearly 80% of which is derived from military shipbuilding, maintenance, and repairs, and employs approximately 108,000 workers. *Id.* ¶ 117. Thus, the country's major and minor shipbuilding yards rely predominantly on contracts with the U.S. military. *Id.* ¶ 116. As of 2020, about 10,000 of those workers were employed as naval architects or marine engineers. *Id.* ¶ 121.

"Naval architects" design vessel hulls and are responsible for a vessel's overall stability and performance, while "marine engineers" design onboard systems such as propulsion mechanics, electrical systems, water purification, heating systems, and air conditioning. *Id.* ¶ 122. While personnel within these two categories are employed under various titles, the Complaint refers to all of them as "naval engineers." *Id.* Naval engineers earn a median salary of $100,000, and generally must have a bachelor's degree in engineering and U.S. citizenship; but some roles additionally require either master's degrees, doctoral degrees, other specialized training, or security clearances. *Id.* ¶¶ 123-25. Most of the naval engineers in the United States work for (1) shipbuilders, (2) dedicated engineering consultancies, or (3) the federal government directly. *Id.* ¶¶ 127-31. Naval engineering skills are highly transferable, and consequently, Defendants are "horizontal competitors" in this labor market for the same pool of talent. *Id.* ¶¶ 132-33. According

to the Complaint, given that limited pool of talent, together with job characteristics that ordinarily promote job mobility such as at-will employment agreements and the industry's geographic concentration, one would expect a competitive environment in which Defendants would "headhunt" experienced candidates, but they did not do so because of their no-poach conspiracy. *Id.* ¶ 126.

The Complaint further alleges that the nature of the domestic ship-building industry encourages the type of anticompetitive conduct at issue here. In that regard, construction projects in the industry typically require collaborative participation from a plethora of contractors, subcontractors, and firms, *see id.* ¶¶ 119, 129; thus, consultancies and shipbuilders often work together across multiple projects, *id.* ¶ 137. As described in the Complaint:

> This repeat-player dynamic encourages close and cooperative inter-firm relationships that extend to the individual level—so much so that one industry veteran described the various firms as "allied places." It also ensures that competing firms' fates are bound to each other by networks of obligation and favoritism that provide each firm with many opportunities to help friends and punish rivals who are perceived as competing "out of bounds."

*Id.* This environment also produces industry groups, conferences, and other regular events at which competitors are free to "interact privately without any digital record." *Id.* ¶ 138. Moreover, industry executives are geographically concentrated in the Washington, D.C., Northern Virginia, and East Coast areas, which further "facilitated Defendants' no-poach conspiracy." *Id.* ¶¶ 139-40.

**B. The No-Poach Conspiracy**

The Complaint alleges that, though the "origins [of the conspiracy] are obscure," all major industry players had joined in the conspiracy by 2000, *id.* ¶ 160, and the conspiracy has continued despite "sales, spin-offs, reorganizations, and other corporate events during the Class Period" because business units maintained continuity through legacy names, personnel, operating practices, and culture. *Id.* ¶¶ 160-61.

4

In support of Plaintiffs' claim that a conspiracy was formed and continues to this day, the Complaint alleges the statements of a wide range of industry participants:

> Managers with hiring authority repeatedly and independently confirmed the existence of an industry-wide "gentlemen's agreement," using that term, not to actively poach from competitors. Another senior employee conveyed that a company that had broken the rules was "not supposed to do that." Each Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime.

*Id.* ¶ 142. The Complaint also cites similar statements by several other unnamed witnesses. *See, e.g., id.* ¶¶ 143, 146-48, 150-58. Moreover, Plaintiffs allege that each of the Defendant entities or business units were connected to the conspiracy by at least one witness who either (1) named the individual Defendant as a part of the conspiracy, (2) discussed how the conspiracy related to an individual seeking to change employment in the industry, or (3) acknowledged that the Defendant had a policy or practice of not recruiting competitors' employees. *Id.* ¶ 159.

