IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SUSAN SCHARPF,                                    )
*on behalf of herself and all others similarly*  )
*situated*,                                       )
                                                  )
                    *Plaintiffs*,                 )
                                                  )
        v.                                        )        Civil Action No. 1:23-cv-01372 (AJT/WEF)
                                                  )
GENERAL DYNAMICS CORP., *et al.*,                 )
                                                  )
                    *Defendants*.                 )
_____          )

## **ORDER**

In this antitrust putative class action, all Defendants[1] have filed a Joint Motion to Dismiss for Failure to State a Claim, [Doc. No. 178] (the "Joint Motion"), and, separately, seven Defendants[2] have filed Motions to Dismiss pursuant to Rule 12(b)(6), [Doc. Nos. 180, 181, 184, 187, 189, 191] (collectively the "Individual Motions"). In an Order dated April 19, 2024, the Court granted the Joint Motion on the grounds that this action was time barred and denied as moot the Individual Motions and the Joint Motion filed on other grounds. [Doc. No. 224]. The Fourth Circuit reversed and remanded this Court's dismissal on May 9, 2025, in large part, on the grounds that the required inferences necessary to plausibly establish tolling of the applicable statute of

---

[1] The twenty defendants are General Dynamics Corp., Bath Iron Works Corp., Electric Boat Corp., General Dynamics Information Technology, Inc., Huntington Ingalls Industries, Inc., Newport News Shipbuilding and Dry Dock Co., Ingalls Shipbuilding, Inc., HII Mission Technologies Corp., HII Fleet Support Group LLC, Marinette Marine Corporation, Bollinger Shipyards, LLC, Gibbs & Cox, Inc., Serco, Inc., CACI International Inc., The Columbia Group, Inc., Thor Solutions, LLC, Tridentis, LLC, BMT International, Inc., Technology Financing, Inc., and Faststream Recruitment Ltd. (collectively, "Defendants"). Of those twenty defendants, BMT International, Inc. and Technology Financing, Inc. have been dismissed from this action, [Doc. No. 200], and Plaintiff reached a settlement with Faststream Recruitment Ltd., [Doc. No. 318], which the Court approved on October 23, 2025, [Doc. No. 332].
[2] Those seven defendants are: General Dynamics Corp., [Doc. No. 180]; Marinette Marine Corporation., [Doc. No. 187]; Bollinger Shipyards, LLC, [Doc. No. 187]; Serco, Inc., [Doc. No. 184]; CACI International Inc., [Doc. No. 191]; Thor Solutions, LLC, [Doc. No. 181], and Tridentis, LLC, [Doc. 189]. BMT International, Inc. and Technology Financing, Inc. also filed individual motions to dismiss, [Doc. No. 193], but have since been dismissed from this action [Doc. No. 200].

1

limitations could be drawn from alleged statements made by "confidential" witnesses that a "gentlemen's agreement" existed, that each defendant was a party to that agreement, and that the parties to that agreement further agreed not to memorialize the agreement in writing or otherwise publicly acknowledge that agreement. *See Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 200 (4th Cir. 2025). Because of its dismissal based on the statute of limitations, the Court did not rule on, and there remained unresolved within the Joint Motion and Individual Motions, motions to dismiss for failure to state a claim.[3]

Upon consideration of the Joint Motion and the Individual Motions, the briefing, the record, and for the reasons stated below, the balance of the Joint Motion [Doc. No. 178] and the Individual Motions [Doc. Nos. 180, 181, 184, 187, 189, 191] are **DENIED**.

## I.    BACKGROUND

Plaintiff Susan Scharpf [4] brings this putative class action lawsuit against twenty defendant companies, including her former employers, alleging that Defendants conspired to depress compensation for Plaintiff and those similarly situated in naval architect and marine engineer roles, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. [Doc. No. 1] ¶¶ 1, 242 (the "Complaint"). Plaintiff alleges the following in the Complaint:

In the United States naval industry, several companies design and manufacture the vessels owned or operated by federal and state governments (the "Relevant Market"). *Id.* ¶ 116. The Relevant Market generates approximately $30 billion a year and employs approximately 108,000 workers. *Id.* ¶ 117. As of 2020, about 10,000 of those workers were allegedly employed as naval

