**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SUSAN SCHARPF and<br>HARRY FORSTER,<br>on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL DYNAMICS CORP., *et al.*,<br><br>Defendants. | Case No. 1:23-cv-01372-AJT-WEF<br><br>Hon. Anthony J. Trenga<br><br>Hon. William E. Fitzpatrick |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS GENERAL DYNAMICS CORP., BATH IRON WORKS CORP., AND ELECTRIC BOAT CORP.'S MOTION FOR ATTORNEYS' FEES AND COSTS UNDER 28 U.S.C. § 1927**

## INTRODUCTION

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). The Supreme Court has recognized the "American Rule" since the dawn of the republic. *See Arcambel v. Wiseman*, 3 U.S. 306 (1796). "[S]ince litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). With few exceptions, parties bear their own fees.

Three of the four General Dynamics ("GD") Defendants[1] in this action seek to penalize Plaintiffs' counsel for bringing this litigation under one such narrow exception, 28 U.S.C. § 1927. That statute provides that an attorney who "[1] multiplies the proceedings in any case [2] unreasonably and [3] vexatiously may be required by the court to satisfy personally the [4] excess costs, expenses, and attorneys' fees [5] reasonably incurred [6] because of such conduct." GD argues that the Defendants' November 2025 declarations so clearly established that Plaintiffs' claims were meritless that it was *unreasonable* and *vexatious* to proceed any further, and that they are therefore entitled to *all* their attorneys' fees after that point. Their argument fails at every step.

*First*, GD cannot show that Plaintiffs' counsel did *anything* in bad faith. Their entire argument rests on a claim GD has *already litigated and lost*: that these declarations so undermined Plaintiffs' case that it should have been dismissed. This Court rejected EB's renewed motion to

[1] The movants are General Dynamics Corp. ("GDC"), Bath Iron Works Corp. ("BIW") and Electric Boat Corp. ("EB") (collectively "GD"). General Dynamics Information Technology, Inc. ("GDIT"), the fourth GD Defendant, does not join the motion. *See* Mem. 3 n.1. Although the same counsel represents GDIT, the movants do not mention that many of their fees were spent on behalf of *all* GD entities, and indeed for the entire Joint Defense Group.

dismiss in January 2026,[2] and GD offers no reason why that decision was wrong. GD cannot explain how Plaintiffs' counsel acted vexatiously, or "multiplied" proceedings *at all*, after the Court considered and rejected the very argument GD brings now. Remarkably, the movants seek fees for "baselessly oppos[ing]" their renewed motion—and *winning*. As case law amply demonstrates, none of Plaintiffs' counsel's conduct even approaches the abuse of process § 1927 was designed to address. At best, GD contends that because Plaintiffs *did not* succeed against GD, their claims must have been baseless all along. Black letter law rejects this fallacy.

Moreover, Plaintiffs' counsel did not unnecessarily prolong the litigation, but moved expeditiously to advance their claims and to resolve this case. Plaintiffs dismissed their case against the GD Defendants only two months and ten days after GD substantially completed its document production. Plaintiffs assessed millions of pages of documents across 17 Defendants and completed in weeks a process that usually takes a year. In fact, *every day* from March 10 to May 6, GD was considering Plaintiffs' two offers of settlement. It cannot be vexatious to wait for GD to respond to a settlement offer.

*Second*, even if GD's argument were right, they would be entitled only to "*excess* costs, expenses, and attorneys' fees *reasonably* incurred *because of*" the vexatious multiplication. 28 U.S.C. § 1927 (emphasis added). Typically, a § 1927 award compensates a party for the costs of responding to a frivolous motion or baseless discovery request. Here, GD does not seek "excess" fees; GD seeks every dollar of their defense costs after November 2025—even costs they would have borne anyway, and costs of their own losing motions, duplicative lawyering, and unnecessary discovery requests.

[2] The fact that none of the other GD Defendants joined EB's motion (technically a motion to reconsider the Court's denial of their original motion to dismiss) belies their current contention that their declarations established that they were plainly entitled to dismissal.

But even if GD's argument were correct, they failed to mitigate their damages, as case law suggests they must. When Defendants first disclosed these declarations, they insisted Plaintiffs withdraw huge swaths of the complaint. Plaintiffs rebuffed these broadside demands in an extensive letter, and offered to consider particular allegations Defendants believed still required withdrawal, either informally or through the appropriate Rule 11 process. GD did not respond and instead chose to bring EB's motion to reconsider the Court's motion to dismiss decision based on the declarations, which then failed. The GD Defendants knew all the information they rely on for this motion in November 2025, but failed to timely secure a dismissal they allege was *obviously* required. GD now seeks to charge Plaintiffs' counsel millions of dollars for eight months of fees that, if GD was correct on substance, they ought to have been able to avoid with diligent action.

*Third*, the motion fails because GD has refused to specify *what* fees they seek, for what work, on whose behalf, and in what amount. They say only that they have spent "millions of dollars" in allegedly excess fees and "tens of millions" overall, but offer no estimate of the amount they actually seek. Because they apparently seek every dollar expended during the most active two-thirds of discovery, Plaintiffs' counsel estimate their request exceeds ten million dollars. They also offer no plan for distinguishing work done for the three movants from work for non-movant GDIT or the Joint Defense Group. GD bears the burden of proving that the fees they seek are reasonable, and that the amount requested was caused by the allegedly vexatious conduct. Federal Rule of Civil Procedure 6(c)(2) requires that they present that proof with their motion, not later.

This is at least the *fifth* motion in which the GD Defendants have baselessly accused Plaintiffs' counsel of misconduct. It comes after Plaintiffs quickly and successfully settled or dismissed their claims with all Defendants and brought active litigation to a close. The Court should reject GD's effort to relitigate these issues and put this case to bed.

## BACKGROUND

Plaintiffs filed this action on October 6, 2023, after more than twenty months of investigation. Dkt. 1 ("Compl."). Before filing, Plaintiffs' counsel spoke with dozens of industry insiders, including a former Huntington Ingalls recruiter, [redacted], who said she was given a "do not hire" list that included would-be competitors, including General Dynamics. Defs. Ex. D at 21. Another witness, [redacted], a former recruiter for EB, said he never recruited from teaming partners because "it was just understood" that they were off-limits. *Id.* at 16. Yet another, [redacted], a former engineer at Gibbs & Cox, told counsel that a colleague had told him that BIW and Gibbs & Cox "had an arrangement with each other to not tamper with each other's employees." *Id.* at 8-9.

The resulting complaint reflected counsel's careful assessment of the evidence, as illustrated by, among other things, their decision *not* to name several other shipbuilders and contractors, including GD's third major shipyard NASSCO, as defendants. Plaintiffs alleged an industry-wide conspiracy, described independently by multiple witnesses as a "gentlemen's agreement," not to recruit one another's naval engineers. Several witnesses testified to multilateral informal agreements, and three separately used the term "incestuous" to describe the industry. *See id.* at 8-28. While some witnesses mentioned teaming agreements, they differed over their duration and scope. Three different witnesses described non-solicitation restrictions (including, according to two of the three witnesses, unwritten policies) that applied to *all* employees from a teaming partner or otherwise swept more broadly than the limited provisions in teaming agreements other witnesses described. *Id.* at 12-14, 16. Others, like [redacted] described particular relationships in terms connoting an illicit agreement. *Id.* at 8-9.