A main feature of the alleged conspiracy is that the Defendants actively avoided recruiting from other Defendants' naval engineers, except when naval engineers made the initial approach to a Defendant, in which case Defendants could and did hire them. *Id.* ¶ 161. "No Engineering Defendant, much less *all Engineering Defendants*, would arrive at such a combination of practices independently without a mutual understanding that the other Engineering Defendants would restrict themselves to the same policies."[5] *Id.* ¶ 162. Moreover, according to one witness, "[t]here was so much more demand [for employees] than there was talent," *id.* (second alteration in original), and thus, the Complaint alleges, Defendants should have been engaged in a "war for talent in which Defendants offered regular promotions and pay increases, attempted to lure talent

---

[5] The Complaint defines "Engineering Defendants" as "the group of business units operated by Defendants other than Faststream Recruitment Ltd.—i.e., the units that employ or employed naval engineers during the Class Period." *Id.* ¶ 22. The Complaint uses "each Engineering Defendant" to refer to "such functional business unit that exists or existed with an independent identity at the relevant time(s)." *Id.* And the Complaint uses "All Engineering Defendants" to "refe[r] to all such business units that exist or existed with an independent identity at the relevant time(s)." *Id.*

away from rivals, and matched offers from competitors trying to do the same," *id.* ¶ 163. "[T]he only explanation for firms' parallel failure to actively recruit from competitors is an unlawful agreement," *id.* ¶ 164, and the following "plus factors" indicate an unlawful conspiracy rather than merely parallel action based on independent decision making:

> (1) high barriers to entry;
>
> (2) shared financial incentives to maintain low salaries industry-wide;
>
> (3) shared pressure from government customers to keep costs low;
>
> (4) extensive repeat-player working relationships among competitors, with opportunities for a range of informal punishments that can be used to enforce the unlawful no-poach agreement;
>
> (5) social ties between key personnel, encouraging trust and cooperation among competitors;
>
> (6) opportunities to collude at industry events, social events, and frequent informal meetings among key personnel; and
>
> (7) a culture of secrecy that insulates the industry from rigorous oversight and enables collusion.

*Id.* ¶ 166-75.

Defendants are also alleged to have participated in the conspiracy by sharing sensitive compensation information, both at in-person events, *id.* ¶¶ 178-81, and through third parties such as Faststream, *id.* ¶¶ 182-83. This information sharing scheme "enabled Defendants to confirm that their no-poach agreement was continuing to have its desired effect of suppressing compensation and that their competitors' compensation was not indicative of true competition for labor." *Id.* ¶ 183. Notably, this information was not provided to Defendants' employees. *Id.* ¶ 182.

Plaintiffs also allege several ways in which the Defendants concealed their conspiracy, specifically, that Defendants (1) avoided putting the alleged agreement in writing, *id.* ¶ 205; (2) entered pretextual teaming agreements that contained limited no-hire clauses, *id.* ¶ 206; (3)

6

represented that they offer "competitive" compensation, *id.* ¶¶ 207-08; (4) made "public and private" representations to "direct attention away" from the alleged conspiracy, such as one Defendant's reference to a "grow our own" workplace development approach, *id.* ¶ 209; (5) represented that they adhere to ethical standards, federal laws, and antitrust laws in particular, *id.* ¶¶ 210-15; (6) represented that they preserve confidential business and employee information, *id.* ¶ 216; and (7) represented that they actively recruit potential employees, *id.* ¶ 217.

## II. LEGAL STANDARD

Under Rule 12(b)(6), "a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). However, to survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and citations omitted). Dismissal of a complaint is appropriate when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While the well-pleaded facts within a complaint are considered by the Court to be true, legal conclusions are not afforded the same presumption. *Id.* at 678. Further, the Court may consider the assertion of the statute of limitations as an affirmative defense pursuant to Federal Rule of Civil Procedure 12(b)(6) "if the time bar is apparent on the face of the complaint." *Dean*

*v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (noting that it is appropriate to rule on an affirmative statute of limitations defense "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint").