---

[3] The Court held a status conference on July 24, 2025, at which time the Parties collectively requested that this Court rule on the balance of the Joint Motion and Individual Motions, [Doc. No 250]. Pursuant to the Court's Order [Doc. No. 258], the parties filed supplemental briefing concerning the effect of the Fourth Circuit's opinion on the Joint Motion and Individual Motions. *See* [Doc. Nos. 264–70]

[4] Formerly named Plaintiff Anthony D'Armiento voluntarily dismissed his claims. [Doc. No. 277].

architects or marine engineers (collectively "naval engineers"), the positions formerly held by the Plaintiff and the proposed putative class. *Id.* ¶¶ 19, 121. Naval engineers design vessel hulls, are responsible for a vessel's overall stability and performance, and design onboard systems such as propulsion mechanics, electrical systems, water purification, heating, and air conditioning. *Id.* ¶ 122. Plaintiff Scharpf worked as a naval architect at Alion Science & Technology Corporation from 2007 to 2009, as a naval marine engineer with Computer Sciences Corporation from 2009 to 2011, which was sold to CACI International, Inc. in August 2018, and as a marine engineer with Gibbs & Cox, Inc., from 2011 to 2013. *Id.* ¶ 19.

In the Relevant Market, Defendants operate as shipbuilders, specialized consulting firms, and a recruiting firm. *Id.* ¶ 3. The shipbuilders are identified as (i) General Dynamics Corporation, and its subsidiaries Bath Iron Works Corporation, Electric Boat Corporation, and General Dynamics Information Technology, Inc.; (ii) the Huntington Ingalls Defendants, which includes Huntington Ingalls Industries Inc. ("Huntington Ingalls"), Newport News Shipbuilding and Dry Dock Company, Ingalls Shipbuilding Inc, HII Fleet Support Group LLC, and HII Mission Technologies Corp.; (iii) Bollinger Shipyards ("Bollinger"); and (iv) Marinette Marine Corporation. *Id.* ¶¶ 3, 23–62. The specialized engineering consulting firms, responsible for "help[ing] design, refit, and maintain nearly every ship in the U.S. fleet," are identified as: (i) Gibbs & Cox, Inc. ("Gibbs & Cox"); (ii) Serco Inc. ("Serco"); (iii) Technology Financing Inc.; (iv) BMT International Inc.; (v) CACI International Inc. ("CACI"); (vi) The Columbia Group Inc.; (vii) Thor Solutions LLC ("Thor Solutions"); and (viii) Tridentis LLC ("Tridentis"). *Id.* ¶¶ 3, 63–102. The only recruitment firm in this case is Faststream Recruitment, Ltd. ("Faststream") that "occasionally helped Defendants recruit naval engineers." *Id.* ¶ 3. Plaintiff alleges that these

twenty Defendants "together control approximately 75 percent of the Relevant Market." *Id.* ¶¶ 244–45.

During the proposed class period, 2000 to the present day, Defendants allegedly wielded their market power to conspire to restrain trade through an unwritten "gentlemen's agreement" not to "affirmatively recruit one another's naval engineers," with some maintaining "do not hire" lists, unless the naval engineers initiated contact and independently applied to work at another company. *Id.* ¶¶ 9, 160, 161, 242, 244. As a result of this "gentlemen's agreement," competition for talented engineers has allegedly been "stifled" and naval engineers' wages have been suppressed, despite "industry insiders acknowledg[ing] that there was an industry-wide shortage of naval engineers," that would be expected to result in "a high degree of labor mobility" and "invariably drive[] up compensation." *Id.* ¶¶ 7, 9, 10, 176.