The Court first dismissed the suit on statute of limitations grounds. After an appeal the case returned to this Court in July 2025, Dkt. 244, and discovery negotiations began in September. The

Court denied the remaining arguments in Defendants' motions to dismiss on November 26, 2025, Dkt. 357, fully opening discovery.[3] As part of discovery, Plaintiffs disclosed the identities of nearly two dozen individuals quoted or referenced in the complaint, along with the corresponding paragraph numbers of allegations that drew on these witnesses' statements, in whole or (typically) *in part*. Defendants successfully moved this Court to supplement these discovery responses with the facts relied on from each individual, which Plaintiffs provided on November 10, 2025. Importantly, the responses conveyed only the *facts* witnesses had told Plaintiffs' counsel; they did not explain counsel's inferences connecting witness statements with ultimate allegations, or what other evidence counsel relied upon. *See* Defs. Ex. D at 8-28; Dkt. 463 at 8-12.

The GD Defendants noticed the depositions of all 22 disclosed witnesses, and, in negotiating those depositions, secured declarations from eight individuals—three of whom were then employed by a Defendant. Each declaration—with the notable exception of [redacted], the only witness represented by independent counsel—followed the same rote pattern, reciting allegations in the complaint for which those individuals provided supporting information and then disclaiming knowledge of the *allegations themselves*, rather than the *underlying facts* Plaintiffs' counsel had used. Of course, because of the combination of evidence from multiple sources and inferences that go into a complaint's allegations, witnesses often do not recognize the connections between the statements they made to Plaintiffs' counsel and allegations as they are ultimately pled. *See Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 278 F.R.D. 454, 459 (D. Minn. 2011) (plaintiffs did not misrepresent testimony of witness who disagreed with an implication made in the complaint as it was "Plaintiffs' implication, not [the witness's]").

[3] The GD Defendants now ask for their fees from November 20, 2025—six days before the Court fully decided the motions to dismiss. *See* Dkt. 357.

The GD Defendants drafted at least some of the declarations themselves—in their own carefully couched legalese, not the witnesses' own words. One acknowledged having "hearsay knowledge, but not personal knowledge," of the anecdote he provided Plaintiffs' counsel. Defs. Ex. I at 4. Another declared only that he "do[es] not have *personal* knowledge" related to an allegation. Defs. Ex. K at 4-6 (emphasis added). Two declarants, then employed by CACI and represented by its counsel, declared only that they lacked "information that supports the allegations of *antitrust violations*" in the paragraphs of the complaint identified for them by Defendants' counsel—an explicitly legal opinion. Defs. Ex. H at 3; Defs. Ex. L at 3-14 (emphasis added). The lone individual represented by independent counsel offered essentially the same story on which Plaintiffs relied. Defs. Ex. I at 3-4. And three of the five declarants not represented by opposing counsel subsequently signed declarations for Plaintiffs substantially reaffirming the facts they had provided to Plaintiffs—some including the quotes attributed to them in the complaint.[4] Pls. Ex. B (Letter re Decls.) at 20-32.

On November 20, 2025, GD's counsel sent Plaintiffs' counsel a letter "as a courtesy before bringing th[e] matter to the Court," attaching their eight declarations. The letter demanded, with less than 24 hours' notice, that Plaintiffs withdraw all allegations sourced in whole or in part from those eight individuals. Defs. Ex. G at 3. The next day, Plaintiffs responded with a 15-page, single-spaced letter and the three "counter" declarations. Plaintiffs identified many specific reasons why Defendants' declarations did not call Plaintiffs' investigation into question. Pls. Ex. B. The letter also invited Defendants, if they disagreed, to file a Rule 11 motion using the safe harbor procedures

[4] Of the remaining five, three were employed by Defendants and represented by their counsel. *See* Defs. Exs. H, L, M. A fourth (the individual represented by independent counsel) confirmed the substance of his conversation with Plaintiffs' counsel but declined to sign another declaration, and the fifth was noticed for a deposition by Plaintiffs—a deposition that, at Defendants' request, did not occur.

that protect counsel with clear notice and an opportunity to correct genuine errors. *Id.* at 14-16. Led by GD, Defendants declined to do so, and instead moved to compel production of counsel's investigative memoranda and all statements from any witness counsel interviewed, whether counsel relied on their statements or not—core opinion work product subject to "nearly absolute" protection from discovery. Dkt. 364; *see* Dkt. 376 at 14-30; *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017). The Court denied that request, adding: "I'm not interested in expanding the scope of discovery in order to aid a Rule 11 motion. I don't think that's—that's where we are. I don't think there's a basis for it." Dkt. 432 at 34:18-21.

In discovery, counsel for the GD Defendants took *all* the depositions of the witnesses Plaintiffs disclosed. These witnesses repeatedly confirmed the facts in Plaintiffs' interrogatory responses. For example, [redacted] confirmed the existence of a "do not hire" list during her time working as a recruiter for Huntington Ingalls, and testified that "General Dynamics is always—was on the list." Pls. Ex. C ([redacted] Tr.) 119:15-16. [redacted] also testified "we were not to—as recruiters to solicit from those particular companies," and gave, as examples, "Bath Iron Works or Electric Boats." *Id.* 117:4-15. Another witness, [redacted], reiterated that he had heard of "no-poach" agreements between the "Beltway Bandits" during his time in the industry. Pls. Ex. D ([redacted] Tr.) 202:15-17. Documentary evidence also confirmed Defendants' agreements not to recruit one another's naval engineers, including informal and multilateral arrangements. For example, a CACI executive [redacted] Pls. Ex. E (CACI-ATR-0000037707) at 708.

Plaintiffs' counsel continued to investigate and receive information from industry veterans supporting their claims. For example, [redacted], a long-time employee of JJMA and

Alion (predecessors to Defendant Serco), signed a declaration on December 6, 2025, affirming that "Alion never actively recruited naval architects or marine engineers from competitors" and that "Alion's competitors did not actively recruit Alion's employees." Pls. Ex. F ([redacted] Decl.) ¶¶ 7-8. Importantly, [redacted] also noted that "[s]hipyards were also considered competitors," *id.* ¶ 9—EB and BIW are both shipyards. [redacted], a former employee of (among others) GDIT, declared on December 19, 2025, that "[t]he rule not to hire teaming partner's naval architects *was not exclusive to teaming agreements*," but that it was "a rule in general"—reinforcing evidence from elsewhere that the restrictions at issue were broader than Defendants' teaming agreements. Pls. Ex. G ([redacted] Decl.) ¶ 10 (emphasis added).

Throughout the litigation, Plaintiffs' counsel weighed the strength of their claims against their risks and costs. Acting in the best interests of the proposed class, they both engaged Defendants regarding potential settlement and appropriately dismissed claims. During motion to dismiss practice, Plaintiffs' counsel voluntarily dismissed their claims against bankrupt BMT's parent entities on the strength of their Rule 12 motion. Dkt. 199. After discovering that Faststream's U.S. entity had been dissolved, they settled for cooperation with its British parent company, avoiding prolonged Hague proceedings that likely would not have yielded significant damages from such a small company. Dkts. 318-19; 332.

Plaintiffs reached a settlement with Gibbs & Cox on December 31, 2025, and then settled with the following entities in quick succession after substantial completion of document production: Huntington Ingalls Industries, Newport News Shipbuilding, Ingalls Shipbuilding, HII Mission Technologies, and HII Fleet Support (March 3, 2026); Serco (March 5, 2026); Marinette Marine (March 13, 2026); Bollinger (April 16, 2026); Thor Solutions (April 16, 2026); and CACI (April 27, 2026). *See* Dkts. 447; 521-23; 565. Plaintiffs then stipulated to a voluntary dismissal

with the remaining Defendants: the Columbia Group, Tridentis, and all four GD Defendants. Dkts. 559; 561-62.