### III. ANALYSIS

In the Joint Motion, Defendants seek dismissal based on the statute of limitations.[6] [Doc. No 178-1] at 10; *see* 15 U.S.C. § 15b. As alleged in the Complaint, the Plaintiffs' employment and participation in the relevant market ended no later than 2004 (as to D'Armiento) and 2013 (as to Scharpf). [Doc. No. 1] ¶¶ 19-20. The expiration of the Sherman Act's applicable four-year statute of limitations as to both Plaintiffs, without any tolling, is therefore clear from the face of the Complaint. Plaintiffs contend, however, and the Defendants dispute, that the Complaint sufficiently alleges fraudulent concealment to toll the statute of limitations.[7]

#### A. Fraudulent Concealment in the Fourth Circuit

To plead fraudulent concealment, Plaintiffs must sufficiently allege that "(1) the [Defendants] fraudulently concealed facts which are the basis of a claim, and that (2) the [Plaintiffs] failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987). Although the circumstances constituting fraudulent concealment, as with all allegations of

---

[6] Defendants also seek dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Given the Court's dismissal based on the applicable limitations period, the Court will not rule on this asserted alternative ground for dismissal.

[7] While the Complaint also raises the continuing violation doctrine to toll the statute of limitations, *see Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997), it does so in reference to the interests of potential class members, *see* [Doc. No. 1] at ¶ 202; and Plaintiffs concede that the doctrine does not relate to acts prior to the last four years. [Doc. No. 202] at 42. Therefore, it appears to be undisputed that the named Plaintiffs do not allege that the continuing violation doctrine applies to their individual claims. As such, "[Plaintiffs'] only hope is to invoke fraudulent concealment doctrine to start the limitations period later than [four years prior to the instatement of the action]; if this argument fails, there is no need to reach the others." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177 (4th Cir. 2007).

fraud, must be pleaded with particularity, *see* Fed. R. Civ. P. 9(b), the Fourth Circuit has recognized that, "[i]n cases involving alleged fraud by omission or concealment, it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023). Accordingly, "plaintiffs may partly rely on information and belief without running afoul of Rule 9(b)" as long as they "state the factual allegations that make their belief plausible." *Id.* However, "this relaxed standard 'does not *eliminate* the particularity requirement.'" *Id.* (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987)).

In a series of cases, the Fourth Circuit has discussed the sufficiency of factual allegations for the purpose of tolling based on fraudulent concealment. In *Pocahontas*, the plaintiff sued various coal-mining companies after the statute of limitations had expired for, as is relevant here, price-fixing under the Sherman Act.[8] *Id.* In an effort to avoid dismissal of the action as untimely, the plaintiff argued that the defendants had "employed techniques of secrecy" to conceal the conspiracy. In support of that claim, plaintiffs pointed to the defendants' response when asked why the price for delivered coal was so low and why the defendants refused to accept certain deliveries of coal; that is, rather than admit the conspiracy, the defendants lied. *Id.* at 218; *see Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 123 (4th Cir. 1995) (discussing *Pocahontas*). Explaining that "[i]t can hardly be imagined that illegal activities would ever be so gratuitously revealed," *Pocahontas*, 828 F.2d at 219, the Fourth Circuit dismissed as "sophistry" the plaintiff's argument that such a "failure to own up to illegal conduct" in response to a "timid inquiry" was enough to toll the statute of limitations. *Id.* at 218–19.

---

[8] The plaintiff theorized that the defendants had conspired to monopolize the metallurgical coal trade in certain West Virginia counties, thereby eliminating the plaintiff (a competing contract coal miner) from the market. 828 F.2d at 215.

In *Marlinton*, the Fourth Circuit formalized its approach to fraudulent concealment. There, food store plaintiffs alleged that several large dairy defendants had concealed their conspiracy to fix milk prices. 71 F.3d 121. The Fourth Circuit rejected the "separate and apart" standard, which "consider[s] only those acts of concealment completed *subsequent in time* to the wrong," *id.* at 125 (quoting *Texas v. Allan Construction Co.*, 851 F.2d 1526, 1532 (5th Cir. 1988)), and held that the proper standard for such claims is the "intermediate, affirmative acts" standard, which requires plaintiffs to provide evidence of affirmative acts of the defendants' concealment but allows for the consideration of conduct both before and after the completion of the conduct constituting the offense.[9] 71 F.3d at 125.