Plaintiff alleges that "[e]very Defendant has been tied to the no-poach agreement by at least one confidential witness." *Id.* ¶ 4. In that respect, Plaintiff quotes anonymous witnesses who explain their knowledge of the non-poach practices adopted by Defendants, with those witnesses being identified as "industry insiders," *id.* ¶¶ 10, 12, 162, 176, and as Defendants' former employees or colleagues.[5]

Plaintiff further alleges that "[s]hipbuilders and engineering consultancies are horizontal competitors for the same pool of naval engineering talent," *id.* ¶ 132, notwithstanding the fact that

---

[5] *See* [Doc. No. 1] ¶ 4 ("Defendants' former executives and managers"); *id.* ¶ 11 (a "former project manager"); *id.* ¶ 12 (someone "who worked as in-house recruiting staff"); *id.* ¶¶ 12, 179 (a third-party recruiter); *id.* ¶ 142 ("[m]anagers with hiring authority"); *id.* (a "senior employee"); *id.* ¶ 148 (a "management-level employee with hiring authority"); *id.* ¶ 157 (an independent recruiter); *id.* ("[h]iring managers"); *id.* ¶ 158 (a "manager who left a Defendant for the government in 2019"); *id.* ("manager who worked in the industry during the last five years"). For a subset of witnesses, Plaintiff specifies whether they were employed by a specific Defendant. *See id.* ¶ 4 ("a former insider from Huntington Ingalls"); *id.* ¶ 146 ("a recruiter from Huntington Ingalls"); *id.* ¶ 150 ("[s]enior managers who worked at Gibbs & Cox, Alion Science & Technology (successor to JJMA, now Serco), and BMT Designers and Planners"); *id.* ¶ 152 ("one executive for Gibbs & Cox"); *id.* ¶ 156 (a "manager involved in recruitment for Thor Solutions"); *id.* ¶¶ 163, 182 ("a former Faststream employee").

shipbuilders and consultancies may have a vertical relationship when shipbuilders "hire engineering consultancies as subcontractors,"[6] *id.* ¶ 133. Based on this no-poach, no-hire, no-recruit agreement between horizontal competitors, Plaintiff alleges the agreement is a "*per se* violation of 15 U.S.C. § 1." *Id.* ¶¶ 2, 14, 242.

With respect to when and how the no-poach agreement was formed, Plaintiff alleges that "[t]hough its origins are obscure, by at least 2000 all major players in the industry had reached a mutual understanding that they would not poach each other's employees." *Id.* ¶ 160. Those "major players" include the following five entities: "[1] Gibbs & Cox, [2] JJMA (now Serco, with pre-sale liabilities owned by HII Mission Technologies), [3] M. Rosenblatt & Co. (now the Columbia Group, with pre-sale liabilities owned by HII Fleet Support), [4] Advanced Marine Enterprises (now CACI, with pre-sale liabilities owned by General Dynamics Information Technology), and [5] Designers and Planners (now BMT)." *Id.* ¶ 149. Other players or newcomers, "like Thor Solutions and Tridentis, who started their firms in the middle of the Class Period, quickly joined the fold." *Id.* ¶ 160. Plaintiff further alleges that "coordination among participants has only become easier as smaller players have consolidated into larger ones," with Plaintiff providing a detailed account of how General Dynamics Information Technology, CACI, Huntington Ingalls, Serco, and other Defendants have acquired industry participants since 2000 and assumed those participants' pre-sale liabilities. *Id.* ¶¶ 31, 37, 42, 46, 51–58, 144. However, Plaintiff does not provide any greater degree of specificity as to dates or general time periods for when each of the twenty Defendants joined the alleged conspiracy.

On October 6, 2023, Plaintiff filed this action on behalf of herself individually and, under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of a class of "[a]ll naval

---

[6] The Complaint does not allege that Faststream, a non-shipbuilder, non-consultancy, is a horizontal competitor.

architects and marine engineers employed by Defendants (except Defendant Faststream Recruitment Ltd.), their predecessors, subsidiaries, and/or related entities in the United States at any time from January 1, 2000, until Defendants' unlawful conduct ceases." *Id.* ¶ 227. The sole count in the Complaint is a violation of Section 1 of the Sherman Act, with Plaintiff requesting damages, an injunction to dismantle the conspiracy, attorney's fees, and any other relief the Court deems necessary and proper. *Id.* at 67–68.