In the end, Plaintiffs' counsel secured $8.25 million in settlements from nine Defendants, a result that the parties reached within two months of substantial completion of document production—before subjecting the parties to the time and expense of further motions practice.[5]

**LEGAL STANDARD**

An attorney "who so multiplies the proceedings in any case unreasonably and vexatiously … may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Section 1927 "is unconcerned with the merits of the lawsuit"[6] and focuses only on conduct. *E.E.O.C. v. Great Steaks, Inc.*, 667 F.3d 510, 522 (4th Cir. 2012). That conduct must rise to the level of "severe misconduct reflecting clear bad faith."[7] *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 276 (4th Cir. 2022). It also must "*multiply* proceedings," *DeBauche v. Trani*, 191 F.3d 499, 511 (4th Cir. 1999), *i.e.*, it "requires the court to show a causal link between wrongful conduct and an unreasonable and vexatious multiplication of proceedings, then to connect the costs wrongfully

[5] GD filed the instant motion and noticed it for hearing without satisfying the Local Rules' requirement to "meet and confer in person or by telephone with his or her opposing counsel in a good-faith effort to narrow the area of disagreement." L. Civ. R. 7(E).

[6] The Court may consider merits questions only "indirectly" insofar as they bear on whether an attorney's conduct was undertaken in good faith. *See Ali v. BC Architects Eng'rs, PLC*, 167 F. 4th 700, 705 (4th Cir. 2026).

[7] GD Defendants do not argue that Plaintiffs' counsel acted in *subjective* bad faith, *i.e.*, that their *intent* was vexatious multiplication; they argue instead that the Fourth Circuit recognizes an objective bad faith standard that includes reckless indifference. *See* Mem. 17-18. This Court need not decide the issue because GD Defendants fail under either standard. *Cf. Zee Co., Inc. v. v. Williams, Mullen, Clark & Dobbins, P.C.*, 2013 WL 12647924, at *2 n.2 (E.D. Va. Nov. 25, 2013).

incurred as a result of the sanctioned attorney's conduct to the amount awarded to the moving party." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 520 (4th Cir. 2018).

Bad faith in a § 1927 context is distinct from Rule 11, which reaches different conduct than § 1927, including the evidentiary basis of complaints, and provides specific protections affording attorneys the opportunity to correct errors. *See Bakker v. Grutman*, 942 F.2d 236, 242 (4th Cir. 1991); Fed. R. Civ. P. 11(c)(2) (Rule 11 "safe harbor"). Section 1927 is "reserved for those cases where, even through the eyes of the proponent of a claim, the challenged proceedings do nothing to advance that claim, but rather are intended simply to impose costs on the other side." *Zee Co., Inc. v. Williams, Mullen*, 2013 WL 12647924, at *3 (E.D. Va. Nov. 25, 2013) (Trenga, J.)

Rule 11's drafters specifically cautioned courts "to avoid the wisdom of hindsight," Comm. Note to 1983 Amdts., and § 1927 jurisprudence follows the same principle, *see Ali*, 167 F. 4th at 706 ("[M]erely 'because a plaintiff d[oes] not ultimately prevail' does not mean the 'action must have been unreasonable or without foundation.'" (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978)).

The Fourth Circuit has yet to decide the burden of proof that applies to § 1927 motions. *See Six*, 891 F.3d at 518 n.9 (declining to decide standard). GD cannot make the required showing even by a preponderance, but the weight of authority in other circuits and in Fourth Circuit district courts requires *clear and convincing* evidence that counsel acted in bad faith.[8]

---

[8] *See Akira Techs., Inc. v. Conceptant, Inc.*, 773 Fed. Appx. 122, 125-26 (4th Cir. 2019) (*per curiam*) (affirming district court's finding applying the "clear-and-convincing" standard); *Williams v. The Ests. LLC*, 663 F. Supp. 3d 466, 487 (M.D.N.C. 2023) (applying clear and convincing standard in awarding § 1927 fees against defendant who filed frivolous and unsubstantiated motion for fees); *Liebowitz v. Bandshell Artist Mgmt.*, 6 F. 4th 267, 286 n.22 (2d Cir. 2021) ("[A] showing of bad faith by clear and convincing evidence is a prerequisite to imposing sanctions under both § 1927 and the district court's inherent authority[.]"); *accord Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 694 (5th Cir. 2010).

## ARGUMENT

**I. Plaintiffs' Counsel Have Not Unreasonably and Vexatiously Multiplied the Proceedings.**

A. Plaintiffs' Counsel Acted Reasonably and in Good Faith.

*1. Plaintiffs' Counsel Filed the Case Reasonably and in Good Faith.*

GD Defendants do not seek fees from the beginning of the litigation, but they are unequivocal that they think Plaintiffs' counsel "knew before filing this case that no witness supported their allegations against the GD Defendants." Mem. 1. That is flatly wrong. Counsel thoroughly investigated the case, both through witness interviews and extensive documentary research. They carefully considered the evidence they gathered and the inferences they could reasonably draw. They named defendants conservatively, declining to name several other shipbuilders and contractors, including GD's third major shipyard. Then they filed suit and spent more than ten million dollars in attorney time litigating it for two and a half years. Plaintiffs did so to "advance [their] claim[s]," not "to impose costs on the other side." *Zee*, 2013 WL 12647924, at *3. Given this care and dedication of resources, it is simply implausible to think Plaintiffs' counsel proceeded knowing the allegations were meritless.

Plaintiffs' evidence against the movants included a recruiter who worked with Huntington Ingalls who said she was given a "do not hire" list that named General Dynamics. Defs. Ex. D at 21; Pls. Ex. C 119:15-16. In her deposition, she confirmed that "we were not to—as recruiters to solicit from those particular companies," and gave, as examples, "Bath Iron Works or Electric Boats." *Id.* 117:4-15. A former EB recruiter said he never recruited from teaming partners because "it was just understood" that they were off-limits. Defs. Ex. D at 16. He also said he *could* hire from such partners only if they sought new employment on their own *and* did not work on the joint project. This practice is more restrictive than the language in most teaming agreements, *including*

*even EB*'s broad agreement with Huntington Ingalls which permitted hiring *any* employee who applied on their own. *See* Defs. Ex. E § 12.8; Defs. Ex. F § 8.8. And a former Gibbs & Cox engineer told counsel that a colleague had told him BIW and Gibbs & Cox "had an arrangement with each other to not *tamper* with each other's employees." Defs. Ex. D at 9 (emphasis added). That witness now believes the "arrangement" in question not to "tamper" related to a teaming agreement,[9] which he has never seen, but affirms the arrangement he discussed with Plaintiffs' counsel (and did not, at the time, identify as a teaming agreement). Defs. Ex. I at 4. These statements must also be weighed in the context of the broader investigation, in which several witnesses independently discussed a "gentleman's agreement" restricting recruitment in this "incestuous" industry. *See, e.g.*, Defs. Ex. D at 8, 11-12, 15, 17-19, 26-27. Against that backdrop, the witnesses' statements provided a more than adequate basis to plead the three GD Defendants' participation in the conspiracy.

If the movants disagreed, they could have brought a Rule 11 motion, which sets out a procedure for adjudicating that very question. But Rule 11 only requires that Plaintiffs' allegations in question have "some evidence" to support them. *See Brubaker v. City of Richmond*, 943 F.2d

---

[9] GD Defendants' argument rests on the claim that Plaintiffs "knew from the start [that] any such non-solicitation agreements were routinely part of *perfectly lawful* and *fully disclosed* [to the government] 'teaming agreements'" between Defendants. Mem. 1 (emphasis added). Plaintiffs doubt the legality of EB's broad teaming agreement with Huntington Ingalls, covering *all* employees of *either* company, involved in the joint project or not. Regardless, the terms of these agreements were *not* fully disclosed *to naval engineers*, and Plaintiffs alleged that teaming agreements' terms were misrepresented to engineers to prevent inquiry into the broader no-poach agreement. Indeed, the evidence shows that Defendants, *including EB*, often ignored the language in teaming agreements and enforced them more broadly than they wrote down. *See, e.g.*, Pls. Exs. E; H; M-Q ([redacted] Dep. Exs.). This is just as Plaintiffs alleged, and Plaintiffs need not have assumed that GD's teaming agreements excluded the likelihood that they participated in a broader agreement.