In *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278 (4th Cir. 2012), *aff'g sub nom. Boland v. Consolidated Multiple Listing Service, Inc.*, 868 F. Supp. 2d 506 (D. S.C. 2011), the plaintiffs alleged a conspiracy between several defendants to restrain competition and raise prices for real estate services. *Boland*, 868 F. Supp. 2d at 509. The plaintiffs argued that they had adequately pleaded fraudulent concealment by alleging "acts of concealment such as meeting secretly, giving pretextual reasons for the costs of real estate services, and agreeing at meetings" to not discuss the conspiracy publicly. *Id.* at 517–18. The district court rejected these allegations as insufficient under Rule 9(b), finding, as the Fourth Circuit did in *Pocahontas*, that such allegations "amount to no more than a failure to admit wrongdoing, which does not suffice." *Id.* at

---

[9] *Marlinton* also suggested that *Pocahontas* did not exclude the possibility of a third, "self-concealing" standard, which would permit a plaintiff to satisfy the "affirmative acts" element of fraudulent concealment simply by demonstrating that the underlying antitrust violation was inherently deceptive. *Id.* at 123 n.1. Ultimately, the Fourth Circuit held that the "intermediate, affirmative acts" standard was applicable because "[a]lthough [price-fixing] is generally secretive, it need not be so." *Id.* A later decision clarified that "[t]he self-concealing standard is only proper when deception or concealment is a necessary element of the antitrust violation." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541 n.24 (4th Cir. 1997). As far as the Court could determine, no court in this circuit has applied the "self-concealing" standard; in any event, Plaintiffs and Defendants appear to agree that the intermediate, affirmative acts standard applies here. *See* [Doc. No. 1] ¶ 204-26; [Doc. No. 178-1] at 13–19.

10

518. On appeal, the Fourth Circuit specifically affirmed the district court's conclusion on this issue. *Robertson*, 679 F.3d at 291 n.2 (citing *Pocahontas*, 828 F.2d at 218–19).

Finally, in *Edmonson v. Eagle National Bank*, 922 F.3d 535, 553 (4th Cir. 2019), the Fourth Circuit applied *Marlinton*'s "intermediate, affirmative acts" standard to allegations that the defendants had employed "trick[s] or contrivance[s]" to conceal a kickback scheme prohibited by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* The Fourth Circuit found that the plaintiffs had sufficiently pleaded affirmative acts constituting a fraudulent concealment of their scheme when they alleged with sufficient particularity under Rule 9(b) that the defendants (1) "created and used 'sham' entities to channel the allegedly unlawful cash kickbacks"; (2) entered sham, "back-dated" agreements to conceal the scheme from investigators; and (3) omitted reporting the kickback payments on plaintiffs' settlement statements, "notwithstanding that governing regulations *required* reporting such payments." *Id.* at 553–54.

### B. Plaintiffs' Allegations Do Not Sufficiently Plead Affirmative Acts of Concealment

Relying on the Fourth Circuit's pronouncements regarding the fraudulent concealment doctrine in *Edmonson* and *Marlinton*, and the relaxed pleading standard for fraud under Rule 9(b) as set out by *Corder*, Plaintiffs point to the following categories of allegations in their Complaint that reflect how the Defendants affirmatively concealed their "no-poach" conspiracy:

(1) Defendants agreed to keep the alleged agreement secret, *see, e.g.*, [Doc. No. 1] ¶ 205 (alleging Defendants avoided putting the alleged agreement in writing);

(2) Defendants made general public and non-public representations that they offer "competitive" compensation and actively recruit employees, *see, e.g., id.* ¶¶ 207-09 (alleging Defendants represented that they offer "competitive" compensation); *id.* ¶ 217 (alleging Defendants represented that they actively recruit potential employees);

(3) Defendants made general statements that they comply with antitrust laws and are essentially law-abiding and ethical, *see, e.g., id.* ¶¶ 207-17 (alleging Defendants failed to admit illegal conduct in web pages, published reports, and codes of

conduct); *id.* ¶¶ 210-15 (alleging Defendants represented that they adhere to ethical standards, federal laws, and antitrust laws in particular); *id.* ¶ 216 (alleging Defendants represented that they preserve confidential business and employee information); and

(4) Defendants included non-solicitation clauses in teaming agreements as "cover" for the unlawful no-poach scheme, *see, e.g., id.* ¶ 206.