In an Order dated April 19, 2024, this Court granted Defendants' Joint Motion, finding that Plaintiff's suit was time-barred by the Sherman Act's four-year statute of limitations. [Doc. No. 224]. The Fourth Circuit reversed that dismissal and "conclude[d] that, under a relaxed Rule 9(b) standard, Plaintiffs have pleaded affirmative acts of fraudulent concealment with particularity" with respect to the conspiracy, to avoid their claims being time-barred. *Scharpf*, 137 F.4th at 199. On remand, the Court now considers the balance of the Joint Motion and the Individual Motions, which argue pursuant to 12(b)(6) that Plaintiff has failed to plausibly state a Section 1 Sherman Act claim. *See* [Doc. Nos. 178, 180, 181, 184, 187, 189, 191].

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." *Adams v. NaphCare, Inc.*, 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). In addressing a Rule 12(b)(6) motion, a court must assume the truth of all facts alleged in the complaint and construe the factual allegations in favor of the plaintiff. *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222 (4th Cir. 2009). However, to survive a motion to dismiss, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and citations omitted). Dismissal of a complaint is appropriate when the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While the well-pleaded facts within a complaint are considered by the Court to be true, legal conclusions are not afforded the same presumption. *Id.* at 678.

## III.    DISCUSSION

Plaintiff's sole claim is an alleged violation of Section 1 of the Sherman Act through a "gentlemen's agreement" to not poach employees from each other, resulting in depressed wages for naval engineers. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination . . . or conspiracy in restraint of trade." 15 U.S.C. § 1. To establish a Section 1 antitrust violation, "a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423–24 (4th Cir. 2015) (citing *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013)). To state a claim for a conspiracy under the Sherman Antitrust Act, Plaintiff must plead facts that plausibly allege a "conscious commitment to a common scheme designed to achieve [the] unlawful objective." *SD3*, 801 F.3d at 424 (internal citations omitted).

In the Joint Motion, Defendants move to dismiss on the grounds that (1) Plaintiff has not plausibly alleged the existence of a conspiracy and (2) Plaintiff has not alleged a plausible antitrust injury under either the *per se* or the rule of reason approach. In the Individual Motions, seven Defendants contend that even if a conspiracy is adequately alleged, their participation in it is not.

### A.  **The Joint Motion**

1. *Plaintiff has plausibly alleged an anti-trust conspiracy.*

In the Joint Motion, Defendants contend that Plaintiff has failed to adequately allege the existence of a conspiracy in violation of Section 1 of the Sherman Antitrust Act. [Doc. No. 178]

at 19–33. Under Section 1 of the Sherman Act, Plaintiff must plead direct or circumstantial evidence that Defendants illegally agreed to unreasonably restrain trade. *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 289 (4th Cir. 2012). Direct evidence, which is "explicit and requires no inferences to establish the proposition or conclusion being asserted," is "extremely rare in antitrust cases and is usually referred to as the "smoking gun." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (holding that a meeting among antitrust defendants is insufficient direct evidence of an anticompetitive conspiracy). In the absence of direct evidence, a plaintiff must plead "more" than parallel conduct among defendants, and instead must plead facts indicating that the parallel conduct occurred in "a context that raises a suggestion of a preceding agreement," *Twombly*, 550 U.S. at 557, and cannot be explained by "rational and competitive business strategy unilaterally prompted by common perceptions of the market," *id.* at 554. In other words, the facts must demonstrate that the "parallel behavior would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Id.* at 556 n.4 (quoting 6 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1425, at 167–185 (2d ed. 2003). As a result, "conscious parallelism" must be accompanied by "plus factors," such as a "motive to conspire," an "opportunity to conspire," a "high level of inter-firm communications," and "acts contrary to a defendant's economic interest, but rational if the alleged agreement existed." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, at *9 (4th Cir. Sept. 7, 1999) (cleaned up). Although an antitrust plaintiff must make "particularized allegations," they need not "plead evidence," *SD3*, 801 F.3d at 431, and at the motion to dismiss stage, the Court is required to accept all well-pled facts as true and draw all inferences in Plaintiff's favor. *Id.* at 418.