GD Defendants' invocation of teaming agreements *produced in discovery* here is also inappropriate; Plaintiffs' counsel obviously could not have known the details of GD's agreements before they were produced. *See* Mem. 8-9.

1363, 1377 (4th Cir. 1991). GD did not move under Rule 11 when Plaintiffs first provided these facts or when GD secured its witness declarations. They did not when Plaintiffs filed an amended complaint asserting the same allegations. They do not now. If GD believes Plaintiffs' allegations lacked a sufficient evidentiary basis, they have conspicuously avoided testing that proposition.

GD likely declined to pursue Rule 11 sanctions because they knew they would lose. *See id.* Plaintiffs' complaint was filed in good faith on a more than sufficient evidentiary basis. Discovery did not bear out their claims with sufficient certainty, weighing all factors, to justify further litigation against GD and Plaintiffs dismissed them. It is not surprising for plaintiffs in multi-defendant antitrust conspiracy cases to voluntarily dismiss defendants after significant discovery,[10] and the law does not penalize them for doing so. And "just because a party cannot overcome a motion for summary judgment does not mean the case is flawed from the outset." *Stradtman v. Republic Servs., Inc.*, 121 F. Supp. 3d 578, 585 (E.D. Va. 2015).

2. *Plaintiffs' Counsel Reasonably and in Good Faith Declined the GD Defendants' Demand to Withdraw Their Allegations.*

GD seeks fees dating to November 2025, when Defendants sent their eight declarations and accused Plaintiffs' counsel of fabricating witness testimony. Defs. Ex. G at 3.[11] Their letter

[10] *See, e.g., Brown, et al. v. JBS USA Food Co., et al.*, No. 1:22-cv-02946 (D. Colo.), Dkt. 375 (voluntary dismissal of defendant Nebraska Beef after review of documentary evidence); *In re Clobetasol Cases*, No. 2:16-cb-27241-CMR (E.D. Pa.), Dkt. 130 (voluntary dismissal of defendant Perrigo following significant discovery).

[11] Notably, none of the eight declarants were [redacted]. Even if [redacted] statements were not considered, [redacted] statements would be sufficient basis, alongside the other allegations of the complaint, to plead the parallel conduct and plus factors needed to proceed against the three GD Defendants. Moreover, Plaintiffs' claims were supported by *other* witnesses Plaintiffs interviewed *after* filing the complaint, especially [redacted], who signed a declaration that "Alion never actively recruited naval architects or marine engineers from competitors"; "Alion's competitors did not actively recruit Alion's employees"; and "Shipyards were also considered competitors[.]" Pls. Ex. F at ¶¶ 7-9.

mischaracterized the declarations they had gathered, asserting that the witnesses "categorically deny the allegations Plaintiff has attributed to them" and "say, under oath, that they have ***never*** made the statements or provided the information that Plaintiff attributes to them, … and have ***no information*** that supports these allegations or Plaintiff's claims." *Id*. (emphasis in original). All three claims were false. The purported "denials" are often partially or heavily qualified, disclaim knowledge of complaint paragraphs *not specific facts*, and in one instance disclaims knowledge that Plaintiffs never claimed he had. *See* pp. 4-7, *supra*; Defs. Ex. I ¶ 9; Defs. Ex. D at 8-9.

The *next day*, Plaintiffs delivered a *15-page* letter detailing exactly why Plaintiffs did not believe the declarations demonstrated a lack of evidentiary basis for the allegations in the complaint. *See* Pls. Ex. B. First, Plaintiffs explained that Plaintiffs' selection of witness-attested facts were drawn from contemporaneous memoranda summarizing their interviews, and noted that three witnesses had already affirmed what they told Plaintiffs in additional declarations. *Id.* at 2-6. Second, Plaintiffs showed that Defendants' declarations lacked credibility, because (1) they were not drafted in the witnesses' words, but parroted the same telltale legalese, apparently designed to mislead the witnesses, word-for-word across multiple witnesses, (2) three of the eight witnesses had been hired by Defendants since Plaintiffs spoke to them, and (3) the declarations were obtained in lieu of the witnesses being deposed by GD. *Id.* at 6-11.

Third, Plaintiffs explained that the declarations lacked *legal import*, because they attacked not the *facts Plaintiffs had said the witnesses told them*, but only offered misleading legalese and legal conclusions. *Id.* For example, multiple witnesses declared they lacked "personal knowledge" of the alleged conspiracy, but did not disclaim the *hearsay knowledge* they had related to Plaintiffs' investigator. Plaintiffs are entitled to rely on hearsay in a complaint as foundation for formal discovery. *See Anderson News L.L.C. v. Am. Media, Inc.*, 2013 WL 1746062, at *5-6 (S.D.N.Y.

Apr. 23, 2013); *Schwartz & Schwartz of Va., LLC v. Certain Underwriters at Lloyd's London*, 677 F. Supp. 2d 890, 898 (W.D. Va. 2009). Finally, Plaintiffs pointed out that (1) what the witnesses *had* said was not controverted by their declarations, and did in fact support Plaintiffs' allegations; and (2) that many of the allegations Defendants attacked and all of Plaintiffs' claims had independent support from other witnesses. Pls. Ex. B at 11-14.

Nonetheless, Plaintiffs offered to meet and confer: "If there is an allegation that should be appropriately corrected, we are open to hearing Defendants' views and the facts that they have learned from the witnesses." *Id.* at 14. Plaintiffs also noted:

> And as to Defendants' "inten[tion] to bring this matter before the Court promptly," we remind Defendants that Federal Rule of Civil Procedure 11 sets forth procedural requirements that must be met before a motion for sanctions can be filed."

*Id.* Defendants never responded to Plaintiffs' arguments. Nor did they respond to Plaintiffs' invitation to meet and confer over particular allegations.[12] They never detailed the allegations they believed should be withdrawn, or their arguments why. They never served a Rule 11 motion on Plaintiffs under the safe harbor rule.

Two main points emerge here. First, it is frivolous to claim that Plaintiffs' dispute over the strength and import of Defendants' declarations was *unreasonable*, *vexatious*, or offered in *bad faith*. Plaintiffs' letter explains in detail why Defendants' declarations did not require withdrawal of their allegations and did not establish facts undermining Plaintiffs' claims. GD's motion rests on the premise that Plaintiffs received these declarations, understood or should have understood that the declarations meant it would be futile to continue their case, and recklessly ignored that conclusion. The facts show the opposite. Plaintiffs' counsel took Defendants' declarations and

[12] The parties met and conferred shortly afterward on Defendants' motion to compel Plaintiffs' opinion work product interview summaries, which Magistrate Judge Fitzpatrick later denied (Dkt. 415), but discussed the parties' positions at the same general level as GD's letter.

their request for withdrawal *very* seriously, considered it *very* closely, responded in detail with reasoned, non-vexatious arguments, and determined that no withdrawal was required. GD's motion must fail on this ground alone; GD cannot meet the standard of bad faith required by § 1927. *See Ali*, 167 F.4th at 707 ("[F]or purposes of its sanctions inquiry, the district court should have asked whether Ali had an 'arguable basis in law or in fact.'") (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)).