The holdings and pronouncements in *Pocahontas*, *Marlinton*, *Boland* and *Robertson,* and *Edmonson* require a rejection of all four of these categories of allegations as insufficient to plead fraudulent concealment at the motion to dismiss stage.

In *Boland* and *Robertson,* the district court and the Fourth Circuit rejected as insufficient to toll the statute of limitations plaintiffs' allegations that defendants (1) met secretly, (2) gave pretextual reasons for real estate costs, and (3) agreed to keep secret the nature of their communications to conceal their illegal agreement. *See Boland*, 868 F. Supp. 2d at 518; *Robertson*, 679 F.3d at 291 n.2. The allegations here that Defendants agreed to keep the conspiracy secret (category one) fare no better than those in *Boland* and *Robertson*; and while Plaintiffs here allege certain "pretextual reasons" and public misrepresentations (categories two and three) with more specificity than the plaintiffs in *Boland* and *Robertson*, these allegations are, in substance, claims that Defendants lied and "fail[ed] to own up to illegal conduct." *See Pocahontas*, 828 F.2d at 218. In fact, these statements have even less connection to the alleged conspiracy than the allegations in *Pocahontas* regarding the defendants' purportedly false responses to the plaintiff's inquiry. *See id.* As the Fourth Circuit explained in *Marlinton*, it is not enough to allege that "the defendants … lied" upon "general inquiry." *Marlinton*, 71 F.3d at 123. Here, the allegations are that Defendants simply failed to admit or disclose their conspiracy without *any* inquiry of them at all. As such, the allegations are insufficient to plead affirmative acts of concealment.

12

Plaintiffs attempt to distinguish *Boland* by pointing to an allegation in the underlying complaint that the defendants had agreed "to develop, implement, enact, and facilitate the enforcement of unlawful CMLS Rules, regulations, by-laws, policies, and procedures." *See Boland*, 868 F.Supp.2d at 513. Plaintiffs argue that the Fourth Circuit's affirmance of the district court's statute of limitations ruling was therefore based on the district court's recognition that the challenged agreements were not *affirmatively* concealed, but rather were "memorialized," "adopted in non-public meetings," and simply "not publicized." [Doc. No. 202] at 32–33. In other words, the challenged agreements were presumably discoverable, while the "gentlemen's agreement" here was unwritten, concealed and therefore undiscoverable. *See id.* at 33.

This argument falls short. First, rather than relying on the memorialized nature of the challenged agreements for its rejection of any tolling, as Plaintiffs suggest, the district court in *Boland* focused on whether the plaintiffs' allegations that the defendants "used means and methods designed to avoid detection" sufficiently alleged affirmative acts of concealment and concluded that they did not.[10] *Boland*, 868 F. Supp. 2d at 518. Second, to the extent that Plaintiffs argue that the decision to participate in a secret conspiracy is *itself* an affirmative act, *see* [Doc. No. 1] ¶ 204 (asserting as an affirmative act that "Defendants had established an 'unwritten rule' that no one Defendant would affirmatively recruit the other's naval engineers"), the Fourth Circuit in *Marlinton* explained that antitrust violations that are not "inherently deceptive" are subject to the "intermediate, affirmative acts" standard, not the "self-concealing" standard. *Marlinton*, 71 F.3d at 123 n.1. As this Court has explained, the "self-concealing" standard does not apply here, nor do

---

[10] Similarly problematic is Plaintiffs' apparent reliance, *see* [Doc. No. 202] at 33, on *Robertson*'s recognition that the "concerted conduct" in that case was "both plainly documented and readily available so that plaintiffs can describe the factual content of the agreement without the benefit of extended discovery." *Robertson*, 679 F.3d at 290. But that aspect of the decision related to whether the plaintiffs had pleaded facts sufficient to establish the *conspiracy itself*. *See id.* at 288 (holding that "the complaints satisfied the pleading requirements set forth in *Twombly*"). Here, by contrast, the question is whether Plaintiffs point to *affirmative acts* that concealed facts that are the basis of their claim.

Plaintiffs contend that it does, *see supra* note 9, and they therefore may not succeed on their claim that, by the creation of and participation in a secret conspiracy, the Defendants committed an act of concealment that tolls the statute of limitations. At bottom, the first three categories of allegations are simply alleged failures to admit wrongdoing, and as such, are insufficient to plead affirmative acts under Rule 9(b).