The Defendants argue that Plaintiff's allegations are too "vague" and "conclusory" to provide direct evidence of an agreement and fail to demonstrate that Defendants' alleged parallel conduct amounts to a conspiracy. [Doc. No. 178] at 20–34. More specifically, Defendants argue that (1) Defendants' alleged parallel conduct, without "more," is not enough to satisfy Plaintiff's burden to survive a motion to dismiss and (2) the "plus" factors advanced by Plaintiff do not support the inference of an agreement because they "either reflect features common to many industries or are entirely consistent with unilateral behavior." *Id.* at 25–33.

Plaintiff's Complaint falls short of providing direct evidence of an unlawful agreement, a conspiracy, in violation of Section 1 of the Sherman Act. Nowhere is described how the "gentlemen's agreement," whose origins are "obscure" and which has become established over time, differs in substance from conduct constituting "conscious parallelism." Nor does it appear from the allegations that the alleged "industry-wide no-poach conspiracy" is anything other than the alleged "gentlemen's agreement."[7] As direct evidence, Plaintiff points to alleged statements from multiple eyewitnesses that certain defendants did not recruit the employees of other defendants[8] and that as to certain "Defendant entities or business units, at least one industry witness either named it as part of the industry-wide no-poach conspiracy, discussed an application involving that entity of the no-poach agreement to a particular individual seeking to change employment in the industry, or acknowledged that it had a policy or practice of not recruiting

---

[7] Definitions differ, but a "gentleman's agreement" is typically viewed as an informal, trust-based understanding. *Gentleman's Agreement*, Oxford English Dictionary, https://www.oed.com/dictionary/gentlemens-agreement_n?tl=true (last visited Nov. 25, 2025). Whether this definition reflects what Plaintiff has alleged as a "gentlemen's agreement" is unclear.

[8] *See, e.g.*, [Doc. No. 1] ¶ 148 ("A management-level employee with hiring authority who was subject to the conspiracy's rules confirmed the existence of a 'gentlemen's agreement' among these firms that 'you didn't recruit people' from competitors."); *id.* ¶ 150 ("Senior managers who worked at Gibbs & Cox, Alion Science & Technology (successor to JJMA, now Serco), and BMT Designers and Planners confirmed that they would not actively recruit from competitor firms. One witness, asked about the scope of no-poach agreements in the industry, stated: 'I never recruited anyone actively from a competitor.'").

competitors' employees." [Doc. No. 1] ¶ 159; [Doc. No. 202] at 9–14. But to the extent these statements have any factual content as opposed to mere conclusory allegations, they do not establish the existence of a conspiracy, without the need for additional inferences, as required in this Circuit, and simply reflect adopted practices that plausibly allege, at most, "conscious parallelism."[9] *See Am. Chiropractic Ass'n*, 367 F.3d at 226 ("[D]irect evidence . . . is explicit and requires no inferences to establish the proposition or conclusion being asserted." (quotation marks omitted); *see also Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) ("Section one of the Sherman Act applies only to concerted action; unilateral conduct is excluded from its purview."). Accordingly, Plaintiff must allege "plus" factors in order to plausibly allege a Sherman Act conspiracy.

With respect to the required "plus factors," the Plaintiff again relies heavily on anonymous statements to allege a common motive and opportunity to conspire that further bolsters the plausibility of an agreement. S*ee, e.g.*, [Doc. No. 1] ¶¶ 135, 137, 143, 145, 161–63, 171. Defendants argue that their "independent self-interest" explained their alleged parallel hiring practices, particularly since Defendants frequently teamed up to better serve their government clients; they hired from rivals when motivated to do so by self-interest; and Defendants' naval engineers worked far apart from each other geographically, making it difficult to recruit from one another. [Doc. No. 178] at 26–31. These arguments are substantial, but at the motion to dismiss stage this Court is not permitted to "weigh[] the competing inferences that can be drawn from the complaint," *SD3*, 801 F.3d at 425, and when considered in light of all the allegations in the

---

[9] This is particularly true with respect to the hiring from another defendant someone who without solicitation sought employment, given that the alleged "gentlemen's agreement" did not preclude such hiring, or with respect to a defendant who did nothing other than "acknowledge[] that it had a policy or practice of not recruiting competitors' employees."