Second, Plaintiffs invited Defendants to specify which allegations they still believed lacked an evidentiary basis after considering Plaintiffs' arguments. They outlined the procedures for litigating any disputes under Rule 11. Defendants did not particularize their arguments and did not serve a safe-harbor Rule 11 motion so Plaintiffs could consider a concrete proposal. Instead, they pursued collateral ways to put their declarations in front of both Magistrate Judge Fitzpatrick and Judge Trenga. *See* Dkts. 364-68; 407-08. Both attacks failed. *See* Dkts. 415; 484. It cannot be bad faith for Plaintiffs to insist on appropriate procedures. And it cannot be *vexatious multiplication of proceedings* for Plaintiffs to consider an argument, respond to it, and proceed with the litigation when Defendants fail to crystallize and prevail on a dispute.

3. *Plaintiffs' Counsel Opposed Electric Boat's Motion to Reconsider Reasonably and in Good Faith, and Prevailed.*

GD Defendants argue that Plaintiffs vexatiously multiplied the proceedings by "baselessly oppos[ing]" *and winning* EB's renewed motion to dismiss. Mem. 2. They appear to argue that Plaintiffs misrepresented witness statements by saying [redacted] "tied" EB "to the conspiracy."[13] Mem. 16. But that issue was squarely before the Court in EB's motion. *See* Dkt. 442 at 7, 17-22; Dkt. 463 at 7:4-17; 10:6-12:3; 15:22-16:25. Plaintiffs specifically argued that his statement, along

[13] The GD Defendants insist that the Court "rel[ied]" on "those misstatements," Mem. 16, but the Court's Order denying Defendants' motion says nothing of the sort. Dkt. 484.

with other evidence (including [redacted] and [redacted]), provided a sufficient basis to proceed. Defendants argued the opposite. The Court—with [redacted] declaration before it—ruled in Plaintiffs' favor. The parties disputed the import of Defendants' declarations, and the Court resolved the issue in Plaintiffs' favor. The GD Defendants' attempts to construct vexatious bad faith out of a winning argument are simply frivolous.

4. *After the Court's Decision, Plaintiffs' Counsel Proceeded with Ordinary Litigation Under the Federal Rules Reasonably and in Good Faith—and Resolved the Case Extraordinarily Fast.*

After the Court's denial of EB's (and other Defendants') motions to reconsider, the GD Defendants substantially completed their productions of documents on March 2, 2026. The GD Defendants seek the fees they expended reviewing and producing those documents. Mem. 15. They do not allege that Plaintiffs' counsel's conduct during this period was unreasonable and vexatious; it was not. Plaintiffs pursued discovery as allowed by the Court under the Federal Rules; GD is not entitled to fees for their response.

Plaintiffs' counsel digested Defendants' materials and assessed their case swiftly. Only two and a half months after receiving the bulk of GD's documents, they voluntarily dismissed their claims—including the claims of GD subsidiary GDIT. Dkt. 559. Not, as GD suggests, because Plaintiffs had no facts supporting their claims, but because discovery revealed a more complicated and harder to prove case than Plaintiffs had anticipated. For example, GDIT owned the pre-2018 liabilities of a naval engineering business named the Navy SETA Division. A Navy SETA executive wrote the following after CACI bought the business in 2020:

[redacted]

[redacted]

Pls. Ex. H (CACI-ATR-0000086395) at 395 (emphasis added).

And as GD admits, Mem. 8, since 1997 EB has had explicit agreements with Newport News Shipbuilding and successor Huntington Ingalls, the country's only other manufacturer of public fleet submarines, not to recruit *any* of each other's employees. This includes not just naval engineers but also unrelated functions like accountants and janitors. The practices contained in their agreements are designed to chill applicants from seeking to change companies:

[redacted][14]

Defs. Ex. F § 8.8 (emphasis added); *see also* Defs. Ex. E § 12.8. EB emails also offered support: [redacted] Pls. Ex. I (EB000000050898) at 900.

So with this evidence and that from the declarations, it is untrue that the voluntary dismissals of the GD Defendants were an "all-too-late admission of what [Plaintiffs' counsel] had known from the start … there was not a shred of evidence that the GD Defendants were involved in any conspiracy." Mem. 2. Additional evidence concerning the movants was scarce due to aggressive document deletion.[15]

[14] The GD Defendants argue that the *existence* of these agreements was public, Mem. 8-9, but offer no evidence that their *terms* were known to class members.

[15] GD represented that they lacked *any* ESI for *31 individuals* Plaintiffs requested as custodians, and that EB had documents "currently available going back 60 days and anything self-selected for archiving." *See* Ex. A (Johnson Decl.) ¶ 5. Of the documents EB produced, *twenty of*

In sum, what Plaintiffs found in discovery was that very few documents *existed* and that this lack of evidence would make it difficult to proceed with their case against the movants. The scant evidence did not warrant the risks and expense of proceeding against the remaining GD Defendants. Plaintiffs' counsel holds a fiduciary duty to guard the class's funds and their dismissals reflect counsel's rational, risk-adjusted assessment of the case, including the possible value to the class of a settlement or verdict weighed against the guaranteed expense of class certification, summary judgment, jury trial, and appeal, including millions of dollars for economist expert expenses that would have reduced the overall settlement fund for the class.

In short, Plaintiffs did not pursue proceedings "simply to impose costs on the other side." *Zee*, 2013 WL 12647924, at *3. Quite the opposite. They moved swiftly to reduce costs. They did not move for class certification. They did not continue to the end of discovery and file or defend dispositive motions. Plaintiffs extensively reviewed the document productions and settled with most defendants in arms'-length negotiations based on the strength of the evidence. Having weighed the possible recovery, risks, and costs of their case against the remaining defendants, Plaintiffs ended the proceedings rather than multiplying them.

5. *Plaintiffs' Counsel Continuously Evaluated Their Claims and then Settled Them; GD Spent Months Considering Plaintiffs' Offers.*

Plaintiffs' counsel have continuously assessed the strength and value of their claims and sought to resolve them through settlement or otherwise. *See supra* p. 8 (BMT dismissal, Faststream settlement); *supra* pp. 8-9 (discovery period settlements). From late December 2025 into April 2026, while litigating the merits at a furious pace, Plaintiffs' counsel negotiated and memorialized

*23* custodians had no documents dated before 2022. *Id.* ¶ 6. Of the 920,000 documents the GD Defendants produced, only about 63,000 came from the movants' *42* custodians. *Id.* Plaintiffs are *not* implying spoliation, merely noting the documents were unavailable.

*seven* settlements with *eleven* Defendant entities, leaving only the GD Defendants and two small consultancies remaining. *See supra* pp. 8-9.

Plaintiffs' counsel sought to resolve their claims with GD as well.[16] First, Plaintiffs offered to dismiss GDC with certain conditions on February 23, 2026.[17] GD never responded. Plaintiffs then made two successive offers of settlement to all the GD Defendants, responding so quickly that GD had a pending offer outstanding *every day* for two months from March 10, 2026 to May 6, 2026. *See* Ex. A (Johnson Decl.) ¶ 4. On March 10, Plaintiffs made a settlement offer, but GD did not respond until March 27, when they rejected it. *Id.* ¶ 2. By that time, Plaintiffs' counsel had reviewed thousands of documents and reassessed their claims, and *that day* issued a new settlement offer, detailing especially the liability evidence against GDIT.[18] *Id.* GD considered the revised settlement offer for nearly six weeks. *Id.* ¶ 3. When they finally rejected it without a counteroffer, Plaintiffs' counsel discussed dismissing the case in the same conversation. *Id.* Within 6 days, the parties had done so. *See* Dkt. 559.

As noted, Plaintiffs' claims against the GD Defendants had value, but over time it became clear that value was outweighed by guaranteed costs to the class. Under those circumstances, Plaintiffs' counsel had a duty to their client and the proposed class to seek to realize as much of the value of their claims as they could. *Cf. Stradtman*, 121 F.Supp. 3d at 585 (discovery of weak record does not mean "an attorney should cease trying to marshal the facts and the law to zealously

---

[16] All GD Defendants negotiated as a group and were represented by the same counsel.