Plaintiffs are therefore left with their argument that the no-hire clauses in the teaming agreements are "sham provisions" that constitute affirmative acts of concealment. *See* [Doc. No. 1] ¶ 206. In that regard, Plaintiffs contend that the no-hire clauses are "shams" because they are "duplicative"; that is, they "occlude the conspiracy by presenting an explanation for the industry's lack of recruitment in which the teaming agreement tail wags the no-poach dog."[11] [Doc. No. 202] at 35.

Plaintiffs' no-poach dog won't hunt. In *Edmonson*, the underlying complaints alleged that the "sham" business entities were used "for the *sole* purpose of receiving the [kickback] payments," and that those payments were further disguised by "sham" agreements that set a fee schedule that was not followed when payments were made, and under which the referring brokers performed no services. *Edmonson*, 922 F.3d at 542 (emphasis added). But the no-hire clauses alleged here have none of the features of the "sham" entities and instruments in *Edmonson*. *See Sham*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A false pretense or fraudulent show; an imposture. 2. Something that is not what it seems; a counterfeit."). Indeed, these no-hire clauses— whose lawfulness Plaintiffs do not challenge—plainly serve the presumably valid purpose of

---

[11] Plaintiffs also allege that the no-hire clauses "misled Plaintiffs" by "creat[ing] the false impression that workers could be solicited and recruited by rivals who were *not* working on their projects." [Doc. No. 1] ¶¶ 206, 13. But the Complaint does not allege *which* Defendants entered the teaming agreements containing these no-hire clauses, or that the Plaintiffs were even aware of such agreements when working for certain Defendants between 2002 and 2013. *See* [Doc. No. 1] ¶¶ 19-20. In short, there are no allegations as to how the Plaintiffs were misled, and their conclusory claim thus fails to "state the factual allegations that make their belief plausible." *Corder*, 57 F.4th at 402.

prohibiting solicitation for the duration of a teaming agreement. *See* [Doc. No. 1] ¶ 13 ("These written teaming agreements were used to cover up the Defendants' unlawful 'gentlemen's agreement' with more credibly defensible project-based limitations."). Perhaps more importantly, there is no allegation that these Plaintiffs were "diverted away" from litigation by, or were even aware of, these provisions.[12]

For these reasons, Plaintiffs have not pleaded facts sufficient to satisfy the affirmative acts element of the Fourth Circuit's fraudulent concealment doctrine, and the Complaint therefore fails to allege facts sufficient to toll the expiration of the applicable statute of limitations apparent on the face of the Complaint.[13]

## IV. CONCLUSION

Accordingly, for the above reasons, it is hereby

**ORDERED** that the Joint Motion to Dismiss, [Doc. No. 178], be, and the same hereby is, **GRANTED**; and this action is dismissed as time-barred under the applicable statute of limitations; and it is further

**ORDERED** that the Individual Motions, [Doc. Nos. 180, 181, 184, 187, 189, 191, 193], be, and the same hereby are, **DENIED** as moot; and it is further

**ORDERED** that the Motion for Preliminary Approval of Settlement, [Doc. No. 219], be, and the same hereby is, **DENIED** as moot.

---

[12] Plaintiffs take the position, itself unsupported, that "reliance [on affirmative acts] is not required for this element of fraudulent concealment." *See* [Doc. No. 202] at 36. But a plaintiff's exposure to an affirmative act and its misleading effect is a core aspect of this element of the test that certainly has some aspect of exposure and reliance built into it. *See, e.g.*, *Edmonson*, 922 F.3d at 549 (noting that the fraudulent concealment doctrine applies "where the defendant has wrongfully deceived or misled *the plaintiff*") (emphasis added) (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987)).
[13] Because the Court holds that the Plaintiffs have failed to plead facts sufficient to support the affirmative acts element, the Court does not reach the due diligence element.

The Clerk is directed to send a copy of this Order to counsel of record and enter judgment in accordance with this Order pursuant to Fed. R. Civ. P. 58.

April 19, 2024
Alexandria, Virginia

_/s/_

Anthony J. Trenga
Senior United States District Judge

16