Complaint, including the alleged motive to collude and conspire ("a key circumstantial fact,")[10] *id.* at 431, the alleged "incestuous" nature of the "small, close-knit, geographically concentrated industry," [Doc. No. 1] ¶ 143, the alleged frequent interactions among executives, *id.* ¶ 138, and the "education, specialized training, security clearance, and citizenship requirements" that "made the pool of naval engineers small and the cost of replacement significant" such that Defendants would have "every incentive to recruit each other's employees[,]" *id.* ¶¶ 162–63, Plaintiff has plausibly alleged "sufficient "plus" factors. *See SD3*, 801 F.3d at 432 ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."). For the above reasons, Plaintiff has plausibly alleged a conspiracy in violation of Section 1 of the Sherman Act.

    2. *Factual issues preclude at this time a ruling as a matter of law whether the alleged conspiracy constitutes an unreasonable restraint of trade.*

Plaintiff alleges that Defendants' horizontal agreement not to recruit from each other constitutes a violation of Section 1 of the Sherman Act under either the *per se* or rule of reason. [Doc. No. 1] ¶ 242. Defendants argue that the *per se* rule does not apply to Defendants' conduct because there are legitimate reasons, such as teaming arrangements, that explain and justify the need not to recruit each other's employees, and that Plaintiff's Section 1 claim fails under a rule-of-reason analysis. [Doc. No. 178] at 34–35.[11]

___

[10] *See* [Doc. No. 1] ¶¶ 166 –75 (detailing several features of the naval engineering industry that render it "particularly susceptible to collusion," including high barriers to entry, shared financial incentives to maintain low salaries industry-wide; shared pressure from government customers to keep costs low; extensive repeat-player working relationships among competitors, with opportunities for a range of informal punishments that can be used to enforce the unlawful no-poach agreement; social ties between key personnel, encouraging trust and cooperation among competitors; opportunities to collude at industry events, social events, and frequent informal meetings among key personnel; and a culture of secrecy that insulates the industry from rigorous oversight and enables collusion).

[11] In deciding whether Plaintiff adequately pled affirmative acts of fraudulent concealment with particularity with respect to the conspiracy, the Fourth Circuit acknowledged that it "need not determine today whether this alleged no-poach agreement is actually illegal," and that the issue is for "the district court to decide in the first instance." *Scharpf*, 137 F.4th at 202 n.6.

At this stage of the litigation, Plaintiff has plausibly alleged an antitrust injury, but there are numerous factual issues surrounding the alleged "gentlemen's agreement," and the Court cannot conclude one way or the other whether the alleged "gentlemen's agreement" amounted to an unreasonable restraint of trade under either the (1) "*per se* analysis, for obviously anticompetitive restraints," or (2) "the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."[12] *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205–06 (4th Cir. 2002) (quoting *Continental Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 508 (4th Cir. 2002)); see also *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 104 n.26 (1984) ("[T]here is often no bright line separating *per se* from Rule of Reason analysis. Per se rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct."); *Lumber Liquidators, Inc. v. Cabinets to Go, LLC*, 415 F. Supp. 3d 703, 711 (E.D. Va. 2019) ("Because of the inherently fact-intensive nature of this inquiry, disposition of an antitrust suit at the pleading stage is accordingly rarely appropriate.") (internal quotations omitted) (denying motion to dismiss where Court could not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses at this stage of the litigation). Accordingly, Defendants' motion to dismiss Plaintiff's Sherman Act claim for failure to state a claim that Defendants imposed an unreasonable restraint of trade is denied.

**B.  <u>The Individual Motions</u>**

In the Individual Motions, seven Defendants, Thor Solutions, Marinette Marine, Bollinger, Tridentis, Serco, CACI, and General Dynamics Corporation contend that even if a conspiracy is adequately alleged, their own participation in that conspiracy has not been.

---

[12] At times, the Supreme Court has indicated that a third mode of analysis exists, the quick look analysis, for those with some procompetitive justification. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002).