[17] GDC represented to Plaintiffs that it had only minimal operations and—according to GDC—Plaintiffs should dismiss their claims against GDC. In response, Plaintiffs agreed to dismiss on the condition that GDC make certain representations, especially that its subsidiaries were sufficiently capitalized. *See* Pls. Ex. J (Email re GDC Dismissal).

[18] CACI, the other entity bearing potential liabilities for the same business unit, settled for $750,000, though it faced many fewer years of potential liability than GDIT. Dkt. 579-4 at 10.

advocate on behalf of his client"). Plaintiffs' counsel's continuous efforts to resolve the litigation quickly and efficiently belie GD's accusation that Plaintiffs' counsel unreasonably and vexatiously multiplied the proceedings. That GD considered pending settlement offers for two months of the period for which they seek fees undermines their claims. It is not bad faith to continue litigating a case while an opposing party considers an offer of settlement.

B. Case Law Demonstrates the Reasonableness of Plaintiffs' Counsel's Conduct; GD's Own Conduct Comes Closer to Vexatious Multiplication.

A wealth of cases, including the two on which GD primarily relies, show that (1) Plaintiffs' counsel's straight-line litigation of disputed issues with reasoned arguments is *not* vexatious multiplication; (2) § 1927 requires either complete discovery or incontrovertible dispositive evidence; and (3) awards are routinely denied or reversed for much weaker litigation positions than those here.

While GD cites eleven cases to try to establish that only "objective" bad faith is required, Mem. 18-19, they briefly offer only three non-precedential cases they contend awarded fees on analogous facts. Mem. 22-23 (discussing *Salvin v. Am. Nat. Ins. Co.*, 281 F.App'x 222 (4th Cir. 2008) and *Rabin v. Dow Jones & Co., Inc.*, 2015 WL 14077369 (S.D.N.Y. July 30, 2015) and briefly mentioning *Lake v. Gates*, 130 F. 4th 1064 (9th Cir. 2025)). Each is inapposite. In *Salvin*, counsel refused to dismiss after *plaintiff's* testimony unequivocally disproved a necessary element of her only live claim. 281 F.App'x at 224. A plaintiff's *admission* on a necessary element is obviously very different than GD's *argument* about the strength of evidence *it presented*.[19] Likewise, in *Rabin*, plaintiff's counsel was aware that "at least two allegations central to the

[19] To the extent GD believes *Salvin* represents a license to seek fees for ill-fated but legally grounded continuation of a litigation through discovery and afterward, that reading is foreclosed by the recent precedent in *Ali*, discussed *infra*, which spoke directly to this issue.

viability of plaintiff's claim were demonstrably false," but nonetheless pled the same allegations in an amended complaint, and then "withheld relevant evidence from defendant" to "'suppress the truth' underlying the viability of their action[.]"[20] 2015 WL 14077369, at *2-3 (citation omitted), including the plaintiff's *receipt of a refund* on some payments he sought as damages. *Id.* at *3.[21]

Here, as explained above, GD's declarations revealed not "that the allegations [against GD] were unfounded," Mem. 22, but that GD contested facts that Plaintiffs persuasively argued were not dispositive of their claims. Both cases illustrate that only unequivocal bad faith qualifies for fees under § 1927. In both cases, fees were awarded only when plaintiffs' counsel knew *uncontested* facts that disproved a *necessary element* of the plaintiffs' claim.

In contrast, courts, including this one, often *deny* fees under § 1927 based on weaker positions than Plaintiffs offered here. In *Stradtman*, a CEO sued city officials for diverting contracts from his company because of his wife's discrimination suit against the officials, forcing the CEO out of his company. 121 F. Supp. 3d at 580. Defendants won summary judgment on grounds that the officials had not induced the company to terminate his contract and that any alleged inducement did not actually cause the plaintiff's damages, because the plaintiff had

---

[20] The *Rabin* court dismissed without discussion the argument that counsel's actions did not multiply the proceedings because "the case lasted only three months." Though the *Rabin* counsel's conduct could likely be sanctioned under *other* theories, it is doubtful that filing a complaint, receiving a dismissal, and filing an amended complaint seeking to cure the original's defects could be considered "multiplication" of proceedings in the Fourth Circuit, where Rule 11 is the established avenue for sanctioning baseless pleadings. *See DeBauche*, 191 F.3d at 511.

[21] GD also cites *Lake v. Gates*, in which the court found that plaintiffs had pled incendiary and incorrect facts about Arizona's electronic voting machines that "baselessly cast doubt on the electoral process in a manner that is conspicuously consistent with the plaintiffs' political ends" in the runup to the 2022 elections. 643 F. Supp. 3d 989, 1010 (D. Ariz. 2022) (sub nom. *Lake v. Hobbs*). It found bad faith under § 1927, because the plaintiffs' preliminary injunction motion was baseless, long delayed "despite the alleged urgency of the situation," and "sought relief that was impossible under the time constraints." *Gates*, 130 F.4th at 1070. This type of deliberate sandbagging serving political, not adjudicative, ends is far afield from the conduct here.

voluntarily resigned—facts known to the plaintiff and his counsel at the time. *Id.* Like GD, the defendants argued that plaintiff's counsel "brought and continued to litigate this case long after they must have known that there was no good faith basis to do so." *Id.*

This Court denied the defendants' motion. The plaintiff "has never denied" the facts in question, but rather "[h]is position in this litigation has been that his resignation cannot be fairly characterized as truly voluntary." *Id.* at 582. Whether that theory prevailed presented "fact-specific determinations that could only be made after a complete record before the Court." *Id.*

> [J]ust because a party cannot overcome a motion for summary judgment does not mean that the case is flawed from the outset. Nor does it mean that, as the record develops and it becomes clear to a neutral observer that one side has a stronger likelihood of success, an attorney should cease trying to marshal the facts and the law to zealously advocate on behalf of his client.

*Id.* at 585. The Court also explained that claims that "there was never a basis for many of the other allegations" were not "actionable under § 1927" but rather the purview of Rule 11. *Id.* at 587-88.

The same logic applies here. Plaintiffs did not hide—and Defendants' declarations did not deny—the facts supporting Plaintiffs' allegations; rather, the parties disputed only what those facts *meant*. Plaintiffs were required to represent their clients zealously in that dispute, and prevailed. As the risks of litigation began to outweigh the potential for recovery against the remaining defendants, Plaintiffs' counsel continued to "try[] to marshal the facts and the law" while negotiating toward the best outcome for their clients. *Id.* at 585. Unlike *Stradtman*, Plaintiffs resolved the case rather than pressing it through further expensive proceedings.

Similarly, in *Zee*, the plaintiff filed a malpractice lawsuit against its former attorneys for failing to inform him of a settlement offer. 2013 WL 12647924, at *1. After depositions, the plaintiff had no evidence that the alleged settlement offer had ever been made, but opposed summary judgment, which this Court granted. *Id.* Nonetheless, this Court explained that, though the plaintiff's case was "very weak on the merits," "weakness … cannot alone justify the award of

attorneys' fees under 28 U.S.C. § 1927, which is not concerned with the merits of the lawsuit." *Id.* at *3; *accord Great Steaks,* 667 F.3d at 522; *DeBauche*, 191 F.3d at 511; *Stradtman*, 121 F. Supp. 2d at 585. The Court recognized that "the issue reduces to whether Zee Company had ***articulable reasons, other than harassment***, for pursuing its theory of the case." *Id.* (emphasis added).