1. *Plaintiff has plausibly alleged that Thor Solutions, Marinette Marine, Bollinger, Tridentis, Serco, CACI, and General Dynamics Corporation participated in a conspiracy to unreasonably restrain trade.*

In actions involving numerous defendants, such as this one, a "global manner of pleading" is insufficient, and Plaintiff must specify how each Defendant was involved. *Langford v. Joyner*, 62 F.4th 122, 126 (4th Cir. 2023) (citing *Barrett v. Bd. of Educ. of Johnston Cnty.*, 590 F. App'x 208, 211 (4th Cir. 2014)); *see Iqbal*, 556 U.S. at 676 (explaining courts require sufficient facts to allow the court to infer liability as to each defendant). Accordingly, the Fourth Circuit has explained:

> A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group. At trial, a § 1 plaintiff will be required to make a factual showing that each defendant conspired in violation of the antitrust laws. Thus, the complaint must forecast that factual showing, and if it fails to allege particular facts against a particular defendant, then the defendant must be dismissed. In other words, the complaint must specify how these defendants were involved in the alleged conspiracy, without relying on indeterminate assertions against all defendants.

*SD3*, 801 F.3d at 422 (cleaned up).

Relying on these pronouncements, Thor Solutions, Marinette Marine, Bollinger, Tridentis, Serco, CACI, and General Dynamics Corporation argue that Plaintiff has not plausibly alleged that they participated in the no-poach conspiracy. [Doc. Nos. 180, 181, 184, 187, 189, 191].

Plaintiff contends that she has "alleged direct evidence of insider witnesses tying each of these Defendants to the alleged conspiracy." [Doc. No. 203] at 1. Specifically, as discussed with respect to the alleged conspiracy, Plaintiff again relies on her allegations that "[e]ach Engineering Defendant in this action is tied to the conspiracy through the testimony of at least one witness who verified the party's adherence to the industry's no-poach regime."), [Doc. No. 1] ¶ 142, which the Fourth Circuit has found "strengthen the plausibility of Plaintiffs' allegations," *Scharpf*, 137 F.4th

at 200, and with respect to these defendants' participation in that alleged conspiracy cites to excerpts specific to Thor Solutions, Marinette Marine, Bollinger, and Tridentis:

> A manager involved in recruitment for Thor Solutions in the mid-to-late 2010s confirmed the existence of a "non-ink-to-paper" agreement among Thor Solutions and companies with which it worked, including Alion, that "we would not poach from each other." *Id.* ¶ 156.

> Defendants' former employees mad[e] statements that [certain Defendants, including Marinette Marine] participated in the gentlemen's agreement not to recruit naval engineers from competitors. *Id.* ¶ 151.

> One of the handful of independent recruiters who placed naval engineers in the industry in the late 2010s . . . recalled in particular that in one instance, Bollinger Shipyards indicated that it could not hire a candidate from Alion, despite the candidate's being an otherwise perfect fit. *Id.* ¶ 157.

> Tridentis, [together with other Defendants], referred to each other collectively as the "Beltway Bandits" [and] . . . [a]ccording to an executive employed by one of these Defendants who was involved in recruiting naval engineers, these companies shared an agreement among themselves not to actively recruit each other's employees. *Id.* ¶ 152.

When all the factual allegations of the Complaint are viewed favorably to the Plaintiff, with all reasonable inferences drawn in her favor,[13] the Plaintiff has plausibly alleged that these four Defendants' participated in the alleged conspiracy.

The adequacy of the Complaint's allegations of participation in the conspiracy by Serco, CACI, and General Dynamics Corporation present a closer question. Defendant Serco's alleged liability stems from its purchase of John J. McMullen & Associates ("JJMA"), a business unit providing naval architecture and marine engineering services, which Alion acquired in 2005 and subsequently sold to Defendant Serco in 2019. *Id.* ¶¶ 51–55.[14] Defendant HII Mission

---

[13] Given the weight attributed to and the inferences drawn from these witness statements by the Fourth Circuit, albeit on a different issue, the Court feels constrained to likewise view these witness statements liberally in assessing whether Plaintiff has plausibly alleged an actionable conspiracy and the Defendants' participation in it.

[14] Even after JJMA was sold to Alion and then Serco, the industry broadly referred to it as "JJMA." [Doc. No. 1] ¶ 52. In this opinion, "JJMA" refers to that engineering consultancy business before its sale to Alion, while "Alion" refers to Alion Science and Technology Corporation before its sale of the legacy JJMA unit to Serco. *Id.* ¶ 58.