*Zee* is on point. At most, GD offered Plaintiffs evidence they claim showed that Plaintiffs' case was *weak*, not *harassing*. GD's evidence was not incontrovertible (especially in light of [redacted] and [redacted] evidence), nor did it show that a necessary element of the claim was absent. Plaintiffs had not just *articulable*, but *good* reasons to continue discovery.

In *Ali v. BC Architects Engineers, PLC*, the plaintiff in a discrimination suit had survived dismissal primarily on the strength of a retaliation claim sustained by the close proximity between the time the plaintiff sent a complaint letter and her firing an hour later. 2023 WL 3191435, at *1 (E.D. Va. Mar. 31, 2023). Discovery revealed that the proximity on which the Fourth Circuit had sustained the claim was unequivocally coincidental. *Id.* at *2-3. This Court granted summary judgment to the defendant and the Fourth Circuit affirmed. *Id.* at *2. In deciding the defendant's § 1927 motion, the Court held that "[b]y the end of discovery, Plaintiff's counsel knew, or should have known, that the core allegations the Fourth Circuit found sufficient to plausibly state a retaliation claim were non-existent." *Id.* at *6. "Nonetheless, in opposing summary judgment Plaintiff's counsel continued to advance the baseless claim … when the documentary and testimonial evidence within his possession clearly and undisputedly refuted any such claim." *Id.* at *7. The Court approved § 1927 fees, but held that defense counsel was only entitled to fees after the *full* evidentiary record "undisputedly refuted" the plaintiff's case, and denied their request for fees incurred while the evidence was still developing. *Id.*

Nonetheless, the Fourth Circuit reversed the award. *Ali*, 167 F.4th. It accepted the Court's conclusion that "the evidence uncovered did not corroborate all of the complaint's allegations…," but noted that discovery "revealed new information about the case," and the relevant question was not whether the evidence supported the plaintiffs' *allegations* but "whether Ali had an 'arguable basis either in law or in fact'" for her case theory as it developed through discovery. *Id.* at 702, 707 (quoting *Neitzke*, 490 U.S. at 325). The Fourth Circuit found that the new "non-frivolous grounds" that plaintiff pursued at summary judgment precluded a § 1927 award, despite their distance from the case she had earlier pled. *Id.* at 708. GD now asks the Court to ignore the Fourth Circuit's holding: even evidence unequivocally controverting allegations in the complaint does not render vexatious all further litigation.

As these cases and others show,[22] § 1927 is not meant to reverse the American rule. It only compensates parties for *incontrovertibly harassing* misconduct that multiplies the proceedings. GD Defendants cannot even show that Plaintiffs' counsel were *wrong* to pursue their claims, much less that they were *recklessly indifferent* to the merits and sought to "impose costs."

Indeed, GD's own conduct in this litigation veers *much* closer to the line of vexatious multiplication than anything they allege Plaintiffs' counsel have done:

- GD opposed a routine motion to amend the complaint, baselessly accusing Plaintiffs of "bad faith"—that is, "[d]ishonesty of belief or purpose"—for making an amendment counsel had discussed *in open court* months in advance. They lost that motion before Magistrate Judge Fitzpatrick, appealed under clear error review and then lost before Judge Trenga. Dkts. 545, 556.

- GD sought discovery of Plaintiffs' confidential settlement communications with other Defendants—a blatant attempt to discourage other parties from settling. *See* Dkt. 449

[22] *See, e.g.*, *Harvey*, 48 F.4th at 279-281; *Great Steaks*, 667 F.3d at 522; *DeBauche*, 191 F.3d at 511; *In re Pittcon Indus., Inc.*, 953 F.2d 1383 (4th Cir. 1992) (table decision); *Royal Ins. v. Lynnhaven Marine Boatel, Inc.*, 216 F. Supp. 2d 562 (E.D. Va. 2002); *Brown v. Torres Towing*, 2026 WL 906445 (E.D. Va. Apr. 2, 2026).

at 7-9. GD's counsel admitted at oral argument that he was aware of *no case* that had *ever* granted a similar request. Dkt. 470 at 40:3-11; *see generally id.* at 35:15-47:16

- GD sent 25 document requests to Plaintiff Susan Scharpf on April 13, 2026, six weeks *after* the deadline for production of documents, and some of the requests were completely duplicative of those they served in September 2025.

Whether these examples could have advanced the GD Defendants' claim, "even through the[ir] eyes," is a much closer question than Defendants' arguments. *Zee*, 2013 WL 12647924, at *3.

C. Plaintiffs' Counsel Have Not Multiplied the Proceedings.

"The unambiguous text of § 1927 aims only at attorneys who *multiply* proceedings." *Great Steaks*, 667 F.3d at 522 (quoting *DeBauche*, 191 F.3d at 511) (emphasis in original). As this Court has explained, "§ 1927 is reserved for those cases where, *even through the eyes of the proponent of a claim*, the challenged proceedings do nothing to advance that claim, but *rather are intended simply to impose costs on the other side.*" *Zee*, 2013 WL 12647924, at *3; *accord Stradtman*, 121 F. Supp. 3d at 580, 582-83 (glossing "bad faith" as "made for the purpose of running up Defendants' costs").

GD argues that the declarations they offered, deeply flawed as detailed above, so clearly established their innocence that even resisting dismissal or seeking further discovery must be "intended simply to impose costs" on GD. *Id.* But to Plaintiffs, GD's declarations did not materially change the factual landscape of the case; GD had merely disputed what the facts *meant*, and the parties litigated that dispute. *See supra* § I.A.2. Indeed, when EB sought dismissal of Plaintiffs' claims, putting their declarations before the Court, the Court denied their motion, Dkt. 484, and discovery continued before Plaintiffs quickly navigated the case to a close. On these facts, Plaintiffs have not multiplied the proceedings *at all*, nor done anything to "impose costs" on GD.

## II. The Requested Fees Are Not Causally Linked to Plaintiffs' Good-Faith Dispute Over the Import of Defendants' Declarations.

Under § 1927, courts may award only "*excess* costs, expenses, and attorneys' fees reasonably incurred *because of*" the complained-of conduct. Not only must GD show bad-faith multiplication, then, but they must also show (1) that the requested fees are *excess*, i.e., they would not have been expended otherwise; and (2) that their fees were *caused by* the bad-faith multiplication, rather than some intervening cause. *See Six*, 891 F.3d at 520. GD can do neither.

*First*, if the GD Defendants were correct that their declarations so obviously required dismissal, then GD's own failure to promptly secure that dismissal is the primary cause of their fees. EB argued to the Court that its declarations required dismissal, and lost. BIW and GDC did not even try. GD also declined to attack any allegations of the complaint under Rule 11. GD's lack of success speaks to the strength of Plaintiffs' good-faith, prevailing argument; but in the alternative, it suggests GD's own errors caused their fees.

If GD were correct that their declarations rendered Plaintiffs' claims baseless, then they should have served Plaintiffs with a Rule 11 motion specifying the allegations they wanted withdrawn. If Plaintiffs declined, they could have litigated the issue in Court under the correct standard. GD did not and instead spent the next *eight months* running the meter on their fees. The basis for the instant motion is that the November 2025 declarations required Plaintiffs to dismiss their claims against GD at that time. But if that were true, the GD Defendants should have brought their § 1927 claim then; they had the same declarations then that they have now.

This is a classic failure to mitigate damages. The Fourth Circuit has held that parties have a duty to mitigate damages in a Rule 11 context, *see In re Kunstler*, 914 F.2d 505, 523 (4th Cir. 1990), and the same logic applies to § 1927. A party seeking sanctions may not sit on its hands while it accrues fees. The Sixth Circuit has explicitly addressed this question under § 1927 and

agrees. *See, e.g.*, *Riddle v. Egensperger*, 266 F.3d 542, 555 (6th Cir. 2001) ("'A sanction is generally improper where a successful motion could have avoided any additional legal expenses by defendants.' Defendants had the opportunity to limit the scope of discovery and issues before the District Court but chose not to do so.") (quoting *In re Ruben*, 825 F.2d 977, 988 (6th Cir. 1987)). Even if GD were correct that Plaintiffs' counsel acted improperly, their own multiplication of the proceedings would require denial of their motion.