Technologies assumed liabilities for the activities by JJMA from the start of class period until 2019, following which Defendant Serco assumed the liabilities of JJMA, which was rebranded as Serco's Maritime, Engineering, Technology and Sustainment division. *Id.* ¶¶ 49, 51, 56. Defendant CACI's alleged liability, like Serco's, stems from its purchase of CSRA, Inc., a Nevada corporation formed in late 2015 that was acquired by General Dynamics Corporation in April 2018 and sold to CACI in August 2018, which transferred to CACI assets but not existing liabilities. *Id.* ¶¶ 85–89.[15]

As Serco and CACI argue, Plaintiff does not allege any specific participation by Serco in the conspiracy after it acquired the JJMA business unit from Alion in 2019 or by CACI after it acquired CSRA in 2018, and Plaintiff's allegations against Serco and CACI are premised solely on the alleged actions of Alion, JJMA, and CSRA that were taken before they were acquired by Serco and CACI, respectively. [Doc. No. 184] at 2–3; [Doc. No. 191] at 5–8. Serco and CACI are included within the group of defendants referred to generally in the alleged witness statements, *see* [Doc. No. 1], ¶¶ 4, 142, 159, but the only allegation that remotely pertains to Serco and CACI's participation in the alleged conspiracy is the conclusory allegation that they "maintained a high degree of continuity in personnel, policies and practices, customers, and business culture" while changing hands [Doc. No. 1] ¶¶ 56, 90.

Similarly, General Dynamics Corporation argues that Plaintiff's allegations against it are premised solely on its role as a parent company to some of the defendant shipbuilders, which is insufficient to allege General Dynamics Corporation's own participation in the conspiracy. [Doc. No 180] at 2–6. But while no alleged witness specifically ties General Dynamics to the alleged conspiracy, Plaintiff has alleged more than General Dynamics Corporation's role as a parent to

---

[15] In this opinion, "CSRA" refers to that corporation from the time of its formation to the time when it was sold to CACI, after which it is referred to as "CACI." *Id.* ¶ 91

entities involved in the conspiracy throughout the class period, specifically that General Dynamics Corporation "operates centralized human resources and recruiting functions that assist GDC subsidiaries, including Bath Iron Works, Electric Boat, and NASSCO in filling positions for naval engineers," and that it "helped GDC subsidiaries participate in the alleged conspiracy, including by refraining from actively recruiting competitors' naval engineers." [Doc. No. 1] ¶ 25.

In assessing the adequacy of the Plaintiff's allegations against Serco, CACI and General Dynamics, the Court has considered that a parent corporation and its wholly owned subsidiary "have a complete unity of interest," and their "coordinated activity . . . must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984). Consequently, in antitrust cases, a parent corporation can be liable for the conduct of its affiliated entity "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct" or when each defendant "played a role—or participated—in the anticompetitive conduct of the enterprise as a whole." *Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 585 (M.D.N.C. 2024) (internal quotation marks omitted) (holding that plaintiff had adequately pled parent company was part of conspiracy where plaintiff alleged common leadership and oversight of subsidiary's sales and marketing strategy). In light of these principles, and the inferences drawn by the Fourth Circuit from the alleged witness statements, the Complaint has alleged facts that plausibly allege these Defendants' participation in the conspiracy.[16]

### IV. CONCLUSION

For the above reasons, it is hereby

---

[16] As to CACI's argument that Plaintiff cannot establish standing against CACI, [Doc. No. 191-1] at 12, the Court finds that this issue involves factual disputes that make it unripe for resolution on a motion to dismiss. *Mowery v. Nat'l Geospatial-Intel. Agency*, 42 F.4th 428, 434 (4th Cir. 2022).

**ORDERED** that the Joint Motion, [Doc. No. 178] be, and the same hereby is, **DENIED** and the Individual Motions, [Doc. Nos. 180, 181, 184, 187, 189, 191] be, and the same hereby are, **DENIED**.

The Clerk is directed to send a copy of this Order to all counsel of record.

November 26, 2025
Alexandria, Virginia

/s/

Anthony J. Trenga
Senior United States District Judge

17