*Second*, GD's failure to timely secure dismissal of Plaintiffs' claims is fatal for another reason: GD *cannot prove* that their costs are in excess of those they would face otherwise. Had GD articulated what allegations they thought were unsupported and why, Plaintiffs might have amended their claims. They might have added new evidence, such as that gathered from [redacted] and [redacted], and passed any further Rule 12 motion. That would have led to the same discovery and the same fees for GD. Because GD failed to follow the procedures that would have tested Plaintiffs' evidentiary basis, they cannot prove that their fees are excess.

## III. The GD Defendants' Opaque Fee Request Masks an Unprecedented Grab for Millions of Dollars in Unreasonably Expended and Commingled Fees.

GD refuses to even estimate their fees, and this is fatal to their motion for four reasons. *First*, it is the movants' burden to establish the reasonableness of their fees and the fees' causal connection to Plaintiffs' counsel's alleged bad-faith conduct. As this Court recently held, a failure to "prove, with evidence, what the fees incurred … were and that those fees are reasonable and thus recoverable" prevents the Court from granting a § 1927 motion. *Landfall Tr. LLC v. Fid. Nat'l Title, Ins. Co.*, 2024 WL 1839457, at *6 (E.D. Va. Apr. 26, 2024). And Federal Rule 6(c)(2) requires that "[a]ny affidavit supporting a motion must be served *with the motion*" (emphasis added). The Rule requires evidentiary support to "be filed simultaneously with the motion it supports, affording the opposing party an opportunity to address the motion fully and squarely on

its merits." *Landfall Tr.*, 2024 WL 1839457, at *5 (quoting *McGinnis v. Se. Anesthesia Assocs.*, 161 F.R.D. 41, 42 (W.D.N.C. 1995)). "[A] party may not file a motion unsupported by any evidence only to spring the evidence on the opposing party at a later date." *Id.* The *Landfall Trust* Court refused to consider evidence submitted for the first time on reply. *Id.* at 5-6.[23]

*Second*, Section 1927 typically compensates parties for the discrete, direct costs of fending off vexatious tactics by, *e.g.*, opposing a frivolous motion, *see Lake*, 130 F.4th at 1070-71. That is not this case where the GD Defendants request fees from months of discovery.

*Third*, the GD Defendants' request involves at *least* "millions of dollars." Mem. 2 ("[P]laintiffs' counsel baselessly opposed the GD Defendants' motion to reconsider . . . costing the GD Defendants additional millions of dollars in fees and costs."). They apparently seek fees for nearly all the active discovery period in a case with "tens of millions of dollars" in total fees. *Id.* Assuming "tens of millions" means at least $20 million, and that GD incurred about the same percentage of their overall fees as Plaintiffs did from November 2025 to GD's dismissal, their fee request likely amounts to well more than *$10 million*. Section 1927 cannot have been intended to allow GD to wait *eight months* and then leave Plaintiffs' counsel with such an extravagant bill. None of the cases the parties have cited so far awarded fees more than $180,000.

*Fourth*, GD fails to distinguish between fees that fit their (incorrect) theory of causality from those that do not. GD has, for example, made no effort to distinguish between fees it expended solely to defend the three movants from those expended for non-movant GDIT or the Joint Defense Group generally, which GD would bear even if the moving GD parties had been dismissed. Indeed, GD requests fees for numerous tasks that did *not* exclusively involve movants, including reviewing

[23] GD also has not even tried to show that their fee *rates* are within the prevailing market rates in the relevant community as they must. *See Landfall Tr.*, 2024 WL 1839457, at *7-8.

Plaintiffs' "more than 5,000 pages of documents"; "taking 15 depositions," the vast majority of which involved non-parties who never worked for a movant; "preparing for an additional 3 depositions"; and "litigating multiple discovery motions," none of which exclusively involved the movants. Mem. 15-16. None of these represent excess costs GD would not have borne on GDIT's behalf even if Plaintiffs had dismissed the movants.[24] GD also voluntarily litigated nearly the entire case for the other nine Defendant families, arguing nearly every motion not specific to another Defendant and taking nearly every single deposition, regardless of any connection to GD. Plaintiffs' counsel may not be tagged with GD's choice to bear more than their share of the labor.

*Finally*, GD's "millions of dollars" in fees were not "reasonably incurred" as § 1927 requires. GD allowed breathtaking overlitigation of the case by its attorneys. They pursued the borderline-frivolous litigation tactics outlined above in Section I.B and, filed no fewer than four motions to compel discovery from Plaintiff Scharpf that the Court denied in whole or in substantial part.[25] At depositions of confidential witnesses who had no GD connection, GD attorneys not only took the depositions, but permitted as many as *six* attorneys to attend when other defendants typically sent one or none. *See*, *e.g.*, Pls. Exs. K-L ([redacted] Tr; [redacted] Tr.).[26]

**CONCLUSION**

The GD Defendants' motion is wrong on the facts and the law. The Court should deny it.

---

[24] Recall GDIT's liability through its purchase of a naval engineering consultancy, and that a longtime executive of that consultancy acknowledged a [redacted] among several consultancies shortly after CACI acquired the business unit. *See supra* at pp. 17-18.

[25] *See* Dkt. 315 (motion to compel additional initial disclosures); Dkt. 415 (motion to compel additional interrogatory responses); Dkt. 468 (motion to compel, among other things, settlement communications); Dkt. 529 (motion to compel, among other things, social media messages).

[26] In a footnote, GD asks the Court to consider findings in an unrelated case about a Hagens Berman attorney. Mem. 23 n.7. But a Court may not issue sanctions based on conduct without a causal link to this litigation. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017).

DATED: July 17, 2026

Respectfully submitted,

*/s/ Brent W. Johnson*
Brent W. Johnson

*/s/ Zachary R. Glubiak*
Zachary R. Glubiak (VA Bar No. 93984)

Steven J. Toll (Va. Bar No. 15300)
Brent W. Johnson (admitted *pro hac vice*)
Robert W. Cobbs (admitted *pro hac vice*)
Alison S. Deich (Va. Bar No. 87452)
Zachary R. Glubiak (Va. Bar No. 93984)
Sabrina S. Merold (admitted *pro hac vice*)
Callie C. Bruzzone (admitted *pro hac vice*)
COHEN MILSTEIN SELLERS &
TOLL LLP
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Tel: (202) 408-4600
stoll@cohenmilstein.com
bjohnson@cohenmilstein.com
rcobbs@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
smerold@cohenmilstein.com
cbruzzone@cohenmilstein.com

Shana E. Scarlett (admitted *pro hac vice*)
Rio S. Pierce (admitted *pro hac vice*)
HAGENS BERMAN SOBOL
SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com

Steve W. Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com

George F. Farah (admitted *pro hac vice*)

Nicholas Jackson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Tel: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Candice J. Enders (admitted *pro hac vice*)
Julia R. McGrath (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
cenders@bm.net
jmcgrath@bm.net

Brian D. Clark (admitted *pro hac vice*)
Arielle S. Wagner (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
bdclark@locklaw.com
aswagner@locklaw.com

Stephen J. Teti (admitted *pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
265 Franklin Street, Suite 1702
Boston, MA 02110
(617) 456-7701
sjteti@locklaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 17, 2026, a true and correct copy of the foregoing was served, via the Court's electronic filing system.

*/s/ Zachary R. Glubiak*_________
Zachary R. Glubiak (Va. Bar No. 93984)